Sean Halloran
Hartig Rhodes Hoge & Lekisch, P.C.
717 K Street
Anchorage, Alaska 99501
Phone: (907) 276-1592
Fax:    (907) 277-4352
mail@hartig.com

Attorneys for Teck Cominco Alaska Incorporated.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| GREGG CONITZ, | ) |
| | ) |
| Plaintiff, | ) |
| vs. | ) |
| | ) |
| TECK COMINCO ALASKA INC., and | ) |
| NANA REGIONAL CORPORATION, | ) |
| | ) |
| Defendants. | )  Case: 4:06-CV-00015 RRB |

## DECLARATION OF TED ZIGARLICK

I, Ted Zigarlick, make my sworn declaration as follows:

1.      I have personal knowledge of and am competent to testify to all facts set forth in this declaration.

2.      Teck Cominco Alaska Incorporated is the operator of Red Dog Mine. I am employed by Teck Cominco Alaska Incorporated as the Superintendant of Loss Control. I formerly served as Superintendent of Mining Operations. I was appointed to oversee Loss Control functions as part of the Red Dog Project's renewed emphasis on improving safety. I was one of the first employees hired by Teck Cominco Alaska to work for the Red Dog Project (Teck

Zigarlick Declaration
Conitz v. Teck Cominco, 4:06-CV-00015 RRB

Cominco Alaska was at that time named Cominco Alaska Incorporated), and I have been continuously employed by Teck Cominco since before the Red Dog Mine and DMTS port were constructed. I have extensive experience overseeing all aspects of Teck Cominco's operations.

3.      NANA Regional Corporation owns the land on which the Red Dog Mine is located, as well as the minerals that are being mined there.

4.      The Red Dog Project began in 1982, when it was agreed by NANA and a company called Cominco American that the Red Dog Mine would be developed.    Teck Cominco Alaska began participating in that Project with NANA in 1988.      The Red Dog Project is much like any joint venture.  NANA provides the land and the mineral rights, while Teck Cominco Alaska provides working capital and its operational expertise and abilities.  NANA and Teck Cominco each further contribute their efforts and knowledge through participation in the Project's management committee, which is the body that oversees and supervises the Project. The management committee is composed of twelve members, six representing NANA and six representing Teck Cominco Alaska.

5.      As compensation for its contributions to the Red Dog Project, NANA receives royalty payments and, after Teck Cominco recovers operating costs, a portion of the net proceeds from the Red Dog Project are paid to NANA.  The percentage of net proceeds accruing to NANA in any given year varies, increasing over time from 25% to 50% of the net proceeds in accordance with a regularly increasing schedule.

6.      Throughout the time that Teck Cominco Alaska has participated in the Red Dog Project, NANA has required, and Teck Cominco Alaska has agreed, that Teck Cominco Alaska will give a hiring preference to qualified NANA shareholders whenever it is employing people to

work in the Red Dog Project. I am aware that NANA requires others who team up with NANA to similarly prefer NANA shareholders.

7. Teck Cominco does not now have, and in its history has never had, any employment preference for Alaska Natives, and has never had any policy or practice, whether formal or informal, of providing any hiring or other employment preference based upon race, religion, color, national origin, sex, marital status, pregnancy, parenthood, or, except as required by the demands of the position, disability. Nor has Teck Cominco Alaska ever had any policy of discriminating based upon Alaska residency, or residency within any geographic region of Alaska. In the history of the company, the only employment preference that the company has ever applied is the preference given to qualified NANA shareholders assigned to work in the Red Dog Project. I am aware that NANA Regional Corporation has a contractual right to require that Teck Cominco adopt various hiring preferences in addition to the shareholder preference that is in effect. However, Teck Cominco has never adopted or applied any such preference.

8. The employment preference for NANA shareholders is applied only when candidates are equally qualified for a position. In that situation, NANA shareholders are preferred over non-shareholders. In a situation where the top candidates for a position are not equally qualified, no preference of any kind is given to any candidate.

9. Mr. Gregg Conitz began employment with Teck Cominco at Red Dog in 1990 as an Oiler in the Mill Maintenance Department. In 1995, he transferred to the Mine Operations department as an apprentice equipment operator. At the time of his transfer, and as a result of my own observations of his performance, I know that his ability to perform as an equipment operator was substandard for his rated Level. It took Mr. Conitz five years as an equipment operator to achieve journeyman, or "Level 6" status, and he continues to be employed as a Level 6 Operator

today. Mr. Conitz's performance has improved over time, but is still not above average with respect to any of the equipment he operates.

10.  When one of Teck Cominco's shift supervisors in the Mine Operations department drowned in a boating accident in June, 2004, it became necessary to hire a replacement. From then until April 2005, Teck Cominco appointed several individuals, including each of the Teck Cominco employees who eventually applied for the job, to serve as an acting supervisor in that position, in order to take advantage of the opportunity to observe the performance of each of the individuals and assess their suitability for the job. I was Superintendent of Mine Operations at that time. I determined that Mr. Larry Hanna was the best qualified applicant, and with the approval of the General Manager, I promoted Mr. Hanna to fill the mine shift supervisor position.

11.  Mr. Hanna was superior to all other applicants, including Mr. Conitz, because he had experience working at the DMTS Port, experience working in Mill Operations, experience working as an operator in Surface Operations, experience serving as a relief supervisor in Surface and Mine Operations, and experience working as an operator/trainer in Surface, Mine and Port Operations. Mr.Hanna's experience provided him with greater breadth and with more training and supervisory experience than any of the other candidates. On the other hand, I felt that Mr. Conitz's job performance, particularly with respect to safety, made him unsuited to serve as an example for others to follow.

