Kenneth Covell
LAW OFFICE OF KENNETH COVELL
712 Eighth Avenue
Fairbanks, AK  99701
Phone: (907) 452-4377
Fax:     (907) 451-7802
Email:  kcovell@gci.net

Attorney for Plaintiff

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA AT FAIRBANKS

GREGG CONITZ,

      Plaintiffs,

vs.

TECK ALASKA INCORPORATED,

      Defendant.

Case No. 4:09-cv-20 RRB

## MOTION FOR INJUNCTION AND JURY INSTRUCTION

## INTRODUCTION

1) "It is undisputed that the overriding purpose of Title VII is to require employers to treat each employee (or prospective employee) as an individual, and to make job-related decisions about each employee on the basis of relevant individual characteristics, so that the employee's membership in a racial, ethnic, religious, or sexual group is irrelevant to the

decisions." *Manhart v. City of Los Angeles, Dept. of Water and Power*, 553 F.2d 581, 585 (9th Cir. 1976) (emphasis added).

2) 42 U.S.C. §2000e-2(a)(2) makes it an unlawful practice for an employer "…to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin."

3) Teck has a policy favoring Alaska Native/NANA Shareholders in the workplace. NANA shares are not freely alienable. Conitz cannot obtain NANA shares because he is white and of European national origin.

4) Because Conitz is being denied equal employment opportunity, such a practice would not pass the "simple test" of Title VII discrimination. Teck treats Conitz in a manner which but for his race or national origin would be different. *Newport News Shipbuilding and Dry Dock Co. v. E.E.O.C.,* 462 U.S. 669, 682-83, 103 S.Ct. 2622, 2630-31 (1983). His status as an employee is adversely affected by the preference. He is classified differently than others (distinguished) because he is white.

5)  A shareholder preference, where shareholders are determined based on their immutable characteristics, has already been examined by the Ninth Circuit. The Ninth Circuit has said that such a shareholder preference violates Title VII because the plans effect is to discriminate against the plaintiffs with respect to their employment because of Plaintiff's race, color or national origin. *Bonilla v. Oakland Scavenger*, 697 F.2d 1297, 1303-04 (9th Cir. 1982).

6)  No special Indian exception or any other special exception excuses the racially discriminatory policy of Teck. It must be enjoined.

## "SIMPLE TEST"/FACIALLY DISCRIMINATORY/ETC.

The "simple test" applies in this instance of a "facially discriminatory" policy. An employer's action can run afoul of statutes prohibiting invidious discrimination in two fundamentally different ways. The first occurs when the employer explicitly classifies or distinguishes among persons by reference to such criteria as sex, religion or ancestry, which has been determined an improper basis for differentiation. Such action is often termed "facially" discriminatory. All such discriminations are unlawful, unless sufficiently accounted necessary to the accomplishment of legitimate objectives. *De La Cruz v. Tormey*, 582 F.2d 45, 49-51 (9th Cir. 1978).

The "simple test" for discrimination stated in *City of Los Angeles, Dept. of Water and Power v. Manhart,* 435 U.S. 702, 98 S.Ct. 1370 (1978) *(LA Water)* is that there would be discrimination when '…the evidence shows "treatment of a person in a manner which but for the person's [race or national origin] would be different."' *LA Water* at 711, 1377.

The *LA Water* reference is most descriptive of a theory of facial discrimination in which inequality of treatment is at issue.

> An employment practice that requires…individuals to contribute more money into a fund than…other employees simply because each of them is a woman, rather than a man, is in direct conflict with both the language and the policy of the Act. Such a practice does not pass the simple test of whether the evidence shows "treatment of a person in a manner which but for that person's sex would be different." It constitutes discrimination and is unlawful unless exempted by the Equal Pay Act of 1963 or some other affirmative justification.

> *LA Water* at 711, 1377.

Teck's workplace preference does not pass the "simple test." Conitz's classification and treatment would be different if he were a Native of the NANA Region.

The preference is racially discriminatory and must be enjoined.

## WHAT'S NEW

Two issues have become clearer due to the extensive briefing in this case. Firstly, the racial character of the preferred group is not the question. Rather, the question focuses on whether an individual is being treated differently, but for his race or national origin. This is discussed below under the sub-heading "Backward Analysis."

In addition, the composition of the favored class is actually more restrictive than previously discussed. The shareholder preference is limited to those shareholders that have voting rights. Non-Natives are restricted from having voting rights. Shareholders with voting rights are only Natives, descendants of Natives and, to a limited extent, spouses of Natives. This is discussed below under the sub-heading "Voting Rights."

## SOME OF TECK'S POSSIBLE DEFENSES

The defense that might have seemed to be the best would be the 42 U.S.C. §2000e-2(i) exception to Title VII (also known as the "703(i)" Indian preference exception). The Indian preference does not apply because there are no reservations in Alaska. Teck does not have a publicly announced policy; and even if Teck were exempt under Title VII by the Indian preference exemption [or §1626(g)], 42

U.S.C. §1981 and AS 18.80.220 would still apply. This defense is foreclosed under *Malabed v. North Slope Borough*, 335 F.3d 864 (Alaska 2003).

Also discussed is Defendant's frequent resort to the 43 U.S.C. §1626(g) exemption. However, this requires NANA to own twenty-five per centum of the equity of Teck. NANA owns nothing of Teck, as is disclosed in the Corporate Disclosure Statements in this case, and in the appellate briefs. *See*, Exh. A, consisting of Conitz I, Doc. 5, Conitz II, Doc. 6, Teck Brief, p. ii, and NANA Brief, p. i.

Conitz reminds the Court that the focus should be on whether Conitz is being discriminated against because he is white, not whether the favored group consists of one, or multiple races.

The §703(i) and §1626(g) defenses are affirmative (justifications) and would need to be pled and proven by the defendant. The defenses have not been pled or proven by Defendant(s).

## PRIOR DECISION
## (CONITZ I, 4:06-cv-15 RRB)

This Court decided that such a preference was legal because it was "based on the permissible distinction of shareholder status rather than race." Conitz I, Doc. 145 at 4.

The word "shareholder" appears nowhere in *Morton v. Mancari,* 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974).

Conitz takes this to mean that the court found the shareholder status was a "political" distinction. The Court cites to *Morton v. Mancari*, 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974), *Doe v. Kamehameha Schools/Bernice Pauahi Bishop Estate*, 470 F.3d 827 (9th Cir. 2006) (*en banc*)[1] (W. Fletcher, concurring), and *Alaska Chapter, Associated General Contractors of America, Inc. v. Pierce,* 694 F.2d 1162 (9th Cir. 1982) *(AGC)*. The *Mancari* and *AGC* cases are permissible "political" discrimination cases. *Kamehameha* is not. *Kamehameha* is the application of an "Affirmative Action" program in an educational setting under a 42 U.S.C. §1981 theory. It appears that the court, in citing to *Kamehameha*, is relying upon the minority concurring opinion, which finds that the discrimination is "political" and therefore, not illegal. The minority concurring opinion is not law. This is an employment case, not an education case. Even if the minority concurring opinion were law, it would not apply in an employment case.

The Conitz I decision is wrong because it relied upon a minority opinion for its authority.

---

[1]     Please note that pages 850-857 are in the concurring minority opinion of the court.

The Court misinterpreted *Morton v. Mancari*. *Mancari* involved the interpretation of a federal statute authorizing a preference for Indians. The federal government exercised a preference for Indian employees within the Bureau of Indian Affairs (BIA). The Supreme Court found that pursuant to a federal statute, the BIA was acting in furtherance of Indian self-government. None of the factors in *Mancari* are present in the Conitz case.

The NANA "Shareholder preference" at Teck is illegal under anti-discrimination laws.

Under the controlling authority of *Bonilla v. Oakland Scavenger Co.*, 697 F.2d 1297 (9th Cir. 1982), the Court should find that:

> To the extent that preferential wages, hours and job assignments are tied to ownership of Company's stock, the shareholder preference plan violates Title VII because the plans effect is to discriminate against [Plaintiff] with respect to [his] compensation, terms, conditions or privileges of employment because of [his] race, color or national origin.
>
> *Oakland Scavenger* at 1303-1304.

## **FACTS**

Conitz is employed by Teck Cominco Alaska, Inc. as a Mine Operations Operator, Level Six. *See* in Conitz I, Doc. 173-7, p. 6, ln. 6-7 and Conitz I, Doc.

58, p. 2-3, para. 9. The Teck mine is located in the Northwest Arctic Borough in Northwest Alaska. Teck is a Canadian company which leases ground from NANA, an Alaska Native corporation, 43 U.S.C. §1606(a)(3), 43 U.S.C. §1629(a)(3). Conitz I, Doc. 14, p. 2. Teck gives preferences in employment to NANA Shareholders.[2] Conitz I, Doc. 104, p. 2. *See* also Declaration of Gregg Conitz I, Declaration of Gregg Conitz II, and Declaration of Gregg Conitz Concerning Ethnicity.

Teck and NANA's corporate disclosure statements prove that NANA owns nothing of Teck. *See* Exh. A.

The Northwest Arctic Borough and the NANA Region have coextensive boundaries. The region is over ninety percent Alaska Native. *See* Conitz I, Doc. 64-12, p. 2. Conitz is white and not an Alaska Native or a NANA Shareholder. *See*

---

[2] The extent of the preference (rather than the existence of the preference) may be a matter that is in dispute. The defendants, in depositions, admit that, all other things being equal, a shareholder will be preferred. This limited preference is belied by written materials of both Teck and NANA. "The first preference for all mine jobs is to go to NANA Shareholders." *See* in Conitz I, Doc. 64-15, p. 4 and Doc. 64-11, p. 2-3. The extent of the preference is immaterial to the question of law of whether any shareholder preference at the Teck mine is illegal. (The mere existence of such policy is a violation of 42 U.S.C. §2000e-2(a)(2) and AS 18.20.220(a)(3).)

Declaration of Gregg Conitz Concerning Ethnicity. He is a minority in the region. Conitz I, Doc. 173-7, p. 6, ln. 6-7.

Conitz has applied for various positions and those positions were awarded to Alaska Native/NANA Shareholders. Conitz I, Doc. 173-7, p. 6-7.[3] Conitz Declaration of Gregg Conitz I, p. 2, para. 8, p. 3-4, para. 15-16, p. 5, para. 21, 24, 26, p. 6, para. 29, p. 7, para. 34, p. 10, para. 42, p. 10-11, para. 44, and p. 14, para. 58.

NANA shares are not freely alienable. 43 U.S.C. §1606(h)(1)(B). The only way to get NANA shares is to be an Alaska Native of the Northwest Region by birth, ancestry, adoption, or marriage. *See* 43 U.S.C. §1606(h)(1)(B) *et. seq.* Furthermore, if shares go to a non-Native, there are various methods to recapture the shares, e.g. escheat, purchase. 43 U.S.C. §1606(h). You cannot call your broker and say, "Get me 100 shares of NANA."

Conitz has been told that Teck had a shareholder preference and that to the extent feasible, there would be one-hundred percent shareholder hire at the Teck

---

[3]   Teck may assert that Mike Baker is not an Alaska Native by one-quarter blood quantum. Regardless he is an Alaska Native by ancestry. Conitz I, Doc. 58, p. 4, para. 16.

mine. Conitz I, Doc. 173-7, p. 37-38. *See* also Declaration of Gregg Conitz I, p. 2, para. 8.

### What Conitz Did

Conitz went to work in the Teck Cominco mine with mill maintenance as a level four oiler on April 9, 1990. Conitz I, Doc. 173-7, p. 9, ln. 12-17. Approximately three or four months thereafter, he was transferred to a job called PM man, which is an oiler but with other associated duties. He was then promoted to a level six position. He stayed in that position for about five years. Thereafter, he transferred to the mine department as a level three operator around 1995. Conitz I, Doc. 173-7, p. 9-10.

The mine department superintendent, Mr. Jim Greenhall, assured Gregg Conitz that he would be allowed to progress within the mine operations department on a fair and equal basis without a hiring preference given to Alaska Native/NANA Shareholders. Conitz I, Doc. 48, p. 3, para. 9. Over the next five years, he progressed to a level six operator. Conitz had been with the mine for approximately sixteen years, when he brought his lawsuit. Conitz I, Doc. 173-7, p. 9-10. *See*, generally, Declaration of Gregg Conitz I, para. 13-50.