12.  Prior to promoting Mr. Hanna, I obtained input from Mr. John Kells as to the suitability of the various candidates for the mine supervisor position. Mr. Kells is no longer a Teck Cominco employee, but at that time he worked under my supervision as a mine general foreman. Mr. Kells suggested to me that Mr. Conitz should be promoted instead of Mr. Hanna. I

rejected his recommendation. Based upon derogatory remarks that I have heard Mr. Kells make about Alaska Natives, and based upon Mr. Conitz's inferior qualifications for the job in comparison to Mr. Hanna and each of the other candidates, I believed then and continue to believe now that Mr. Kells' recommendation was primarily based on racial prejudice in favor of white people. Mr. Kells justified his recommendation by asserting that Mr. Conitz had been assigned to the Mine Operations department longer than Mr. Hanna had. However, I believe that the length of time spent working in any one particular department has little or no relevance to the degree to which a person is qualified for a supervisory job. Of much greater importance is the person's safety and disciplinary record, their overall understanding of all aspects of the Red Dog Project's operations, their attitude, their organizational skills, their problem solving skills, and their interpersonal and communication skills. Mr. Hanna had demonstrated abilities with respect to each of these factors, and had also shown proficiency with respect to the other skills and competency areas identified in the Job Profile for the position at issue, while Mr. Conitz was substantially less qualified.

13. During the time that I was evaluating applicants for the shift supervisor position, Mr. Kells approached me and expressed his belief that any hiring preference given to NANA shareholders was improper under U.S. laws. I let him know that the company's shareholder preference policy had been litigated and found to be in compliance with law by the State's Human Rights Commission. I also explained to him that NANA requires Teck Cominco to favor NANA shareholders, and that Teck Cominco would not deviate from its shareholder preference policy in any situation where application of the policy was warranted.

14. During the time that Mr. Kells worked for Teck Cominco, there were several occasions when it was necessary to counsel him to not allow his racial prejudices to interfere

with the performance of his duties. Specifically, it was necessary to remind him to treat

individual employees with respect and to not type-cast people or make generalizations about

"those Natives" or "those people".

15. When I selected Mr. Hanna to become a Mine Operations shift supervisor, no

hiring preference of any kind was given to him. He was the vastly superior candidate based on

his qualifications and experience, and my observations of his performance.

16. An opening for a Mine Operations trainer was originally posted on December 2,

2004, and scheduled to close on December 22, 2004. Because of operational concerns driven by

international metals prices, the targeted starting date was moved back from January 2005 to June

2005, and the application period was similarly extended. At the same time, and as part of an

overall evaluation of Red Dog operations, the name of the position was changed from "Mine

Operations Trainer" to "Mobile Equipment Trainer". By the time that applications were closed

in May 2005, the applicant pool consisted of the four individuals that were unsuccessful

applicants for the mine shift supervisor position. I selected Mr. Mike Baker as the successful

candidate.

17. Mr. Baker was originally hired by Teck Cominco at Red Dog on April 26, 1993 as

a Level III Equipment Operator for the Mine/Surface Department. He progressed rapidly and

obtained Level VI (journeyman) status on December 5, 1995. Level VI was the highest level

achievable at that time in the Mine/Surface Operations Dept. Mr. Baker consistently

demonstrated that he adapted well to new equipment and met all challenges of the job. He

operated all sizes of equipment, and had demonstrated competency with all equipment except for

production drills, which were not available to him in the Mine/Surface progression. Mr. Baker

successfully served as an acting supervisor on many occasions from April 1995 forward, and

proved to be quite proficient when assigned to assist and train lower level operators. Mr. Baker had no reported incidents/accidents from April, 1993 when he was originally hired through the time he was promoted in December, 1996. He was promoted to mine supervisor on December 17, 1996 for a very short period of time, until his position was redefined as a mobile equipment trainer effective January 1, 1997. As a trainer, Mr. Baker was required to manage and maintain equipment training files, perform operator training and all other associated tasks of the job. Mr. Baker obtained MSHA certification as a trainer, and in April 1998, he completed a formal course of training entitled "Train the Trainer" which was developed specifically for the mining industry to further enhance the training skills of persons holding positions like the one that he held. At Red Dog Mine, Mr. Baker was instrumental in developing a competency based training program for all mobile equipment operations. In this regard, Mr. Baker identified all tasks associated with particular jobs and set standards to be met in training operators to perform those tasks properly. He worked as a trainer until he resigned his position effective April 28, 1999, when he left to further develop a regional airline serving Northwest Alaska that was his family-owned business.

18.     As a former trainer for Teck Cominco Alaska seeking to return to his former position in 2005, Mr. Baker was highly qualified. I chose him as the successful candidate due to his exemplary safety record; his experience in Surface Operations, Materials Management and Mine Operations; and his qualifications and outstanding past performance both as a trainer and as a developer of training programs. Mr. Conitz, on the other hand, had a poor record with respect to safe mobile equipment operating practices over many years of operations (between 1995 and 2004, he averaged nearly three safety incidents/accidents per year), had no prior experience as an equipment trainer that I am aware of, and had no formal training as a trainer. In sum, I felt that Mr. Baker was well qualified for the position while Mr. Conitz was not qualified at all.

Zigarlick Declaration
Conitz v. Teck Cominco, 4:06-CV-00015 RRB

19.     No hiring preference of any kind was given to Mr. Baker when he was re-hired as a mobile equipment trainer. He was the vastly superior candidate based on his qualifications and experience.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

DATED this _15_ day of November, 2007.

_[signature]_
Ted Zigarlick

CERTIFICATE OF SERVICE

I hereby certify that on the _____ day of November, 2007
a true and correct copy of the foregoing was served
on Kenneth Covell & Thomas Daniel by electronic
means through the ECF system as indicated on
the Notice of Electronic Filing.

Hartig Rhodes Hoge & Lekisch PC