**The Progression of Conitz**

In August 1999, Conitz began working as a relief supervisor. Conitz was cut off from his relief supervisor duties after he filed his EEOC complaint concerning the issues in this case.[4] Conitz I, Doc. 173-7, p. 20, ln. 9-11.

Conitz had prior mining experience. Conitz worked for Alaska Gold in Nome from 1982 until he went to work at Teck in 1990. He began at Alaska Gold as a laborer and worked his way up to a "winch man," which is the operator of the gold dredge, and in charge of a crew of four that ran the gold dredge. Prior to that, he worked for a mine in Idaho at the Golden Gate Mine. Conitz I, Doc. 173-7, p. 27-32. See Declaration of Gregg Conitz I, para. 14-49.

Conitz was initially assigned to duties as Acting Supervisor in December 1999. After filing complaints with the EEOC and the Alaska State Commission for Human Rights, he was deliberately excluded from his former duties as Acting Supervisor from March 2006 to January 2008. At the time, Mr. Barger had approximately five years of mining work experience and no previous supervisory experience. *See* Declaration of Gregg Conitz I, para. 33, filed herewith.

---

[4] Conitz did work again as a relief supervisor between late January 2008 and late July 2008.

On or about March 2, 2006, Conitz went for one week of vacation and his regular R&R. When Conitz returned to work on or about March 23, 2006, he found that he had been replaced as an Acting Supervisor by Charles "Chuck" Barger, an Alaska Native/NANA Shareholder. At the time, Mr. Barger had approximately five years of mining work experience and no previous supervisory experience. Conitz was never told by anyone in management why he had been excluded from Acting Supervising; nor did anyone give him a reason why Mr. Barger had replaced him as Acting Supervisor. *See* Declaration of Gregg Conitz I, para. 34.

On or about September 1, 2007, Conitz applied for the opening for Mine Operations Supervisor, which had been vacated by Larry Hanna. Jim Baldwin, an Alaska Native/NANA Shareholder, was given the position on or about November 23, 2007. Jim Baldwin was less qualified for the position than Conitz. Larry Hanna, who made the decision of Jim Baldwin for his replacement as Supervisor, had only been in the Mine Operations Foreman position since on or about August 26, 2007. Conitz was excluded from Acting Supervising during this entire time period. *See* Declaration of Gregg Conitz I, para. 42.

On or about January 28, 2008, Mr. Hanna reinstated Conitz to the Acting Supervising position. By this time, Mr. Baldwin had been promoted to Supervisor and Mr. Barger was firmly established as a full-time Acting Supervisor and was

regularly assigned to these duties. After Conitz was reinstated to Acting Supervisor, Mr. Barger was always given preference for the position when Barger and Conitz were on the same shift. During the period of Conitz's exclusion from Acting Supervisor, Marvin Jackson and Darold Sun, both Alaska Native/NANA Shareholders, were used as Acting Supervisors. They were also always given preference for the role of Acting Supervisor when either of they and Conitz were on the same shift, after Conitz was reinstated to Acting Supervisor. *See* Declaration of Gregg Conitz I, para. 43.

### Baldwin/Barger

In this case, Conitz alleges that he was similarly discriminated against in September 2007 when he was passed over for a promotion in favor of Jim Baldwin, an Alaska Native/NANA Shareholder. He also alleges that he was discriminated against on July 25, 2008, when he was passed over for a promotion in favor of Charles Barger, an Alaska Native/NANA Shareholder. In both instances, Conitz claims as he did in Conitz I, that he was the best qualified candidate.

### 1982 Contract

A 1982 contract between Cominco, Teck's predecessor, and NANA requires Teck to give a preference to NANA Shareholders in employment, to the extent

permissible by law. Conitz I, Doc. 64-10, p. 4-11. Conitz works for Teck, not for NANA.

The stated goal of Teck Cominco is to have a one-hundred percent NANA "Shareholder" workforce.[5] Conitz I, Doc. 64-11, p. 5. NANA Shareholders are defined as "Natives of the NANA Region". *See* the 1982 Agreement at Conitz I, Doc. 64-10, p. 5. Almost all, if not all, NANA Shareholders are Alaska Natives. Conitz I, Doc. 145 at 4. The NANA Shareholder preference is part of the agreement between Teck and NANA. Conitz I, Doc. 64-10, p. 2-3.

Despite Teck's characterization of it as a preference only when candidates are equally qualified, the President and CEO of NANA Corporation, Marie Green, states that it is a one-hundred percent NANA Shareholder preference even for non-Teck employees over experienced Teck employees. *See* Letter from Marie Green., attached as Exh. B. *See* also Covell Affidavit, filed herewith.

---

[5]   Teck says that they only exercise a preference when candidates are equally qualified. They do not say that whether candidates can meet the minimum qualifications with a reasonable amount of on-the-job training and within a reasonable amount of time are "equally qualified" with candidates who already experienced and fully capable of performing the job, presently. Even if they deny such conduct, given the fact that they claim their policy, (even though not written down), is well known around the property; such position is totally contrary to their written materials and in the 1982 contract. They simply cannot be deemed credible on that issue.

## Not Joint Venture

The relationship between NANA and Teck is not a joint venture.  Teck and NANA are both corporations. The relationship between them is contractual.  *See* Corporate Disclosure Statements, Exh. A.

Teck characterizes the contract as a development and operating agreement between NANA Regional Corporation and Cominco American, Inc. Conitz I, Doc. 14, p. 4. It is not a joint venture.)

## KELLS' FACTS[6]

─────────────────────

[6]
### NEW HAVEN FIREFIGHTERS

The Conitz I Court's decision directly conflicts with *Ricci v. DeStefano*. In that case, the United State Supreme Court reviewed a testing procedure.

Ricci says that where a merit "testing procedure" is put in place and then abandoned for a race-conscious one, such action is (direct) racial discrimination and violates the employees' legitimate expectation not to be judged on the basis of race. *Ricci* at 2677, 2681.

In Conitz's case, the employer was going to try out multiple employees. John Kells, the Mine General Foreman, was going to select the most qualified person for the position. Exh. C, p. 8-10, p. 13, ln. 6-12. Instead, after testing, Defendant changed the criteria to a race-based selection method and told Kells to select a NANA Shareholder. Exh. C, p. 15, ln. 10 – p. 16, ln. 8. *See* also, Appellee's (Red) Brief at p. 8-10, where Teck acknowledges the testing procedure but denies Kells as the decision maker.

Kells' testimony, if believed by the trier of fact, would show Conitz's case to be a disparate treatment case, identical to *Ricci*.

Teck claimed in Conitz I that Conitz was not promoted because of a poor safety record. Appellee's (Red) Brief at 10. This is not true. *See* Kells Deposition, attached as Exh. C, p. 17, ln. 9-11, p. 18, ln. 23, and p. 23, ln. 1 - p. 24, ln. 21. [Where Kells discusses incident reports not necessarily reflecting an operator's safety abilities].

John Kells was the Mine General Foreman. Conitz I, Doc. 125-6, p. 9, ln. 25 - p. 10, ln. 1. In 2004, a supervisor, Leo Thomas, died and Conitz expressed interest in the position. Kells and Ted Zigarlic discussed the position and they decided to give three or four individuals an opportunity to actually try out the position, in order to see how they performed. Exh. C, p. 9, ln. 25 – p. 10, ln. 14. Kells carefully evaluated the candidates, and selected plaintiff, Gregg Conitz, for

--------

*Ricci v. DeStefano* is an especially relevant model showing that Conitz has made out a case of direct discrimination. Appellant's (Blue) Brief at 50–56. This court needs to rule on the illegitimacy of Teck's race-conscious defenses.

The parties were told that merit was the testing parameter and were ranked accordingly. Thereafter, the list was disallowed because it did not achieve the desired racial balance.

Conitz was told what the testing procedure would be. Kells would test out the employees in the position of supervisor then select the best qualified. Kells picked Conitz; and thereafter, was told that he had to select an Alaska Native/NANA Shareholder. Exh. C, p. 15, ln. 10-20. This is nothing more than a race-based qualification, and directly contrary to the United States Supreme Court's decision in *Ricci v. DeStefano*.

the job. Kells told this to Zigarlic and Zigarlic said, "Okay, I'll tell Rob," meaning Rob Scott, the Mine General Manager. Exh. C, p. 13, ln. 17-23. Kells was later told that they could not give the promotion to Mr. Conitz because of the Alaska Native/NANA Shareholder preference. Conitz I, Doc. 125-7, p. 2. Mr. Kells had a lengthy discussion with both Mr. Zigarlic and Mr. Scott about this matter. They did not discuss the merits of the qualification of the candidates but only discussed the preference. Zigarlic and Scott showed Kells a copy of what apparently was the 1982 agreement. Exh. C, p. 15, ln. 10 – p. 16, ln. 8.

Kells had selected Conitz for the job and then he was told that:

> …we were to select Larry Hanna. And I do not recall we--ever discussing qualifications at that time. The discussion centered on the shareholder preference. And I don't recall all the details of the conversation, but I clearly remember saying I don't think this is legal in the United States.

> *See* Exh. C, p. 15, ln. 12-18. Please read the entire Kells Deposition Excerpts attached at Exh. C.

## DISCUSSION

Conitz's position is that Teck's Alaska Native/NANA Shareholder preference is an intentional violation of 42 U.S.C. §2000e-2(a)(2) and directly actionable under 42 U.S.C. §2000e-2(a)(2), not requiring any analysis under

disparate impact or disparate treatment.[7] This is direct discrimination.[8] However, even if that were disparate impact/ disparate treatment, the preference in itself it would constitute an "adverse effect," or injury, under Title VII. It is a *per se* violation of Title VII to have an official policy in violation of Title VII.

> …segregated dormitories and eating facilities in the workplace may be challenged under 42 U.S.C. §2000e-2(a)(2) without showing a disparate impact on hiring or promotion.
>
> *Wards Cove Packing Co., Inc. v. Atonio*, 490 U.S. 642, 655, 109 S.Ct. 2115, 2123, fn. 9 (1989).

## INJUNCTIVE RELIEF

Teck's shareholder preference policy segregates or classifies people based upon their race or national origin. Such policy is a violation of 42 U.S.C. §2000e-2(a)(2) and AS 18.80.220(a)(3).[9] This policy violates these statutes, as a workplace permeated with unwelcome intimidation, ridicule or insult, based on Plaintiff's

---

[7] "Section 2000e-2(a)(2) of Title VII has no intent requirement." *Nashville Gas Co. v. Satty*, 434 U.S. 136, 139-41, 98 S.Ct. 347, 350 (1977).

[8] *See* section titled "A Different Kind of Animal". *See* also "Continuing Violation Doctrine" section, comments on *Morton v. Mancari* and the Court's Order, Conitz I, p. 21-22, and section titled "Evidence of a Guilty Mind."

[9] Alaskan statutes forbid the use of racial hiring preferences. AS 18.80.220(a)(3). *United States v. Bishop*, 959 F.2d 820, 826 (9th Cir. 1992).

membership in a protected class that is sufficiently severe or pervasive to create an abusive work environment. *Harris v. Forklift Systems, Inc.,* 510 U.S. 17 (1993).

Conitz is entitled to have Teck's racially discriminatory policy enjoined, e.g. *See, LA Water* at 584.

**Law**

In *Bonilla v. Oakland Scavenger*, 697 F.2d 1297 (9th Cir. 1982), the Court found that any shareholder preference that uses immutable characteristics to limit those permitted to be shareholders is racial discrimination. It does not pass the "simple test."

Conitz's situation is no different from a lunchroom with a sign that says, "We prefer whites to black." Such a situation must be enjoined.

In *Bonilla v. Oakland Scavenger Co.,* 697 F.2d 1297, 1302-1303 (9th Cir. 1982), *cert. denied, Oakland Scavenger Co. v. Bonilla,* 467 U.S. 1251, 104 S.Ct. 3533, 82 L.Ed.2d 838 (1984), a garbage hauling company had been owned since 1909 by persons of Italian ancestry. As time went on, the company began to hire non-Italians. However, only Italians could obtain shares in the company and the Italians were given preference in employment. Were the stock alienable the Court might have agreed that such a plan was neutral on its face.

We reject the company's argument that it its legitimate interest in protecting its family members overrides the countervailing national interest in eliminating employment discrimination based on race and national origin. To the extent that the preferential wages, hour, and job assignments are tied to ownership to the company's stock, the shareholder preference plan violates Title VII because the plan's effect is to discriminate against [plaintiff] with the respect [their] compensation, terms conditions or privileges of employment because of [their] race, color… or national origin.

*Bonilla* at 1303-1304. [10]

Try as they might, Bonilla could not become Italian and Conitz could not become an Alaska Native. As a matter of law, under the ruling of *Bonilla*, Teck's Alaska Native/NANA Shareholder preference plan violates Title VII. It does not pass the "simple test." The Court should so rule.

----

[10]    [*Bonilla*] is an unusual disparate impact case because it alleges a violation of §703(a)(1)…..Disparate impact…has been developed in cases alleging violations of §703(a)(2): discrimination with respect to "employment opportunities or…status as an employee."

   *Wambheim v. J.C. Penney Co., Inc.*, 705 F.2d 1492 (1983).

*Wambheim* acknowledges that there are unique and lawful applications of the Title VII statutes. It specifically notes that the ruling in *Bonilla v. Oakland Scavenger* was not specific about considering whether it was a §703(a)(2) or a §703(a)(1) [§2000e-2(a)(2) or §2000e-2(a)(1)] claim.

*Wambheim* concurs that *Bonilla* is controlling authority as to this 42 U.S.C. §2000e-2(a)(2) action.

## CONITZ I DECISION

## The *Mancari* "Political" Exception Does Not Apply

*Morton v. Mancari* involved an employment preference within the Bureau of Indian Affairs. *Morton v. Mancari* spawned the "political" classification language.

The Conitz I Court's ruling is mistaken. The Trial Court reached the question of the legality of the Alaska Native/NANA Shareholder preference. Conitz I, Doc. 145 at p. 4. Judge Beistline found that the "shareholder hiring preference is not prohibited by law because it is based on a permissible distinction of shareholder status rather that race." Footnoted thereto was *Morton v. Mancari* and the *Doe v. Kamehameha en banc* opinion, as well as *Alaska General Contractors v. Pierce,* 694 F.2d 1162 (9th Cir. 1982). None of those authorities supports the Court's position.

If the preference for NANA Shareholders discriminates against an individual because of their race or ancestry, then the preference is prohibited.[11]

---

[11]  *Rice v. Cayetano*, 120 S.Ct. 1044 (2000).

The Court found that a shareholder preference in favor of Alaska Natives was permissible "political favoritism" under *Morton v. Mancari*, 417 U.S. 535, 94 S.Ct. 247, 41 L.Ed.2d 290 (1974). [12]

The *Mancari* "political" exception was found pursuant to a federal statute. *Mancari* at 555. Since Teck does not have the shelter of any federal statutes, be it §1626(g) or §703(i), there simply is no *Mancari* exception. *Mancari* was considered *sui generis*. In other words, BIA is one-of-a-kind. The *Mancari* exception has never been applied anywhere without the benefit of a federal statute.

## Mistaken Analysis

The thread of the Court's logic in reaching its conclusion appears that it reaches a tentative assumption that there is a racial classification. Conitz I, Doc. 145, p. 4. Then, based on that, it considers whether or not there is a special Indian exception. It then says that the classification of shareholders is "political" and therefore permissible; and then goes back and "bootstraps" its own decision by saying that since there might be a few shareholders who are not Native, the shareholder classification is not a proxy for race.

---

[12]  The concurring opinion in *Kamehameha* is not law.

The problem with this analysis is that once you decide that "shareholder" is a racial classification, it cannot be undone. Either it is "political" or it is not. If it is not "political" then it is racial discrimination.

### Conitz I Ruling
### Further Comment

The Court cites to *Alaska General Contractors v. Pierce,* 694 F.2d 1162, 1169, fn. 10 (9th Cir. 1982) (*AGC*). Conitz I, Doc. 145, p. 4, fn. 7. *AGC v. Pierce* dealt with a Federal Government policy requiring an Alaska Native subcontractor preference in building Indian housing. *AGC* at 1163 (Pierce was the secretary of HUD). The Court in *AGC* found that the plain language of the statute of §7(b) of the Indian Self Determination Act [25 U.S.C. §450e(b)] provided for a preference to the benefit of Indians in construction of housing. *AGC* at 1165. Congress has a special obligation to Native Americans. If Congress, under its duty to Native Americans, grants a special reference to Native Americans, then such classification will be deemed "political" rather than a racial classification, even though race criteria is used in defining who is an eligible Indian. *AGC* at 1167. The unique status between the Federal Government and Indians arises from two sources, both the Indian Commerce Clause and the Treaty Power Clause. Art. 1, Sec. 8, cl. 3 and Art. 2, Sec. 2, cl. 2. *AGC* at 1165, referring to *Mancari. Id.* Additionally, a

guardian ward relationship arose between the Federal Government and the Indian tribes because of their subordination of their sovereignty. *AGC* at 1168.

The special relationship of Congress to Indians plays no role in this case.

Bald-faced recitation by the Defendant that classification is "political" rather than racial says nothing. Indeed, it immediately makes the classification racial. Clearly, by claiming a "political" classification, the defendant(s) admit their class of shareholders really is a class of "Alaska Natives" or "Native Americans." The actions of Teck, a private, non-Native corporation, have nothing to do with Congress' special obligation to Indians. Therefore, all that the defendant is saying is that its categorization of NANA Shareholders is, indeed, a racial categorization. It does not afford any special protection.

*AGC* succinctly states what a "political" classification is:

> *Mancari* simply held that, as long as a special treatment is rationally related to Congress' unique obligation toward the Indians, the preference would not violate equal protection. If the preference, in fact, furthers Congress' special obligation, then *fortiori* it is a "political" rather than a racial classification, even though racial criteria may be used in defining who is an eligible Indian.

> *AGC* at 1168.

Conversely, if Congress did not do so, then such discrimination is racial discrimination.

Congress alone regulates Indian authority. *U.S. v. Lara*, 541 U.S. 193, 124 S.Ct. 1628 (2004).

### *Dawavendewa v. Salt River Project*, 154 F.3d 1117 (9th Cir. 1988)

In *Dawavendewa,* the Salt River Project had an employment preference for Navajos for a project on the Navajo reservation. Dawavendewa, a Hopi Indian, challenged this proposition.

There, the Ninth Circuit said:

> *Salt River* does not contend that the different Indian tribes are not "nations" for Title VII purposes. Rather, it relies on *Morton v. Mancari,* 417 U.S. 535, 552-554 (1974) for the proposition that employment preferences based on tribal affiliation are based on political affiliation rather than national origin and are thus outside the realm of Title VII…. *Morton* did not involve a claim of discrimination based on membership in a particular tribe. In fact, in *Morton* no claim was made of any violation of Title VII. *Morton* simply held that the employment preference at issue, though based on a racial classification, did not violate the Due Process clause because there was a legitimate non-racial purpose underlying the preference: the unique interest the Bureau of Indian Affairs had in employing Native Americans, or more generally, Native Americans' interests in self-governance -- interests not present in this case. For these reasons, *Morton* does not affect our conclusion that discrimination in employment on the basis of membership in a particular tribe constitutes national origin discrimination. We therefore conclude that

differential employment treatment based on tribal affiliation is actionable as "national origin" discrimination under Title VII.

*Dawavendewa* at 1120.

*Dawavendewa* rejects any protection for the Salt River policy under *Alaska Chapter, Associated General Contractors of America, Incorporated v. Pierce*, 694 F.2d 1162 (9th Cir. 1982). The policy has to favor all Native Americans in order to meet one of the multiple criteria under *Mancari*.

## NANA'S INTERVENTION

NANA desired to intervene to contest the legality of the preference.[13] "[The] argument assumes that the contract's stockholder-hiring provision is illegal. But that is precisely the issue that may be addressed in this case." Conitz I, Doc. 64-3, p. 2. Teck and NANA then admit there is a preference, and then say that NANA Shareholders are not the same as Alaska Natives. Conitz I, Doc. 64-4, p. 2 (Conitz I, Doc. 14, p. 2). "Teck Cominco is obligated to offer employment to qualified NANA shareholders . . ." Conitz I, Doc. 64-5, p. 2 (Conitz I, Doc. 11, p. 2).

―――――――――――

[13]   NANA is not a named defendant. Conitz I, Doc. 11.

As the Ninth Circuit commented in *Malabed*, the racial classification concerning the Inupiat Eskimo of the North Slope Borough (and by analogy the Inupiat Eskimos are the Northwest Arctic Borough), "this argument puts more weight on *Mancari* than it can bear." *Malabed v. North Slope Borough*, 335 F.3d 864, 868, fn. 5 (Alaska 2003).

Great doubt can be cast on the notion that the Federal Government's trust duty can be delegated to the states, more or less to a private corporation. *Rice* also emphasizes, as does *Morton v. Mancari*, that the Bureau of Indian Affairs is *sui generis*.[14] *Rice* at 520; *Mancari* at 554.

If Congress had intended to shelter the classification of Alaska Native/NANA Shareholders from anti-discrimination lawsuits Congress could decide to do so and authorize such by legislation.

> ...when Congress wants to authorize or require Native hiring preferences, it knows how to do so...25 U.S.C. §450e(b).

---

[14] *Sui generis* /s(y)úway jénərəs/. Lat. Of its own kind or class; i.e., the only one of its own kind; peculiar. Black's Law Dictionary, 5th Edition. "*Suigeneris*" appears as a single word in Mancari at 544. Senator Wheeler described the BIA as, 'an entirely different service from anything else in the United States.' (Citation omitted) *Mancari* at 554, fn. 25.

*Malabed v. North Slope Borough*, 335 F.3d 864, 872 (9th Cir. 2003). *See* also, *Dawavendewa v. Salt River Project*, 154 F.3d 1117, 1123 (9th Cir. 1988).

Congress simply has not authorized or required any such hiring preference. It knows how to do so and it knows how to do so unequivocally.

*Mancari* provides no protection to the racially discriminatory policy.

### The Double Red Herring of *Doe v. Kamehameha*

*Doe v. Kamehameha* is a red herring in this case for the following reasons:

1) The Court and the defendant rely on non-majority, non-precedential portions of the *Kamehameha* opinion. Since it is not good precedent, it is not good law and cannot support any rulings of the Court, or arguments of the defendant.

2) *Kamehameha* is, by its own terms, is limited to an educational environment, contrary to this case, which is an employment case; a *Kamehameha* style "Affirmative Action" plan only applies in an educational environment. *Doe v. Kamehameha* does not apply here. *Kamehameha* at 856, 857.

The big red herring of *Doe v. Kamehameha* is that the Conitz I Court and the defendant rely on a non-majority opinion, to say that the Alaska Native/NANA

Shareholder preference is a "political" preference rather than discrimination. Again, this is simply not the law absent the careful legal analysis and a finding that Congress has statutorily authorized such preference, e.g. *see*, *Kamehameha,* 879-895, section III.

There was a significant scholarly dissent Judge Bybee and Judges Kozinski, O'Scannlin, Tallman, Callahan, Riemer and Kleinfeld.  The dissenting judges numbered seven. There was a concurring opinion by five judges; those five judges would have said that the discrimination by *Kamehameha* was "political" not racial. The number of dissenters was seven. The concurrence has fewer subscribers to it than the dissenting opinion.

"An opinion by less than a majority of the court is not precedent." *Marks v. US,* 430 U.S. 188, 193 (1977), *Battle v. Liberty Nat'l Life Ins. Co.,* 877 F.2d 877, 881-882 (11th Cir. 1989), *Vendo Co. v. Lectro-Vend Corp.,* 433 U.S. 623, 97 S.Ct. 2881, 53 L.Ed.2d 1009 (1997) (is an opinion of only three justices of the court and is consequently, not binding precedent."), *U.S. v. Ameline*, 409 F.3d 1073, 1083 (9th Cir. 2005), *Marsh v. Sullivan*, 1991 WL 154450 (N.D.Cal. 1991), *In re. Erin G.*, 140 P.3d 886, 890 (Alaska 2006), *State St. Bank & Trust Co. v. Park,* 198 B.R. 956, 969 (Bankr.C.D.Cal. 1996), *Roy Supply v. Wells Fargo Bank*, 39 Cal.App.4d 1051, 1067-1068 (Cal.App.3rd Dist. 1995), *Harris v. Drake*, 65 P.3d 350, 356

(Wash.Ct.App. 2003), "it is well established that an opinion that expresses the views of less than a majority of the members of the court is not a precedent." *Fredrickson v. Bertolino's*, 127 P.3d 5, 10 (Wash.Ct.App. 2005), *Dananen v. State,* 711 P.2d 528, 531 (Ak.Ct.App. 1985), "dissents, of course, are not precedential." *Purcell v. Bank Atlantic Fin. Corp*., 85 F.3d 1508, 1513 (11th Cir. 1996) (noting that dissenting Supreme Court opinion is not binding precedent and "does not tell us how a majority of the court would decide.")

Indeed, uniquely it appears that a "political" theory had not even been briefed by the parties in the case. The minority's arrival at the "whole cloth" political decision was subject to significant and piercing criticism. For instance, Justice Bybee indicates that Judge Fletcher states that "Native Hawaiian" status is both a "political" and a "racial classification." *Kamehameha* at 879-895, section III. A classification being both "political" and racial is a novel theory.

*Kamehameha* modified the standard for a private employers "Affirmative Action" program to an educational context, and found that the actions of the Kamehameha School were not illegal as an educational preference under 42 U.S.C. §1981. Conitz v. Teck is an employment case, not an education case. Even if the Kamehameha concurrence were law, which it is not, it would not apply in an employment context.

If the *Kamehameha* minority concurring opinion of "educational affirmative action" were expanded to employment affirmative action, there would be no more civil rights law. Any entity could prefer its favored class of people one-hundred percent of the time. This is not the law.

The concurring opinion is of no precedential value. It was only subscribed to by five of the fifteen justices. The unique theory that the discrimination was "political," is not subscribed to by majority of the court. The idea in *Kamehameha* asserting that the fact pattern is "political" discrimination, is novel, not law, and carries no weight here.

Again, the Court is reminded that the focus of the analysis of any racial category is whether because Conitz is white and of European national origin, he is treated differently than Alaska Native/NANA Shareholders. *See* Declaration of Gregg Conitz Concerning Ethnicity. To the extent that examination of the Alaska Native/NANA Shareholders category illustrates Conitz's discrimination discussion, it is helpful. The examination of the composition of the NANA Shareholder group is illuminating of the fact that Conitz is being treated differently, because he is white and of European national origin.

In *Rice v. Cayetano*, the Court found the class of Native Hawaiians to be a proxy for race. The transparent use of shareholder (to possibly include some ethnically different people) for Alaska Natives is in direct conflict with the Supreme Court's rejection of the same argument when made about Native Hawaiians.

*Rice v. Cayetano*, 528 U.S. 495, 514, 120 S.Ct. 1044, 145 L.Ed.2d 1007 (2000) warns, "ancestry can be a proxy for race." In *Malabed v. North Slope Borough,* 335 F.3d 864 (9th Cir. 2003), a Native hire preference was struck down as illegal. The questioned ordinance expressly professed intent to benefit a class defined by race and borough residency. In this case, the class is defined by race of being Inupiat Eskimo and by borough residency, as the boundaries of the NANA Region and the Northwest Arctic Borough are coextensive. The North Slope Borough preference in favor of Native Americans was construed as a proxy for an illegitimate race-conscious purpose. *Malabed v. North Slope Borough,* 70 P.3d 416, 424 (Alaska 2003).

When the composition of the class of persons of NANA Shareholders is examined, the racial character of NANA Shareholders is the same as the *Malabed*

class of preferred persons. [15] Again, however, the actual relevant question is whether Conitz is being discriminated against because of his race or ethnicity. (It does not matter that perhaps a few people of Conitz's race or ethnicity are treated favorably. What matters is that Conitz is classified, segregated and treated differently because of his race and ethnicity.

## A DIFFERENT KIND OF ANIMAL

Rarely will a Court, especially these days, find a case of direct intentional discrimination. That leaves courts to immediately think in terms of burden shifting under *McDonnell Douglas* and disparate impact and statistical analyses.

None of those is necessary to the case here.

*Wards Cove Packing Co., Inc. v. Atonio*, 490 U.S. 642, 655, 109 S.Ct. 2115, 2123, fn. 9 (1989) says, "… segregated dormitories and eating facilities in the workplace may be challenged under 42 U.S.C. §2000e-2(a)(2) without showing a disparate impact on hiring or promotion."

---

[15]   The shareholder preference is a proxy, euphemism or surrogate for race.

This is a case of intentional direct discrimination.[16] It requires very little analysis to see the illegality. If an employer has a sign that says, "We prefer whites to blacks in the workplace," it is an illegal employment practice under 42 U.S.C. §2000e-2(a)(2).

Saying, "we prefer blacks to whites" is the same as saying, "we prefer NANA shareholders to everybody else." This is the case of an ethnic majority discriminating against everybody else. If a parts supplier was doing business with Ford and they said they prefer Ford shareholders to everybody else, it might be a legal preference; but, if only black people can buy Ford, it is the same as saying, "we prefer black people to everybody else." This is a blatant invidious discrimination. *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 109 S.Ct. 706 (1989).

In *Bazemore v. Friday*, 478 U.S. 385, 395, 106 S.Ct. 3000 (1986), salary disparities had existed in the North Carolina Extension Service prior to 1964. Since 1965, the Extension Service maintained two separate racially segregated branches and paid black employees less than they paid white employees. The Court said that

---

[16] Intent is not an element of a 42 U.S.C. 2000e-2(a)(2) claim. *Nashville Gas Co. v. Satty*, 434 U.S. 136, 98 S.Ct. 347, (1977).

the illegality of "salary disparities…perpetuated thereafter is too obvious to warrant extended discussion… to the extent an employer continued to engage in that act or practice, it is liable under that statute." This was an ongoing violation. To the extent that this discrimination was perpetuated after 1972, every paycheck issued was an actionable wrong under Title VII.

"The "critical question" the Court declared 'is whether any present violation exists.'" *Bazemore* at 396, fn. 6.

If the acknowledged pre-1965 discrimination continued for employees employed prior to 1965, then respondents violated the law. *Id.* at 397, fn. 8.

Just as in *TransWorld Airlines v. Thurston*, 469 U.S. 111, 121, 105 S.Ct. 613, 83 L.Ed. 523 (1985), *Los Angeles, Department of Water & Power v. Manhart*, 435 U.S. 702, 98 S.Ct. 1370, 55 L.Ed. 567 (1978), *Newport News Shipbuilding and Dry Dock Co. v. E.E.O.C.*, 462 U.S. 669, 103 S.Ct. 2622 (1983) (cited and discussed below), *Reed v. Lockheed Aircraft*, 613 F.2d 757 (9th Cir. 1980), and Conitz, the employer has an official policy of discrimination. The discrimination is too obvious to warrant extended discussion. The policy does not pass the "simple test." This is no different from having a sign on the wall in the lunchroom that

says, "We prefer whites to blacks in the workplace." Such official policy is direct violation of 42 U.S.C. §2000e-2(a)(2) and AS 18.80.220(a)(3).

*Newport News Shipbuilding and Dry Dock, Co. v. EEOC*, 462 U.S. 669, 2631 (1983), *citing City of Los Angeles, Dept. of Water and Power v. Manhart*, 435 U.S. 712, 711, 98 S.Ct. 1370, 55 L.Ed.2d 657 (1978), stating that it is discrimination if it would treat a male employee with dependents "in a manner which but for that person's sex would be different."

The Court needs to keep in mind the discrimination here is neither subtle nor indirect. (The only possible indirectness is that the defendant's current use of the term "shareholder" instead of Alaska Native. Keep in mind that Defendant has defined "shareholder" as "a Native of the NANA region" with voting rights.) Conitz I, Doc. 64-10 at p. 5.[17] (*See* also section below titled "Voting Rights.") Again, however, the focus is on the ethnicity of the burdened individual, not the preferred group.

---

[17] However, the Court needs to keep in mind that these are shareholders in Alaska Native Corporations. The term NANA stands for Northwest Arctic Native Association. Saying Alaska Native Corporation NANA Shareholder preference is saying Native Native preference.

*LA Water* demonstrates that a policy based on a prohibited characteristic is direct discrimination and more than sufficient direct evidence to overcome any summary judgment motion. The policy alone is sufficient evidence of direct discrimination to overcome any summary judgment motion.

In *Thurston*, 496 U.S. 111, 105 S.Ct. 613 (1985), an issue of direct discrimination concerning age, Plaintiffs did not have to meet a *McDonnell Douglas* case or disparate impact test. If there is a policy, it is discriminatory.

In *Bartmess v. Drewrys U.S.A., Inc.,* 444 F.2d 1186 (7th Cir. 1971), Drewrys had a retirement plan where females were retired at age 62, and men at age 65. The Court said, "We have no difficulty in concluding that the actual maintenance of a discriminatory retirement plan can be one of the acts which 'adversely affect (an individual's) status as an employee, because of such individual's * * * sex.' and that retirement plans should be viewed as 'conditions of employment' within the meaning of §703 of Title VII [42 U.S.C. §2000e-2(a)(2)].

### \\*Connecticut v. Teal*, 457 U.S. 440, 102 S.Ct. 2525 (1982)

We found that Congress' primary purpose was the prophylactic one of achieving equality of employment "opportunities" and removing "barriers" to such equality.

*Teal* at 449, 2531, *citing Griggs v. Duke Power Co.*, 401 U.S. 424, 429-30, 91 S.Ct. 849, 852-53 (1971).

In considering claims of disparate impact under §703(a)(2) this Court has consistently focused on employment and promotion requirements that create a discriminatory bar to *opportunities*.

*Teal* at 450, 2532 (emphasis in original).

Section 703(a)(2) prohibits practices that would deprive or tend to deprive " any individual of employment opportunities." The principal focus of the statute is the protection of the individual employee, rather than the protection of the minority group as a whole. Indeed, the entire statute and its legislative history are replete with references to protection for the individual employee.

*Teal* at 453-54, 2533-34.

It is clear that Congress never intended to give an employer license to discriminate against some employees on the basis of race or sex merely because he favorably treats other members of the employees' group. We recognized in *Los Angeles Dept. of Water & Power v. Manhart*, 435 U.S. 702, 98 S.Ct. 1370, 55 L.Ed.2d 657 (1978), that fairness to the class of women employees as a whole could not justify unfairness to the individual female employee because the "statute's focus on the individual is unambiguous."

*Teal* at 455, 2535.

The adoption of a policy, which favors Alaska Native/NANA Shareholders over all other employees in ways that deprive or tend to deprive an individual of employment opportunities, is racial discrimination.

Teck's policy affects Conitz's status as an employee, because of his individual race, color, religion, sex, or national origin. 42 U.S.C. §2000e-2(a)(2).

> Though we have phrased the query differently in different cases, it is generally well established that at the justification stage of such a disparate impact case, the dispositive issue is whether a challenged practice serves, in a significant way, the legitimate employment goals of the employer.

> *Wards Cove Packing Co., Inc. v. Atonio,* 490 U.S. 642, 109 S.Ct. 2115, fn. 9 (1989).

Whether the Court classifies the official policy of an Alaska Native/NANA Shareholder preference as disparate impact or disparate treatment does not matter. If an official policy of discrimination exists, it "would in itself constitute an "adverse effect," or injury, under Title VII." *Bloodsaw* at 1272,[18] *Bonilla* at 1303-1304.

---

[18]  The unauthorized obtaining of sensitive medical information on the basis of race or sex would in itself constitute an "adverse effect," or injury, under Title VII. Thus, it was error to rule that as a matter of law no "adverse effect" could arise from a classification that singled out particular groups for unconstitutionally invasive, non-consensual medical testing, and the district court erred in dismissing the Title VII claims on this ground as well.

> *Norman-Bloodsaw v. Lawrence Berkeley Laboratory,* 135 F.3d 1260, 1272-73 (9th Cir. 1998).

Motion for Injunction and Jury Instruction                    Page **40** of **84**

## BACKWARDS ANALYSIS

Previous briefing in this matter focused on the racial composition of NANA Shareholders. That was a backward analysis. The analysis needs to be on the racial and/or national origin characteristics of the person being denied equal opportunity.

It is undisputed that Conitz is white and of European national origin. *See* Declaration of Gregg Conitz Concerning Ethnicity. What is even more undisputed is that Conitz is not a Native of the NANA Region, nor can he become one. He is treated differently, solely because of his race.

There has been extensive discussion about the composition of the class of NANA Shareholders that does distract attention from the heart of the issue. Focus must be on the immutable characteristics of Conitz. *See* Declaration of Gregg Conitz Concerning Ethnicity.

However, since there has been extensive discussion on the composition of the class of Alaska Native/NANA Shareholders, and some minds may be "stuck" on that issue, it may be helpful to discuss the class of Alaska Native/NANA Shareholders in working toward the correct analysis. Again, the focus needs to be on the immutable characteristics of Conitz and the "simple test" of whether Teck's

Alaska Native/NANA Shareholder preference treats Conitz differently solely because he is white.

For the purposes of analysis, portions of the ensuing discussion are couched in terms of the proxy for race, even if analysis is easily defeated by *Rice v. Cayetano*. Additionally, there is a discussion of standing.

## DISCUSSION OF TECK'S DEFENSES

It is undisputed that the overriding purpose of Title VII is to require employers to treat each employee (or prospective employee) as an individual, and to make job-related decisions about each employee on the basis of relevant individual characteristics, so that the employee's membership in a racial, ethnic, religious, or sexual group is irrelevant to the decisions.

*Manhart v. City of Los Angeles, Department of Water and Power*, 553 F.2d 581,585 (9th Cir. 1977) (emphasis added).

Conitz is being discriminated against because he is white. (The focus is not on the composition of the favored group, e.g. 65 of 11,655). The analysis should not be overly concerned with the exactness of the group being favored. Rather, the analysis is whether an individual is segregated or classified differently from others, based on his race or national origin.

Here, Conitz, who is white and of European national origin, is treated less favorable than are those in another group. He is classified and segregated by race. It is not an equal opportunity workplace.

It does not matter if the favored group is all Alaska Native, mostly Alaska Native, or Alaska Native and Korean. If Conitz is discriminated against because he is white, then it is racial discrimination.[19]

## VOTING RIGHTS

Only those shareholders with voting rights, and their descendents and spouses, receive a Teck employment hire preference. In other words, only Natives, or those whom are ancestrally Native and their spouses receive the preference.

§1.17 "Natives of the NANA Region" means the stockholders of NANA whose stock carries voting rights, and the descendants and spouses of such stockholders.

Conitz I, Doc. 16-3, p. 2 (Teck/NANA 1982 agreement).

--------

[19] To this extent, all the Court's looking in *Kamehameha* missed the boat, as far as being pulled into the proxy issue. Those who were excluded from the school because of their race were being discriminated against. Whether or not Native Hawaiians are all Polynesians of a particular ancestry or various groups of Polynesians makes no difference. The complaining students were being excluded because of their (white or non-Native) race.

Intervenor NANA admits that a 1982 agreement between Cominco American Corporation and NANA Regional Corporation provided, in part, that Cominco American had a goal of "to the extent feasible, on hundred percent of such employees shall be "Natives of the NANA Region". The term "Natives of the NANA Region" was defined in that same agreement as "stockholders of NANA whose stock carries voting rights, and the descendents and spouses of such stockholders." Conitz II, Doc. 33, p. 2, para. 4.

Shares in Alaska Native Corporations are generally not alienable or subject to lien, judgment, or other transfer. 43 U.S.C. §1606(h)(1)(B). Generally, any transfers are restricted to other Alaska Natives. 43 U.S.C. §1629c(d)(7)(A). In rare circumstances, stock may be transferred to a non-Native person. 43 U.S.C. §1606(h)(2)(C). However, stock that is transferred to a non-Native does not carry voting rights. *See* Exh. D, Declaration of Joanne Harris.

**43 U.S.C. 1606(h)(1)(B) and (C)**

(h) Settlement Common Stock
(1) Rights and restrictions
(B) Except as otherwise provided in this subsection, Settlement Common Stock, inchoate rights thereto, and rights to dividends or distributions declared with respect thereto shall not be
(i) sold;
(ii) pledged;
(iii) subjected to a lien or judgment execution;

(iv) assigned in present or future;

(v) treated as an asset under

(I) Title 11 or any successor statute,

(II) any other insolvency or moratorium law, or

(III) other laws generally affecting creditors' rights; or

(vi) otherwise alienated.

(C) Notwithstanding the restrictions set forth in subparagraph (B), Settlement Common Stock <u>may be transferred to a Native or a descendant of a Native</u>

(i) pursuant to a court decree of separation, divorce, or child support,…

(iii) as a inter vivos gift from a holder to his or her child, grandchild, great-grandchild, niece, nephew, or (if the holder has reached the age of majority as defined by the laws of the State of Alaska) brother or sister, notwithstanding [in spite of] an adoption, relinquishment, or termination of parental rights that may have altered or severed the legal relationship between the gift donor and recipient.


## 43 U.S.C. 1606(h)(2)(C)

(h) Settlement Common Stock

(C) Settlement Common Stock of a Regional Corporation

(i) transferred by will or pursuant to applicable laws of intestate succession after February 3, 1988, or

(ii) transferred by any means prior to February 3, 1988,

to <u>a person not a Native or a descendant of a Native shall not carry voting rights</u>., If at a later date such stock is lawfully transferred to a Native or a descendant of a Native, voting rights shall be automatically restored.


## 43 U.S.C. §1629c(d)(7)(A)

(d) Opt-in procedure

(7)

(A) <u>No share of alienable common stock</u> issued pursuant to paragraph (6) <u>shall carry voting rights if it is owned</u>, legally or beneficially, <u>by a person not a Native or a descendant of a Native.</u>

Therefore, any preference in the Teck workplace for NANA Shareholders with voting rights means Natives,[20] or people ancestrally Native and the spouses of Natives.[21]

## Continuing Violation Doctrine

If an employer has a policy of direct discrimination, it falls under the continuing violation doctrine. A continuing violation is always subject to a civil rights cause of action.

Indeed, there is a new violation occurring every day that such policy exists. *National R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 122 S.Ct. 2061 (2002).

… [W]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or

---

[20]  The only possibility of being non-Native would be a non-Native spouse. Would a preference be legal if it preferred white people and spouses of white people?

[21]  The presumption that the 65 out of 11,655 NANA Shareholders who may be less than one-quarter blood quantum were eligible to benefit from the hiring preference is most likely not so.

pervasive to alter the conditions of the victim's employment and create
an abusive working environment,' Title VII is violated.

*Morgan* at 2074.

The Court should "redress the evil at which the federal legislation was
aimed…"

*Morgan* at 2076.

Each week's paycheck that delivers less to a black than to a similarly
situated white is a wrong actionable under Title VII…

*Bazemore v. Friday*, 478 U.S. 385, 395, 106 S.Ct. 3000 (1986).

Each day that passes that Conitz has to work in a work environment where
an employment hiring preference exists favoring Alaska Native/NANA
Shareholders over all other races, ethnicities and national origins actionable under
Title VII.

## ADVERSE EFFECT

### *Lowe v. City of Monrovia*, 775 F.2d 998 (9th Cir. 1985)

A civil rights plaintiff may prove his case by direct evidence. Very little
evidence is required. *Lowe* at 1009.

Defendants, by their own admission, have a facially discriminatory policy, Conitz I, Doc. 64-11, p. 2-3, Conitz I, Doc. 64-15, p. 4. They favor Alaska Native/NANA Shareholders. When a defendant has a policy that treats one group differently than another based on their race and/or national origin, it is discriminatory on its face; summary judgment for the defendant is not appropriate on any ground relating to the merits. *Lowe* at 1009.

Also, under the direct evidence standard of *Lowe v. City of Monrovia*, the "very little" evidence standard may be met by the defendant's reaction, if any, to the plaintiff's legitimate civil rights activities. Again relying solely on Defendant Teck's facts, they acknowledged that Conitz worked as a relief supervisor prior to, during, and after his application for the job, but then subsequently was removed. Teck further acknowledged that Conitz alleges this was retaliation. Appellee's (Red) Brief at p. 7-9. This evidence meets the "very little" evidence standard.

## EXTENT OF PREFERENCE/
## SIZE DOESN'T MATTER/BROKEN BONES
## (DIRECT DISCRIMINATION)

Prior to the 1964 Civil Rights Act, many employers in the South had official policies of segregation in the workplace. After passage of the Act, these official policies faded away. However, there was still indirect discrimination that gave rise to various theories of prosecuting civil rights cases, e.g. disparate treatment and

disparate impact. A number of cases illustrate however illustrate direct discrimination.

In *City of Los Angeles, Dept. of Water and Power v. Manhart*, 435 U.S. 702, 98 S.Ct. 1370 (1978), the employer's policy of requiring female employees to make larger contributions to a pension fund than male employees was found to be discriminatory on its face. *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 105 S.Ct. 613 (1985).

The question of whether a discriminatory policy, to whatever extent, was sufficient evidence to overcome a summary judgment motion was addressed in *Newport News Shipbuilding and Dry Dock Co. v. E.E.O.C.*, 462 U.S. 669, 103 S.Ct. 2622 (1983).

There, the employer provided different pregnancy health benefits for employed females as opposed to female dependents of male employees. This was found to be discrimination for it would treat a male employee with dependents in "a manner which but for that person's sex would be different."

The Court explained,

"…the same result would be reached even if the magnitude of the discrimination were smaller. For example, a plan that provided

complete hospitalization coverage for the spouses of female employees but did not cover spouses of male employees when they had broken bones would violate Title VII by discriminating against male employees."

*Newport News* at 2630.

Saying, "Your sister wears combat boots--but only on Tuesdays," is the same as saying, "We only have a limited employment preference." Once it is said, the damage is done. A preference is a preference.

*LA Water* demonstrates that a policy based on a prohibited characteristic is direct discrimination in violation of Title VII and 42 U.S.C. §2000e-2(a)(2). *LA Water* at 584.

In *Kang v. U. Lim America, Inc.*, 296 F.3d 810 (9th Cir. 2002), the "very little" standard of direct evidence of discrimination to show pretext was examined. Kang showed that his supervisor thought that Koreans worked harder than Mexicans and Americans. That was sufficient evidence that Kang was subjected to an adverse employment condition and ultimately fired for failure to conform to ethnic stereotypes. *Kang* at 819.

The extent of the preference is immaterial to the question of law of whether any shareholder preference at the Teck mine is illegal. The mere existence of such policy is a violation of 42 U.S.C. §2000e-2(a)(2) and AS 18.80.220(a)(3).

In *Malabed v. North Slope Borough*, 335 F.3d 864 (9th Cir. 2003) a similar Native hire preference scheme was found to be unconstitutional and violative of civil rights laws. The Court found that calling such a hiring preference "political" under *Morton v. Mancari,* 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974)*,* placed more weight on *Mancari* than it could bear. *Malabed* at 868, fn. 5. *See* also *Malabed v. North Slope Borough*, 70 P.3d 416, 424 (Alaska 2003), where the Alaska Supreme Court says that, "a class defined by borough residency and race could be construed as a proxy for an illegitimate race conscious purpose" *citing* to *Rice v. Cayetano*, 528 U.S. 495, 514 (2000). *Rice* found that the use of the term Native Hawaiian was merely a proxy for race. These are Alaska Native Regional Corporations; what racial group will the corporate shareholders be and represent? NANA stands for <u>N</u>orthwest <u>A</u>rctic <u>N</u>ative <u>A</u>ssociation. The classification is neither subtle nor indirect.

Should there be any doubt that the "shareholder category" (which is defined as "Natives of the NANA Region" with voting rights, (Conitz I, Doc. 64-10, p. 5) is not a proxy for race, then consider the flip side of the coin.

Motion for Injunction and Jury Instruction                    Page **51** of **84**

If the owner of the store in Kotzebue said he would not hire NANA Shareholders, there would be a hue and cry that such a hiring policy was racist. If the storeowner responded that it was merely economic or political, would this Court allow such a policy?

## PART II
## (TECK'S POTENTIAL CONTENTIONS)

### §703(i)

Does the "Indian preference" of §703(i) apply? The "Indian preference" of §703(i) does not apply because there is no publicly announced policy; and because there are no reservations in Alaska; and for other reasons stated in the *Malabed* decisions.

42 U.S.C. §703(i) is now renumbered as 42 U.S.C. §2000e-2(i). In *Dawavendewa*, this is described as the "Indian Preferences exemption."

**42 U.S.C. §2000e-2(i)**

(i) Businesses or enterprises extending preferential treatment to Indians

Nothing contained in this subchapter shall apply to any business or enterprise on or near an Indian reservation with respect to any publicly announced employment practice of such business or enterprise under which a preferential treatment is given to any individual because he is an Indian living on or near a reservation.

The Court might consider whether the group of NANA Shareholders is an "identifiable class of persons" based on "ancestry or ethnic characteristics." Clearly, this is such a group, especially when the Court considers the "Flip Side" argument of a storeowner in Kotzebue excluding all NANA Shareholders from employment there. Once the Court reaches that step, it may analyze under *Mancari* whether the discrimination is excused. Clearly, it is not. The Court then can also look at the §703(i) Indian preference exemption, which is not allowable under *Malabed*. Then, the Court needs to go back to *AGC v. Pierce*, which says that if an "identifiable class of persons" based on "ancestry or ethnic characteristics," are receiving favoritism, then it is racial or national origin discrimination and not "political" favoritism. *Kamehameha* is no help as it only applies in an educational setting; and the concurring opinion is a minority opinion.

If Conitz were black, and Teck were owned by a white company that had an official policy for a preference for white employees (to whatever extent), would this Court find the white over black racial preference discriminatory, (and enjoin it)? Why should the result be any different if the majority is Alaska Native and the minority is white?

One of the principle reasons race is treated as a forbidden classification is that it demeans the dignity and worth of a person to be

judged by ancestry instead of by his or her own merit and essential qualities. An inquiry into ancestral lines is not consistent with the respect based on the unique personality each of us possesses, a respect the constitution itself secures in its concerns for persons and citizens.

*Rice* at 517.

## Other Defenses

Two of Teck's more tantalizing defenses are the "Political Preference" and the purported "Affirmative Action" plan. The "political" exception does not apply because only Congress decides when it is fulfilling its unique duty under the Indian Commerce Clause and the Treaty Powers Clause, through its guardian ward status with Native Americans, to allow favoritism for Native Americans. Only Congress decides. *Rice v. Cayetano*, 528 U.S. 518-520, 120 S.Ct. 1057-1058 (2000). *United States v. Mazurie*, 419 U.S. 544, 557-558, 95 S.Ct. 710, 42 L.Ed.2d 706 (1975) (Tribes retain authority to govern "both their members and their territory, subject ultimately to Congress.) Most often, if a "political" preference is given, it is done by the government itself, e.g. *Morton v. Mancari*, 417 U.S. 535, 94 S.Ct. 247, 41 L.Ed. 2d 290 (1974), *Aleman v. Chugach Services,* 485 F.3d 206 (4th Cir. 2007), *AFGE v. United States,* 330 F.3d 513 (D.C.Cir. 2003). If Congress had at all decided to exercise its authority in this instance, it would have done so; and it might have done so pursuant to 43 U.S.C. §1626(g).

## TECK'S DEFENSES

### 1.  "Proxy"

The class of shareholders is not equal to a class of Alaska Natives, therefore, not racial or national origin discrimination.

### 2.  "Political"

Definition of the class as being shareholders and/or Natives is not racial or national origin discrimination because it is "political" discrimination under *Mancari.*

### 3.  "Not an Employer"

Teck states, "we are not an employer" under Title VII, pursuant to the exception from the definition of employer under 43 U.S.C. §1626(g), an exception for Alaska Native corporations and entities in which an Alaska Native corporation "owns twenty-five per centum of the equity."

### 4.  "Unwritten Affirmative Action Plan"

If the class of Natives and shareholders is essentially coextensive and deemed a proxy for race; and if such classification is not "political"; and if Teck is an employer under Title VII; Teck has a nebulous "Affirmative Action" plan which authorizes discrimination in favor of Alaska Native/NANA Shareholders. (Who

knows if this used an abandoned defense of Teck's might be revived in this pleading).

## Shareholder Does Not Equal Native
### (Proxy)

NANA Shareholder, like ancestry, is "a proxy for race," because it "singles out identifiable classes of persons" because of "their ancestry or ethnic characteristics". *Rice v. Cayetano*, 528 U.S. 495, 120 S.Ct. 1044, 145 L.Ed.2d 1007, 1025 (2000). The inclusion of some small percentage of non-tribal enrolled Native Americans is irrelevant.

NANA Regional Corporation is an ANCSA corporation. 43 U.S.C. §1606(a)(3), 43 U.S.C. §1629(a)(3). NANA shares are not freely alienable. 43 U.S.C. §1606(h)(1)(B). The only way to get NANA shares is to be a Native by birth, ancestry, adoption, or marriage. *See,* 43 U.S.C. §1606(h)(1)(B), *et seq. See* also Exh. D.

In order to be a NANA Shareholder, you must be an Alaska Native, (with minor exceptions). Conitz I, Doc. 64-11, p. 2.[22] 99 1/2 percent of NANA Shareholders are Alaska Natives. *See* Exh. D and Conitz I, Doc. 106-2.

Here, Defendant Teck's argument is that because a small percentage of shareholders may not be ancestrally Alaska Natives (*see* Exh. D), the class of shareholders is not a proxy for a class of Alaska Natives and therefore, discrimination in their favor is not racial discrimination.

The Trial Court found that the Alaska Native/NANA Shareholder hiring preference was not a surrogate or proxy for race. Conitz I, Doc. 145 at 4. The Conitz I Court recognized, of NANA's 11,655 current shareholders, only sixty-five were represented by NANA to be "non-Native". *See* Exh. D.

Defendants do not detail whether any of those sixty-five people are of Native ancestry, but are, perhaps, below a one-quarter blood quantum. Nor do they

---

[22]     **A.**   My understanding of shareholder is someone who -- lives or has been blood of the NANA region and has shares of NANA.

     **Q.**   Ok, alright. And is it your understanding that you're born into these shares.

     **A.**   That's my understanding, yes.

     Conitz I, Doc. 64-11, p. 2, ln. 6-10.

detail the close affiliation that these sixty-five may have with Alaska Natives effectively; which may make them members of the same racial or ethnic class by affiliation; *e.g.* married to an Alaska Native, adopted into an Alaska Native family. In any event, dealing with these statistics alone, those sixty-five shareholders would constitute .5577 percent of the class of shareholders, or slightly more than one-half of one percent of the whole. Between 99 1/2 and one-hundred percent of the group or class are ethnically, racially and ancestrally Alaska Native. *See* Exh. D. This can be nothing but a proxy or surrogate for race.

## 1971=1778

"…the…structure now before us is neither subtle nor indirect. It is specific in granting the vote to persons of defined ancestry and no others. The state maintains this is not a racial category at all but instead a classification limited to those whose ancestors were in Hawaii at a particular time, regardless of their race. The state points to theories of certain scholars concluding that some inhabitants of Hawaii as of 1778 may have migrated from the Marquesas Islands and the Pacific Northwest, as well as from Tahiti. Furthermore, the state argues, the restriction in its operation excludes a person whose traceable ancestors were exclusively Polynesian if none of those ancestors resided in Hawaii in 1778; and on the other hand, the vote would be granted to a person who could trace, say 1/64th of his or her ancestry to a Hawaiian inhabitant on the pivotal date. These factors, it is said, means the restriction is not a racial classification. We reject this line of argument.

Ancestry can be a proxy for race. It is that proxy here.

*Rice v. Cayetano*, 528 U.S. 495, 514, 120 S.Ct. 1044, 1055 (2000), *Malabed v. North Slope Borough*, 335 F.3d 864, 868 at fn. 5 (9th Cir. 2003).

The Hawaiians were selected for having an ancestor in Hawaii in 1778. Remarkably, NANA tells us that the NANA Shareholders were selected because they were Alaska Natives as of December 18, 1971. NANA Brief, p.4-5.

> Alaskan Natives alive and enrolled on ANCSA's date of passage, December 18, 1971, received 100 shares of stock in the corporation assigned to their region.

> 43 U.S.C. §1606(g).

> In order to qualify as a native for purposes of ANCSA, an individual had to have at least one-fourth degree of Alaska Indian Eskimo or Aleut blood, or (2) in the absence of proof of minimum blood quantum, must have been regarded as Alaska Native by the Native village or group to which a parent of the individual belonged.

> 43 U.S.C. §1602(b).

In *Rice v. Cayetano*, the court characterized the Native Hawaiian's thusly. The inhabitants shared common characteristics and by 1778, they had a common culture. Indeed, consideration was given to the "unique culture of the ancient Hawaiians." The provisions before us reflect the states effort to preserve that commonality of people to the present day. Such characterization singles out an

"identifiable class of persons" solely because of their "ancestry or ethnic characteristics." The early Hawaiians are a distinct people commanding their own recognition and respect. In enacting legislation, the state of Hawaii used ancestry as a racial definition and for a racial purpose. *Rice* at 515, 1057.

Similarly, the NANA Region is characterized thusly:

Today, the vast majority of Regional inhabitants are Inupiat, making the NANA Region distinct from other areas of Alaska, where various groups of Indians, Aleuts and Eskimos, intermarried, blurring cultural distinctions. Conitz I, Doc.64-14, p. 2.

Inupiat people of the Northwest Arctic became members of NANA Regional Corporation. Conitz I, Doc.64-14, p. 1. The Corporation is fully owned by the Native people of Northwest Alaska. Conitz I, Doc.64-14, p. 1.

NANA is owned by more than 11,400 Alaska Native shareholders of Inupiat Eskimo decent. Conitz I, Doc.64-12, p. 2.

More than 90% of the Region's residents are Inupiat Eskimo descendants of ancestors who settled the land over 10,000 years ago. Conitz I, Doc. 64-12, p. 2. *See* also Conitz I, Doc. 173-11, para. 2-3.

NANA Shareholders are an "identifiable class of persons" selected solely because of their "ancestry or ethnic characteristics." Ancestry can be a proxy for race. It is that proxy here.

> …Alaska shall be divided…into twelve geographic regions, with each region composed as far as practicable of Natives having a common heritage and sharing common interests…., such regions shall approximate the areas covered by the operations of the following existing Native associations:
>
> …. (3) Northwest Alaska Native Association (Kotzebue)…
>
> 43 U.S.C. §1606(a).

## ESPECIALLY HOLLOW

Borden's distinction between age and retireability is especially hollow here, where 15 out of the 16 employees 55 or older had served the 10 years necessary to qualify them for retirement.

*EEOC v. Borden,* 724 F.2d 1390, 1393 (9th Cir. 1984).

Even if 65 of 11,655 NANA Shareholders were entirely non-Native ancestrally, culturally, socially, or otherwise, attempting to say it is not discrimination based on race, rings "especially hollow." Borden tried to assert that it was not a case of age discrimination where 15 out of the 16 employees subject to the practice had served the 10 years necessary to qualify for retirement. 15 out of

sixteen means 93 3/4 percent of the group fit the description. This was found to be "especially hollow."

In Conitz, 99 1/2 percent of the group is racially homogenous. *See* Exh. D. Here, the defendant's distinction must ring "super especially hollow." Because the group of 65, if non-Native, is not included in the preference group, then Defendant's distinction must ring "super extra especially hollow."

### Store in Kotzebue Analysis
### or the Flipside of the Coin

To confirm the above logic, not that it needs it, posit the flipside of the coin. A white or Korean store owner in Kotzebue decides that many of the jobs in the Region are going to Alaska Native/NANA Shareholders as the Teck mine is one of, if not the largest, employers in the massive region. The storeowner says, "I will not hire NANA Shareholders." Someone will complain this is racist. Can the storeowner defend and say this is merely an economic distinction?

A further practical consideration of why Civil Rights acts prevent such discrimination follows:

The mine is a remote site. Employees go to the mine on a rotating schedule, four weeks on and two weeks off or two weeks on and one week off. Imagine that

a single parent NANA Shareholder wishes to remain in town to care for his or her children. They may wish to work at the store in Kotzebue. Imagine that White or Korean or Filipino or black or Chinese person in the village wants to work at the mine and has no family obligations restricting them from it. Is this the type of society in which we wish to live? Does a scheme that allows such results seem fair on a racial basis?

## II. There is No "Political" Relief in Sight for Defendant; Even Through 43 U.S.C. §1626(g)

### 1. Not Joint Venture

43 U.S.C. §1626(g) exempts some businesses as employers under Title VII (but no other act).

In any event, 43 U.S.C. §1626(g) does not apply.

Teck asserts that it is authorized to discriminate in favor of Alaska Native/NANA Shareholders because it is a joint venture, and thus authorized to do so under 43 U.S.C. §1626(g).

An essential element of a joint venture is the right to share in profits and losses.

*Basel v. Westward Trollers, Inc.,* 869 P.2d 1185, 1190-91 (Alaska 1994), *Doe I v. Unocal Corp*., 395 F.3d 932, 970 (9th Cir. 2002).

There is no evidence whatsoever to show that NANA and Teck had any agreement to share Teck's losses. There is simply no joint venture on this, as well as many other bases. Additionally, this defense was never pled as an affirmative defense; nor did the trial court make any findings in this regard. However, this appellate court can and should make a finding of no joint venture. The court could make this finding based on the corporate disclosure statements alone and/or as well as the fact that it was never pled as an affirmative defense.

43 U.S.C. §1626(g) does not apply because there is no joint venture. There is no joint venture because:

1) Corporate disclosure statements, show no joint venture (Exh. A);

2) There is no sharing of liability;

3) There is no 25% equity;

4) NANA has no control of Teck.

There is no evidence outside of the defendant's self-serving statements that Teck is a joint venture with NANA.[23] [24] The court need go no further than look at the corporate disclosure statements in Defendants' briefs. *See* Exh. A. There, it indicates, "Teck Alaska Incorporated is a wholly owned subsidiary of Teck American Incorporated,…" NANA owns nothing of Teck.[25]

The closest Defendants might get to any type of congressional intent here is under 43 U.S.C. §1626(g), which exempts entities where a Native corporation "owns twenty-five per centum of the equity" of the defendant. This is simply not the case. 43 U.S.C. §1626(g) does not apply because NANA does not own "twenty-five per centum" or more, of Teck.  The District Court declined to reach

---

[23] The defendant cites to *Reich v. Cominco Alaska*, 56 P.3d 18, 23 (Alaska 2002). A joint venture was not at issue in that case, and the court may have used the phrase "joint venture" in a dicta-like or common usage. This in no way establishes that Teck is a joint venture with NANA. Even if such issue were adjudicated in that matter, Conitz was not a party in that action and it would have no preclusive effect here.

[24] Teck claims it is a joint venture. It says it pays royalties to NANA. Appellee's (Red) Brief at 7. The term "royalties" is indicative of an oil and gas and/or mining lease. See Black's Law Dictionary, 5th Ed., p. 1195. A joint venture would share profits and loss, not royalties.

[25] NANA, in its Motion to Intervene in Conitz I, not characterize its relationship with Teck as a joint venture. Rather, they stated, "NANA has a contractual relationship with Teck Cominco, providing for Teck Cominco to operate the mine." Conitz I, Doc. 11, p. 2, filed June 22, 2007.

this issue. The reasoning of the Court and the defendant is circular. They state that this is not "racial discrimination," it is "political." They fail, however, to do the requisite analysis. The requisite analysis requires the court and the defendant to examine where Congress said such action would be fulfilling its unique obligation to Indians. The statutory authority simply does not exist here and the careful analysis required was not done.

"When Congress wants to authorize or declare a Native hiring preference, it knows how to do so." *Malabed v. North Slope Borough*, 335 F.3d 864, 872 (9th Cir. 2003).

Furthermore, 43 U.S.C. §1626(g) is an exemption from Title VII. Just as a §703(i) exception was argued in *Malabed,* a 43 U.S.C. §1626(g) exemption might apply in Conitz.[26] However, these exceptions "provide only that such preference

_____

[26] Section 703(i) of the Civil Rights Act of 1964 is codified as 42 U.S.C. §2000e-2(i). It says:

> Nothing contained in [Title VII] shall apply to any business or enterprise on or near an Indian reservation with respect to any publicly announced employment practice of such business or enterprise under which a preferential treatment is given to any individual because he is an Indian living on or near a reservation.

This is likely, the type of exemption that Teck would like to claim. However, it is foreclosed for multiple reasons as described in the *Malabed* cases.

programs are exempt from the reach" of Title VII. *Id*. They do not have preemptive

effect. State Title 18, Civil Rights Claim, or 42 U.S.C. §1981 would survive any

finding of any 43 U.S.C. §1626(g) exception. *Malabed* at 872-874.

Defendant Teck claimed it was exempt from Title VII, the Civil Rights Act,

pursuant to 43 U.S.C. §1626(g).

43 U.S.C. §1626(g) provides that:

> For the purposes of implementation of the Civil Rights Act of 1964, a
> Native Corporation and corporations, partnerships, joint ventures,
> trusts, or affiliates in which the Native Corporation owns not less than
> 25 per centum of the equity shall be within the class of entities
> excluded from the definition of "employer" by section 701(b) (1) of
> Public Law 88-352 (78 Stat. 253), as amended, or successor
> statutes."[27]

NANA owns nothing of Teck.

In any event, the burden of proving such exception is upon Teck. *EEOC v.*

*Chicago Club*, 86 F.3d at 1429 (7th Cir. 1996); *Firefighters for Racial Equality v.*

*Bach*, 611 F.Supp. 166 (D.C.Colo. 1985).

---

[27] The Conitz I Court declined to reach the 43 U.S.C. §1626(g) question.
However, if this Court is to consider whether Teck's shareholder favoritism is
"political," it probably needs to review this defense.

## TECK IS NOT NANA

The District Court directed the parties' attention to *Aleman v. Chugach Support Services Inc.*, 485 F.3d 206 (4th Cir. 2007), Transcript, Conitz I, Doc. 173-2, p. 8, ln. 20-25.

The question of whether Chugach Support Services qualified under 43 U.S.C. §1626(g) was not addressed in the text of that case; however it appears that Chugach Support Services is either a Native corporation or an entity that the Corporation owns at least "twenty-five per centum of the equity." Chugach Native Association is listed as an Alaska regional corporation under 43 U.S.C. §1606(a)(9). Additionally, under 45 U.S.C. §1205(a)(3), Chugach Natives are once again listed concerning transfer of lands. Chugach Support Services has a website, which has indications that it is a subsidiary of Chugach Native Corporation. *See*, www.chugach-ak.com.

Another case that addressed the "twenty-five per centum of the equity" question was *Pratt v. Chenega Integrated Systems,* 2007 WL 2177335 (N.D.Cal. 2007). In that matter, the court noted, "here Chenega provided documentation that demonstrates it is at least twenty-five percent owned by a Native corporation, Chenega Corp. and Pratt do not contest this status." *Chenega* at 3. This was discussed and uncontested.

Plaintiff notes that both Chugach Support Services and Chenega Integrated Systems have the base name, or root name, of a Native corporation or village in their name. Plainly, Teck does not. Teck is not a Native corporation. There is no evidence in the record to show that NANA "owns" any portion of Teck. The business agreement between Teck and NANA is that of a lease. Conitz I, Doc. 64-4, p. 2.

Congress drew the line in the sand, in 43 U.S.C. §1626(g), in exempting discrimination liability under Title VII based solely on shareholder status at a twenty-five percent ownership. The Court and the parties know that NANA does not own "twenty-five per centum of the equity" of Teck because, were it so, the defendant would have by now plainly stated such, and produced unflappable documentation thereof. The absence of such evidence, were it to exist, which would easily be within the access of defendants and its counsel, precludes the necessity of further discussion of the evidentiary issue. Plaintiff attempted to discover materials concerning the business relationship between Teck and NANA. The defendants resisted and Motion to Compel was filed. The Court restricted Plaintiff's access to the operating agreement between the parties. *See*, Conitz I, Doc. 26. The corporate disclosure statements prove that NANA owns nothing of Teck. *See* Exh. A.

## REMARKABLY, NOTHING IS WRITTEN DOWN

### Evidence of a Guilty Mind

We are all familiar with equal opportunity statements put out by employers.

They will typically say something to the affect of the following:

> We are an equal opportunity employer and do not discriminate based on race, sex, creed, color or national origin, etc.[28]

---

[28] *See,* Expert Report of D. Jan Duffy, September 8, 2009 (attached as Exh. F, e.g. 7-10 and 13), in a separate employment action against Teck. Mitchell v. Teck Cominco, 2KB-05-103 CI, and is a Human Resources appraisal of Teck Cominco's failure to have, or even be aware of whether it is has an equal employment opportunity statement. Ms. Duffy levels scathing criticism at Teck.

She sums up her examination:

> "In fact, although I have been extensively involved with employers like Teck Cominco in such relatively rugged industries as mining, manufacturing, petroleum exploration and production, transportation, and law enforcement as a legal advisor, consultant, educator, investigator, and expert witness, I have never seen a workplace culture as extremely and unabashedly out of step in discrimination matters with those of similarly situated American employers as was, and is, Teck Cominco's Red Dog Mine." Exh. F at p. 13.

Ms. Duffy also notes that in the Mitchell case, Teck read emails of employees. This invasion of privacy and spying conduct is the same as opening letter mail in Conitz. Exh. F at p. 23.

Then, if there is an allegation of discrimination in the workplace, the employer can claim, and likely does so truthfully, that there is no such policy of discrimination.

However, if there is an official policy of discrimination, it ought to be included and is required if the employer seeks the limited exception to Title VII under §703(i).[29]

Note for example, the clipping from the newspaper concerning a workplace preference notice in a Help Wanted Ad, Exh. E.

At first, such notice may seem inconsequential. However, it clearly and unequivocally gives the potential employee notice of a preference in the workplace and the opportunity for the employer to explain the legality of its preference. Furthermore, at least then the employee knows where he stands.

Teck on the other hand will not admit to having a written policy on this. It has done its absolute utmost to hide its 1982 agreement with NANA that states it has such a preference. It avoids making any such statement on any of its personnel

---

[29] This exception, the "Indian preference" to Title VII, is currently codified as 42 U.S.C. §2000e-2(i). However, it has been commonly referred to in the case law under the previous numbering as the §703(i) exception.

documentation. The reason it does not, is that it has a guilty mind. It knows that its workplace preference is not legally justified. This is further illustrated by Mr. Conitz's declaration where it says that he spoke with Mr. Greenhall; and that he was told that he would be able to advance without hindrance of an Alaska Native/NANA Shareholder hiring preference. *See* Declaration of Gregg Conitz I, p. 4, para. 17.

## AFFIRMATIVE ACTION

Conitz is the minority in the NANA region, because the region is populated by over ninety percent Inupiat Eskimos. Conitz I, Doc. 64-8. Therefore, you have an ethnic majority, Inupiat Eskimos, discriminating against an ethnic minority, white people and/or others. This cannot be an "Affirmative Action" plan. *City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 505-06, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989).

While, perhaps, the one-hundred percent goal, with no beginning and no end and no opportunity for other races, might fit the education-based *Kamehameha*, there is no precedential law for such a plan in the employment context. Any such ruling in an employment context would mean an end to discrimination lawsuits. It would allow any employer to set an endless one-hundred percent quota for its pet

class of folks and that would end that. Anti-discrimination law would no longer exist.

These suggestions are incredible. If an undergraduate admissions program fails strict scrutiny under the equal protection clause, it also violates 42 U.S.C. §1981. *Kamehameha* at 839, *citing Gratz v. Bollinger*, 539 U.S. 244, 275-76, fn. 23, 123 S.Ct. 2411, 156 L.Ed. 257 (2003). The proffered non-specific "Affirmative Action" plan, with its one-hundred percent Alaska Native/NANA Shareholder employment goal, will trammel the rights of everyone else. It is not a viable plan. Therefore, since it fails, it also violates Title VII of 42 U.S.C. §1981 and Title 18 of the Alaska Statutes.

These constantly shifting and inconsistent defenses demonstrate the pre-textual nature of Defendant Teck's actions. Teck's "Affirmative Action" plan" is invalid. It simply does not exist. The defendant's plan is nothing more than a race-conscious employment practice. This is discrimination, plain and simple.

## STANDING

### *Waters v. Heublein, Inc.*, **547 F.2d 466, 469**

In *Waters*, a white person moved to enjoin discrimination against groups to which she did not belong, blacks and Hispanic Americans. The question was

whether or not she was a "person claiming to be aggrieved" by such discrimination. The Ninth Circuit relied on the Supreme Court decision in *Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972) which held that the term "person aggrieved" includes persons not themselves the object of discrimination or injured "(by the loss of important benefits from interracial associations).

There is no doubt that Conitz is an aggrieved person based upon his treatment by Teck, as is outlined in his declaration and his statement that he is aggrieved by the Teck policy because it segregates, limits, and classifies him due to his race and national origin. Conitz does not have the opportunity to compete fairly and evenly with Native job applicants. See *Connecticut v. Teal*, 102 S.Ct. 2525, 2531 (1982), which says when an employer uses a nonjob-related barrier in order to deny employment opportunity because of race, color, religion, sex or national origin, it violates Title VII. Merely precluding Conitz from having the opportunity to compete fairly (even if only in the context of equally qualified people) violates 42 U.S.C. §2000e-2(a)(2).

*De La Cruz v. Tormey*, 582 F.2d 45, 50 (9th Cir. 1978) addresses standing and requires that in order to have standing Plaintiff must have alleged a personal

stake in the outcome of the controversy as to justify their invocation of the Federal Court jurisdiction. All allegations must be construed as true.

There, the plaintiffs alleged denial of their access to higher education. The injury would be redressed by the remedy sought. Merely because they had not attended college or expected to go to college eliminated from the case the alleged burdens and uncertainties claimed to suffer because of the challenged policy. The Court concluded they were not deprived of their standing to sue.

> The defendants have challenged the plaintiffs' standing to sue. There are four plaintiffs presently before the court. At the commencement of this action, one of them, De La Cruz, was a prospective high school graduate not then enrolled in any college of the District, but wishing to go to college at some future time. [FN17] The other three plaintiffs are presently students in colleges of the District. Consequently, the defendants suggest that there is no causal relationship between any action or policy of the District and the plaintiffs' alleged lack of appropriate educational opportunities. Since the plaintiffs, the argument runs, have not been denied a college education or access to a college education because of any failure of the District to provide child-care facilities, they are suffering no deprivation of rights nor any legally cognizable injury. The motion to dismiss for lack of standing was not passed upon by the District Court, but since our jurisdiction to decide the case is implicated we are constrained to consider it.

> FN17. We are informed by counsel for the appellants that plaintiff De La Cruz has since acquired her high school equivalency diploma and now claims to be unable to attend college because of the lack of available child care.

> The governing standard is clear:

For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party.

*Warth* v. *Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975).

Applying this principle, there can be little doubt that plaintiffs have standing to sue. They have alleged "such a personal stake in the outcome of the controversy" as to justify their "invocation of federal-court jurisdiction." *Id.* at 498-99, 95 S.Ct. at 2205, *quoting Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). They have alleged that they themselves are injured, and the complaint indicates that the alleged injury is fairly traceable to defendants' acts or omissions. *Village of Arlington Heights v. Metropolitan Housing Development Corp., supra,* 429 U.S. at 261, 97 S.Ct. at 555. Moreover, they meet the requirements enunciated by this Court in *Bowker v. Morton*, 541 F.2d 1347 (9th Cir. 1976). In brief, plaintiffs have alleged a "particularized injury," namely, the denial of their access to higher education; this injury is asserted to have "concretely and demonstrably result(ed) from defendants' action(s)"; and the injury alleged would be "redressed by the remedy sought." *Id.* at 1349. The plaintiffs' grievances have not become any less palpable or distinct to them because they attend college or expect to go to college, nor does the fact that several have made temporary arrangements for the care of their children eliminate from the case the alleged burdens and uncertainties they claim to suffer as a result of the challenged policy. Consequently, we conclude that they are not deprived of standing to sue.

*Tormey* at 62.

Conitz, who actually works for Teck, has competed for promotions, and he has been turned down for them. He has and will be denied the access to compete

fairly for promotions. The injury will be redressed by the remedy sought. *See* Declaration of Gregg Conitz I.

Conitz asks the Court for an order holding that any preference based on Alaska Native/NANA Shareholder status is a violation of the laws of the United States and the State of Alaska.

## **CONCLUSION**

Teck has admitted to having a policy in favor of Alaska Native/NANA Shareholders. The Court must decide whether the Alaska Native/NANA Shareholder hiring preference is illegal discrimination. The Court in Conitz I, in doing its analysis, subliminally finds that Alaska Native Corporation, Northwest Alaska Association Shareholder really does equal a member of an "identifiable class of persons" who are given a preference in employment, solely because of their "ancestry or ethnic characteristics." The Court the goes on to justify the preference under *Mancari*. However, it fails to recognize that the *Mancari* preference applies to all Native Americans and not one specific group of Native Americans.

The Court then goes on to say that because not all shareholders are more than one-quarter blood quantum Native, the group of NANA Shareholders are not

an "identifiable class of persons"  ascertained because of their "ancestry or ethnic characteristics."

This self-supporting circular reasoning is invalid.

It is the overriding public policy of the United States, and all of the individual states, that there will be equal economic opportunity in employment. One does not have to be a lawyer to know this. Should an employer impose some racial preference in employment, a person of common sense would ask the employer to why there should be some exception to the rule.

The category of NANA Shareholders is a proxy for race. Essentially all NANA Shareholders are Alaska Natives. *See* Exh. D. The Alaska Native/NANA Shareholder preference is an illegal racial employment preference under 42 U.S.C. §1981, Title VII, and AS 18.80.220(a)(1) and (a)(3).

Teck admits that they have an employment preference in favor of Alaska Native/NANA Shareholders. Clearly, Conitz and others are an "identifiable class of persons" who are subject to intentional discrimination solely because of their "ancestry or ethnic characteristics." However, the composition of the favored class is actually irrelevant. The focus is on the race of the burdened party.

Baseball was segregated until Jackie Robinson came along. If Buck O'Neill complained and said he wanted to play Major League Baseball, and Major League Baseball said, "You have no complaint because not only do we have white people playing here; but we have Lefty Gomez, a light-skinned Mexican;" Buck O'Neill would still be being discriminated against because he was black.

The Alaska Native/NANA Shareholder preference discriminates against Conitz because he is white. Conitz cannot obtain shares in NANA and therefore cannot obtain economic equality in the workplace – unless the preference is enjoined or removed. Our nation has a paramount goal of equal economic opportunity for all without regard to race, creed, color, or origin. Teck's plan discriminates against Conitz and all non-Northwest Alaska Natives based on race.

The Court should rule that any preference for an Alaska Native/NANA Shareholder is illegal under Title VII, Title 18 of the Alaska Statutes, and 42 U.S.C. §1981 and is a direct violation of 42 U.S.C. §2000e-2(a)(2). Conitz and others are segregated because of their race and national origin. It is also a direct violation of AS 18.80.220(a)(1) and (a)(3) because the employer circulated a statement which made an inquiry in connection with employment which expresses directly or indirectly a limitation, specification or discrimination as to race, color, and national origin or an intent to make that limitation.

The Conitz I Court and the defendants argue that it is not discrimination because it is "political" favoritism. The defendants and the courts failed to do the required careful analysis. Congress and only Congress can decide when to exercise its authority under the Indian Commerce Clause and the Treaty's Powers Clause to provide favoritism to Native groups. When it does so, it does explicitly through statutes. No such statutes apply here. This is not "political" favoritism. It is racial discrimination.

### The Flawed Analysis

In Conitz I, the Court relied upon a bad kettle of fish. The Court relied upon the minority concurring opinion in *Doe v. Kamehameha*. The concurring opinion in *Kamehameha* is not law; and the Conitz I Court was clearly mistaken to rely upon it. In addition, the Conitz I Court relied upon *Morton v. Mancari*; but they failed to do the careful analysis required there. There is no congressional authority for any kind of "political" favoritism in *Mancari*. There is no federal statute to support the Court or the defendant's position.

The §703(i) exception does not apply. See *Malabed*.

The §1626(g) exception does not apply. Congress chose to draw a line in the sand at "twenty-five per centum of the equity" - (for exemption from Title VII

only). Teck and NANA are in the position to bring forth any such proof and have failed to do so, (particularly if the court has prohibited discovery by Plaintiff of this nature). Additionally, Teck and NANA's corporate disclosure statements prove that NANA owns nothing of Teck. *See* Exh. A.

The Conitz I Court's flawed logic was that it presumed or assumed *arguendo* that NANA Shareholders was a racial group. The Court then went and fished around for a justification for racial discrimination. The Court mistakenly relied upon *Kamehameha* and *Mancari*.

The Court then goes back and undoes the conclusion that it is a racial preference because 65 of 11,655 shareholders might not be one-quarter blood quantum Alaska Native. See Exh. D. The Court then states that Alaska Native Corporation NANA Shareholder is not a proxy for race.

This analysis is logically flawed. In the final analysis, the *Mancari* exception is not considered unless it is established that the preference is for an "identifiable class of persons" based on their "ancestry or ethnic characteristics." Once that is established, either it receives the shelter of *Mancari* or it does not. If it does not receive the shelter of *Mancari*, then the analysis is over and the preference is illegal. The Court's arrival at the conclusion that *Mancari* MIGHT apply, means

Motion for Injunction and Jury Instruction                    Page **81** of **84**

that NANA Shareholders are an "identifiable class of persons" based on their "ancestry or ethnic characteristics," is then established. Once that is done, you cannot go back and pull yourself up by your bootstraps.

The thread of reasoning would then go back to the Court deciding that the preference does not describe a racially discernable group; and therefore there is not a preface for race. Again, it does not matter whether the NANA group is a racial group; what matters is whether Conitz is discriminated against because he is white (just like Buck O'Neill would be discriminated against because he is black).

The Court becomes trapped in this circular reasoning. Linear reasoning needs to apply.

An additional major flaw in this illogical reasoning loop is that *Mancari* does not authorize permissible discrimination on behalf of a segment of a Native American population. *Dawavendewa* at 1120. Even if the illogical circular reasoning loop were not used, the fact that the discernable group of Alaska Native/NANA Shareholders is only a fraction of all Native Americans makes the Court's decision contrary to *Mancari* itself and the discussions of *Mancari* in the federal and state court decisions in *Malabed*.

### The Appropriate Analysis

The analysis of this case and the Court's prior decision in Conitz I can be digested into a very simple analytical scheme.

Therefore, the correct logical sequence is as follows: **(a)** Teck has a hiring preference for Alaska Native/NANA Shareholders; **(b)** a preference for Alaska Native/NANA Shareholders singles out identifiable classes of persons solely because of their ancestry or ethnic characteristics (non-Natives); **(c)** if there is no exception to the general rule that such a preference is illegal discrimination; then it is illegal discrimination; **(d)** does *Mancari* or any other exception apply? **(e)** *Mancari* does not apply because, a "political" preference  is not specifically statutorily authorized and is only for all Native Americans (the word "shareholder" does not appear even once in the *Mancari* opinion); **(f)** 43 U.S.C. §1626(g) does not apply (even if it did, the claim would only be excepted from Title VII and not other civil rights statutes); **(g)** 43 U.S.C. §1626(g) does not apply because NANA owns nothing of Teck.

Therefore, any shareholder preference in the Teck workplace is illegal discrimination.

**RELIEF REQUESTED**

1) Forever enjoin Teck from giving any preference whatsoever to shareholders in the workplace at its mine in Northwest Alaska; and

2) Issue a jury instruction stating that any shareholder preference in the Teck workplace is illegal race and/or national origin discrimination.

RESPECTFULLY SUBMITTED this 11th day of November 2009, at Fairbanks, Alaska.

> LAW OFFICES OF KENNETH L. COVELL
> Attorney for the Plaintiff, Gregg Conitz
> s/ Kenneth L. Covell
> 712 Eighth Avenue
> Fairbanks, Alaska 99701
> Phone: (907) 452-4377
> Fax: (907) 451-7802
> Email: kcovell@gci.net
> ABA No. 8611103

**CERTIFICATE OF SERVICE**

This is to certify that a copy of the foregoing has been served electronically through ECF to the following attorney(s) and/or parties of the record:

**Sean Halloran**

**Thomas Daniels**

Dated: November 11, 2009
By: s/ Kenneth L. Covell