# EXPERT REPORT OF D. JAN DUFFY

**RE: Maurice Mitchell v. Teck Cominco Alaska Incorporated**

**CASE NUMBER 2KB – 05 - 103**

**PROFESSIONAL QUALIFICATIONS:**

As detailed in the attached resume, I am a management practices consultant, independent workplace investigator, and educator with offices in San Francisco, California, and London, UK. I advise employers and employees, human resources professionals, managers, and attorneys, in both public and in-house settings, concerning such management issues as effective discrimination, harassment and retaliation prevention and correction; conducting workplace investigations; critical thinking in managerial decision-making; workplace privacy and information practices; culture assessment; diversity change management; and managing in the global workplace. I advise employers in designing and implementing equity change management and monitoring programs, and drafting and implementing appropriate workplace policies, procedures, and programs. I act as an independent investigator in workplace complaints, compliance, ethics, whistleblowing, and business misconduct matters both in the US and Europe. I also maintain a nationwide practice as an employment practices litigation consultant and testifying expert, serving both plaintiffs and defendants, concerning usual and appropriate workplace-related management practices.

From September 1980 until September 1996, I was employed full-time as a Professor of Business at California Polytechnic State University at San Luis Obispo, California. In that capacity, I taught undergraduate and graduate business classes in public policy and government regulation of business, legal and regulatory aspects of international business transactions, employment and business law, and the legal environment of business. All of those classes included a component of employment law and policy, compliance and ethics, and critical thinking in managerial decision-making. My students were chiefly MBA, management, human resources, finance, marketing, accounting, and international business majors. I taught and evaluated the performance of several hundred such students each year. As a business school professor, I also served the university in the following capacities, among others: Chair of the 1993 Business Dean Search Committee; faculty liaison to the Business School Advisory Council; faculty liaison to the University President's Cabinet; Chair of the University Grievance and Disciplinary Action Committee; sexual harassment advisor and investigator; and as a member or Chair of various committees including the Affirmative Action Grant Review Committee and the Ad Hoc Committee on the Status of Women. As a senior faculty member, I had occasion to observe, evaluate and/or recommend job-related decisions respecting university business students, faculty, and administrators.  I participated, as either a member or Chair, on several dozen selections or appointment committees for administrators, interim administrators, foundation administrators, faculty, and student employment positions.

I am also a former management-side employment attorney. Having practiced full time for approximately four years before joining Cal Poly's faculty, I continued to practice part-time for eight years as "Of Counsel for Employment Matters" after becoming a professor. While employed as an attorney, I advised public and private sector employers on most

1

aspects of labor relations, employment law, employee rights and responsibilities, and appropriate managerial practices. In a number of circumstances, although I did not have an official title or office with the company in question, I served as the de facto Human Resources Director, resolving employee relations matters in direct consultation with the employer/owner. I have assisted in recruiting and selecting human resources directors for those and other clients. Since leaving the "of Counsel" law firm position in 1991, I have continued to work as a human resources and management consultant and employment-related educator and investigator to managers, employees, and human resources professionals.

In these above capacities, over a 33-year period, I have worked with or concerning several hundred public and private sector organizations in mining, manufacturing, pharmaceuticals, technology, retail, telecommunications, hospitality, construction, transportation, law enforcement, education, health care, financial services, and other industries. Among the organizations that I have advised or consulted to, or whose policies, procedures, and practices I have evaluated in the course of my career, are a large number of organizations that are similar to the defendant in certain relevant respects. This includes organizations similarly situated in terms of legal jurisdiction, that is, the federal and/or state laws under which they operate and which therefore inform their management and legal compliance practices; time period; size; organization and structure; geographical locations-structure; union status; employees (positions and/or skills levels); and/or general type of industry, service, or sector.

I have created employee manuals, policies, and procedures; discrimination, harassment, and retaliation prevention programs, policies, and procedures; intellectual property protection programs; reduction-in-force plans; affirmative action plans and recruiting initiatives; performance evaluation systems; promotion and transfer policies; and disciplinary action systems. I have conducted fact-finding investigations and audits; assisted in performance coaching and counseling; created performance improvement plans; reviewed performance evaluations; audited employee performance assessments; recommended termination or other disciplinary action; and devised and implemented termination strategies and agreements. I have educated hundreds of employers, managers, union officials, and employees in such subjects as discrimination, harassment, and retaliation prevention; workplace investigations; whistle blowing; appropriate disciplinary action programs; handling difficult employees; performance evaluation; workplace privacy and information collection, retention, and disclosure; decision-making; legal compliance; wrongful termination avoidance; and other appropriate management and leadership practices.

As an expert witness or consultant, I have evaluated, among other issues, workplace investigations; discrimination, harassment, and retaliation prevention and correction programs; interactive processes; privacy and proprietary information practices; code of conduct issues; complaint responses; performance evaluations; promotion and selection programs and decisions; disciplinary action programs and decisions; reductions in force; and employee terminations. I have regularly evaluated training programs, particularly those concerning discrimination, harassment, and retaliation prevention; workplace investigations, privacy, and other information practices; and valuing diversity and creating respect for individual differences.

In addition, I have recently achieved certification from the Society for Corporate Compliance and Ethics as a Certified Compliance and Ethics Professional. This course of study required the completion of credits in subjects such as creating effective compliance programs; risk assessment and management; conflicts of interest; and codes of conduct; as well as the successful passage of a written examination. Maintenance of the credential requires significant ongoing continuing education and professional activity in the ethics and compliance field. I have recently published an article on retaliation prevention in the Society's refereed journal, C*ompliance and Ethics Magazine*, and presented a paper entitled "Retaliation Investigations: Cross-border Edition" at the Society's 2008 Annual Meeting.

I am also a founding member of an international, multi-disciplinary human resources group called XBHR (Cross-Border Human Resources) that focuses upon appropriate human resources strategies and programs for multinational and global corporations.  I am also a founding member of two professional groups for independent workplace investigators, the Independent Investigators Association and the California Association of Workplace Investigators, now the Society of Independent Workplace Investigators that focus upon appropriate strategies and standards in the ethical and effective conduct of internal investigations in employment and business related matters.  I speak at and/or attend a variety of professional programs and presentations every year on issues related to management practices and/or the law of business and of the workplace. I also write and publish several professional papers or articles on related topics each year.

I have been active in professional organizations such as the American Bar Association's Labor and Employment Section and the International Bar Association's Human Resources Section on issues of employee rights and responsibilities.  Initially, I served as Co-Chair of various subcommittees of the Employee Rights and Responsibility Committee including the Subcommittees on Privacy and Collateral Torts and on Covenants Not to Compete.  During my years chairing the Privacy and Collateral Torts Subcommittee, in particular, I was responsible for reporting on employee rights and responsibilities developments in privacy and workplace information collection, retention, and disclosure law and practice.  Ultimately, I served a three-year term as Co-Chair of the entire ERR Committee and have remained active in related ABA and employee rights and responsibilities activities. I have recently been appointed Co-Chair of the newly formed ERR Workplace Investigations Sub-Committee.

Additionally, a significant portion of my archival scholarly research both as a business school professor and as an active speaker and member of professional organizations, has concerned employee rights and responsibilities issues. This has particularly included work in the areas of privacy and workplace information practices, wrongful termination, code of conduct, ethics, and compliance programs; internal investigations, and design and implementation of programs, policies and procedures that balance employer and employee rights.

Finally, I am a qualified expert witness on usual and reasonable management and human resources practices in state and federal court in California and other states, having testified in deposition or trial in over 100 cases. In 1999, I was appointed by consent of the Federal District Court for the Southern District of California as consultant to the class action Consent Decree in Bouman v. Baca et. al., a gender-related promotion, transfer,

3

and harassment case against the Los Angeles County Sheriff's Department.  In that capacity, for one and one half years, my organization and I served nearly full time to evaluate and advise the parties to the consent decree in the development of a workplace discrimination, harassment and retaliation prevention and correction restructure and education program and development of new policies and procedures for the County's 14,000 employee Sheriff's Department.  My full Resume is attached as Attachment 1.

## MANAGEMENT PRACTICES

"Management practices" is the discipline or subject area that concerns the theories, strategies, policies, procedures, processes, and practices that organizations use to manage resources, processes, and operations successfully. This includes managing employees. Sometimes also called "employment" or "human resources" practices, management practices in the employment area include such matters as establishment and maintenance of effective employment-related initiatives, programs, policies, procedures, and practices such as those involved in discrimination, harassment, and retaliation prevention and correction programs; complaint procedures and internal investigations; ethics and compliance programs; and managerial decision-making and disciplinary action in situations involving, among other things, discrimination, retaliation, code of conduct violations and other workplace misconduct.

"Management practice" is certainly informed by the law, as legal and regulatory compliance is a prerequisite to reasonable and effective management.  Legal change often creates corresponding change in reasonable management practice, and although with less frequency, change in reasonable management practice will sometimes drive legal change. In addition, however, "reasonable" or "appropriate" management practice is also that which attracts and retains employees, maintains a productive and safe work environment, and meets community and societal expectations of good corporate citizenship or public sector service. In short, appropriate management practice is also comprised of the known, fair, effective, and relevant management policies, procedures, practices, strategies, and other tools that reasonable organizations use to solve common problems or advance common goals and objectives within the enterprise and the workplace.

The purpose of providing management practices expertise in litigation is to offer the trier of fact information and insight as to the known, effective, relevant, usual, and customary, that is, "usual and reasonable" practice of comparable organizations or institutions at the time of the events involved in the litigation. The applicable standard for such analysis is not "best practices," which is an aspirational standard, but rather, "usual and reasonable" practice at the time of the events or circumstances in question in the litigation.  That is, again, the policies, procedures, processes, and programs that comparable employers at the time *knew* to engage in; what they feasibly *could* do or engage in; and what they in fact, commonly *were doing* to achieve legal compliance, equal employment opportunity, property protection, adherence to codes of conduct and ethical behavior, or other necessary workplace objective.

## RELEVANT MANAGEMENT PRACTICES

Both the law and practice driving "usual and reasonable" management efforts to prevent and correct discrimination, harassment, and retaliation have evolved over time.  They

both clearly derive from numerous different sources in the legal and the business management worlds. On the legal side, most federal and state courts have weighed in on various aspects of what constitutes *legal* and reasonable management effort under various circumstances in various time periods. The seminal legal drivers clearly include the U.S. Supreme Court's 1998 decisions in *Faragher v. City of Boca Raton* and *Burlington Industries, Inc. v. Ellerth,* as well as its 1999 *Kolstad v. American Dental Association* decision. State judicial law, has for the most part followed federal law in the development of legal guidance as to numerous specific aspects of necessary policies, procedures and practices in anti-discrimination compliance. However, there is still no comprehensive or definitive legal ruling as to the entirety of what constitutes, or at any given time constituted, a complete, legally compliant, discrimination prevention and correction program.

The federal Equal Employment Opportunity Commission's 1997 Best Practices of Private Sector Employers Taskforce Report, various Compliance guidelines, and particularly its 1999 Guidelines on Vicarious Liability for Supervisors have also served as helpful compliance guidance to employers in developing legally appropriate practices in this area. Although much of the EEOC's early guidance specifically concerned prevention and correction of sexual harassment, the EEOC has since clarified that its prevention and correction guidance is intended to apply to all forms of discrimination, harassment, and retaliation. The EEOC's Guidelines on Vicarious Liability for Supervisors, supplemented by such guidance as its 2006 Compliance Manual on "Race and Color Discrimination" provide considerable guidance as to the elements of effective anti-discrimination policies and procedures; necessary components of management and employee training programs; and the fundamentals of reasonable fact finding and decision-making in the event of a complaint. Although not legally mandated, such guidelines are sufficiently persuasive as to form a substantial part of the body of known, usual and reasonable management practice in the prevention and correction of discrimination, harassment, and retaliation in the workplace.

More recently, analysis of what is legally "usual and reasonable" in organizational compliance efforts, including discrimination prevention and correction programs, has also frequently referenced the 2004 revisions to the U.S. Federal Sentencing Commission Guidelines. Tasked in the Sarbanes-Oxley Act with amending and amplifying the Sentencing Guidelines for organizations that violate federal laws, the Federal Sentencing Commission amended Chapter 8 of the *Commission Guidelines* in 2004 to identify seven factors that define an effective compliance program. Chapter 8's Guidelines identify many of the same factors utilized by the EEOC in its 1999 Guidelines but place particular emphasis on certain newer requirements such as establishment of an appropriate "tone at the top" through active top leadership involvement in compliance efforts, and the establishment and maintenance of an organizational "culture of compliance." Chapter 8's Guidelines for effective organizational compliance programs are now utilized by a wide variety of government agencies from the Justice Department to the Securities Exchange Commission to the Equal Employment Opportunity Commission. Such agencies apply the seven factors in evaluating compliance efforts not only for providing sentencing advice to judges in the event of corporate wrongdoing, but also for helping government agencies in determining whether to pursue investigations and/or prosecutions of alleged non-compliance with federal laws in the first place.

On the management practice side of the legal/business equation, the past two decades' compliance efforts of thousands of employers and their advisors in every industry and sector of the economy, as well as the wide range of management responses to the business and social incentives and challenges of providing a discrimination or retaliation-free workplace, developed and utilized over time, have ultimately resulted in a body of practice that constitutes "known, usual and reasonable management practice." "What to do" and "what not to do" or "what works" and "what doesn't" as regards the reasonable management practices relevant to prevention and correction of discrimination, for example, has been, and continues to be, regularly chronicled by scholars, experts, and legal advisors in academic books, treatises and journals, the news media, trade journals, and professional meeting proceedings. Based on this experience and archival research or knowledge, management practices experts explain "known, feasible, usual and reasonable" management practice standards for particular time periods and specific circumstances.

## REPORT

This dispute is between former employee Maurice Mitchell (hereinafter "Mr. Mitchell" or "Plaintiff") and his former employer, Teck Cominco Alaska Inc (hereinafter "Teck Cominco" or "the Company" or "Red Dog Mine") which operated the Red Dog Mine at which Mr. Mitchell was employed for 16 years.  Mr. Mitchell, who was employed as a warehouse supervisor, was terminated on or about May 25, 2005. The alleged reason for his termination was offering a female employee a job in exchange for sex.  He was also said to have lied in his investigation interview and to have violated the company's email policy.

## OPINIONS

Based upon my review of the materials listed in Attachment 2, as well as my experience and expertise, I am of the opinion that:

1.     Teck Cominco failed to engage in usual, fair, and reasonable actions to prevent and correct discrimination and harassment, including that on the basis of race, in its Red Dog Mine workplace.  As such, it acted well out of keeping with its own asserted policies and procedures, as well as usual and reasonable management practice of similarly situated American employers.

2.     Teck Cominco also failed to engage in fair and reasonable fact-finding or investigation prior to deciding to terminate Plaintiff Maurice Mitchell's employment. The Company's investigation was not conducted by competent and impartial investigators or appropriately well planned and organized.  It was unduly hasty. It was not thorough and accurate. It was not fair, either in the sense of being impartial and objective or being conducted according to fair process. It was not adequately documented so as to permit effective decision-making.   Teck Cominco's resultant decision-making concerning Mr. Mitchell's employment was consequently seriously flawed.  As such, Teck Cominco's decision to terminate Mr. Mitchell was neither fair nor reasonable and was well out of keeping with its own asserted policies and procedures as well as usual and reasonable management practice of similarly situated American employers.

3.    Teck Cominco's detailed progressive discipline policy for rank and file employees expressly assures fair and consistent treatment in disciplinary action matters. Whether or not the policy specifically applies to supervisory employees such as Mr. Mitchell, any unfairness or inconsistency in such disciplinary decision-making clearly violates the spirit of Teck Cominco's policy, stated philosophy, and the image of fairness it attempts to project through its disciplinary action policy.

Teck Cominco's disciplinary action policy statement also allows for and encourages disciplinary decision-making that is both subjective and is based upon facts and judgments specific to each individual circumstance. While not wrong per se, such discretionary policies are easily subject to being abused by being applied unfairly and inconsistently by supervisors. They may even serve, through unfair application, as a tool for illegal discrimination.

The obvious fact that Teck Cominco appears to have at least applied this discretionary discipline policy inconsistently as between Mr. Mitchell, who is black, and numerous employees, including managers and supervisors, who are not black, raises the possibility of unfair or inappropriate application in Mr. Mitchell's case. Given Teck Cominco's failure to take necessary actions to assure fair application of its disciplinary action policy, its failure to engage in usual and reasonable actions to prevent discrimination in its workplace, and the concomitant impact of such failure on fair and reasonable decision-making, Teck Cominco's decision to terminate Mr. Mitchell is suspect as being neither fair nor reasonable. As such, Tech Cominco's decision to terminate Mr. Mitchell violated its own asserted policies and procedures and was well out of keeping with usual and reasonable management practice of similarly situated employers.

## BASIS OF OPINIONS

**Opinion 1:   Teck Cominco failed to engage in usual, fair, and reasonable actions to prevent and correct discrimination and harassment, including that based on race, in its Red Dog Mine workplace.  As such, it acted well out of keeping with its own asserted policies and procedures, as well as usual and reasonable management practice of similarly situated American employers.**

At the time of Mr. Mitchell's employment and termination, employers such as Teck Cominco in its Red Dog Mine operations were obligated both by law and fair management practice to engage in reasonable efforts to prevent and correct discrimination and harassment on the basis of such protected status as race and sex as well as retaliation for complaining about it or participating in a related investigation. Failure to engage in such efforts taints every aspect of employee-related decision-making from hiring to firing. This is because in organizations where such efforts have not been made effectively, neither employees nor managers understand their rights and responsibilities under the law or the employers' policies or procedures that have been implemented to achieve compliance with the law and reasonable management practices.
As a result, employees cannot act appropriately to either avoid violating such policies and procedures or to vindicate their rights when others do so.  Even more important, managers and supervisors cannot act appropriately and in accordance with the organization's policies and procedures to fairly and reasonably enforce them or to engage

7

in other necessary measures to prevent and correct discrimination, harassment, or retaliation in the workplace.

Responsible employers accordingly understand that they must undertake a number of important actions to achieve a non-discriminatory workplace.   These include at a minimum:

1.  Demonstration of a clear and unambiguous organizational commitment to equal employment opportunity and a workplace free of discriminatory, harassing, and/or retaliatory conduct.
2.  Establishment and maintenance of a culture and environment that supports rather than undermines such anti-discrimination efforts.
3.  Clear and effective communication of comprehensive, understandable, written anti-discrimination, harassment and retaliation policies and procedures, including effective complaint and remedial procedures.
4.  Effective education of all employees as to their rights under the employer's asserted equal employment opportunity and anti-discrimination policies and procedures. Effective education of executives, managers and supervisors about their responsibilities to refrain from discrimination, harassment, and retaliation against employees as well as their duties and responsibilities under the organization's non-discrimination programs.
5.  Establishment of relevant, effective accountability systems for managers and employees.
6.  Adequate documentation and record-keeping requirements and systems to guide fair and reasonable decision-making, deterrence, and remedial efforts.
7.  Fair and effective actions to investigate and reasonably evaluate complaints of, as well as circumstances or occurrences suggesting, possible discrimination, harassment, retaliation, or related policy violations.

1.  Unambiguous Commitment to Equal Employment Opportunity and Non-Discrimination:

As described in the regulatory compliance literature, including, for example, the Equal Employment Opportunity Commission's Best Practices of Private Sector Employers Taskforce, organizational "commitment" is a key factor in an effective anti-discrimination and diversity program.   The Task Force stated, at page 27 of its 1997 Report: "Management must have a positive and unequivocal commitment to equal employment opportunity.   Without commitment from top-level management to front-line supervisors, nothing can reasonably be expected to be done. Management commitment must be a driving force." Chapter 8 from the *Guidelines Manual* of the Federal Sentencing Commission also identifies commitment as a requisite of any effective compliance program, calling this managerial commitment the critically necessary, appropriate "tone at the top."

Organizations demonstrate such all-important commitment by investing adequate resources of time, money, personnel, and managerial attention to establishing and enforcing clear and comprehensive anti-discrimination policies, procedures, and systems. They also develop and deploy sufficient competent human resources or other compliance personnel to effectively staff and enforce their anti-discrimination efforts. Most

important, they demonstrate active knowledge, awareness, and prioritization, particularly on the part of the organization's leadership, to equal employment opportunity and non-discrimination measures and the substantial effort necessary to achieve an equal employment and non-discriminatory workplace.

From the facts and circumstances revealed in this case, it is apparent that Teck Cominco has failed to engage in virtually any of the actions necessary to demonstrate an appropriate commitment to maintaining an equal employment opportunity and non-discriminatory workplace.  As to investment in the requisite policies, procedures, and programs, for example, as late as 2005, Teck Cominco doesn't appear to even have published a non-discrimination policy or procedure in its Red Dog Operations Policy Manual, other than an inadequate sexual harassment policy, much less established effective EEO procedures or programs at its Red Dog workplace.

Teck Cominco also failed to deploy human resources or other compliance personnel who were trained and experienced in EEO matters. For example, although he had been employed by Teck Cominco for many years in Human Resources and for several years at Red Dog Mine as the chief Human Resources professional, Human Resources Head Jim Somers acknowledged in his deposition that he had no degree in human resources or related subject. Moreover, Mr. Somers, a Canadian, appeared to have had little or no significant American education or training in anti-discrimination matters. (Somers Depo. at 10-12).

When questioned as to Teck Cominco's anti-discrimination policy in a different case, Conitz vs. Teck Cominco Alaska, Inc. Case No. 4:06-CV-00015 RRB, Mr. Somers stated that he thought he had seen an EEO policy somewhere but was unable to state where or accurately to recollect what it said. When asked to find it in the Red Dog Operations Policy Manual, he was unable to do so.  (Summers Depo. at 27-28 in Conitz.) This is a highly unusual and unpropitious knowledge gap for the head of Human Resources who is the employee principally responsible for ensuring that polices and procedures concerning non-discrimination are established and implemented. Further testimony as to Teck Cominco's failure to deploy competent and authorized Human Resources was provided by Red Dog Superintendent Ted Zigarlik. Mr. Zigarlik acknowledged in his deposition that he had little confidence in the competence of Red Dog's Human Resources function. As he quite candidly admitted, "I thought Human Resources as being weak for several years" and "They run themselves thin, as in coverage, quite regularly."  (Zigarlick Depo. at 52-53)

Worse, Teck Cominco's Red Dog Mine leadership, including Mine General Manager Robert Scott, Superintendent Ted Zigarlik and Supervisor Jeff Sheardown among others, appear from their deposition testimony to have been completely unaware of and relatively unconcerned about their organization's equal employment opportunity obligations.  None of Red Dog's leadership expressed or even appears to have been aware of any affirmative obligations on their part to support equal employment opportunity based on factors such as race or ethnicity, or to emphasize or prioritize non-discriminatory behaviors in the Red Dog workplace. None appears to have expressed the slightest understanding that harassment based on race, including racial slurs, derogatory remarks, and racial or ethnic jokes, was contrary to the law or reasonable policy.  None noted or seems to have even understood that efforts to assure fair and non-discriminatory treatment of minority group

members such as Mr. Mitchell in all terms and conditions of employment are requisite in all American workplaces, including Teck Cominco's Red Dog Mine.

Even as to sexual harassment matters, the Company's leadership was manifestly undereducated, ill-informed, and confused. For example, Mine General Manager Robert Scott seemed to think, based on nothing other than his own understanding, that even flagrant sexual conduct between high level superiors and their subordinates or even multiple subordinates was completely acceptable so long as it was "consensual" or did not occur "in the workplace." (Scott Depo. at 41-44, 54-55)   Worse, in answer to a query as to whether Teck Cominco had ever been sued for sexual harassment, he responded that he couldn't understand how a company could be sued for sexual harassment because he didn't see how an entity could harass.  (Scott Depo at 14-15)  On the other hand, Mr. Zigarlik, based on his own interpretation, seemed to believe that even asking a co-worker for a date might be sexual harassment, at least if the woman said "no." (Zigarlik Depo. at 35)  Mr. Sheardown seemed to believe that sexual harassment could occur, as he apparently believed it had in Mr. Mitchell's case, if an individual asked to be introduced to another individual and the second person was "offended" by the request or did not "welcome" it. (Sheardown Depo at 63)  Certainly, neither Mr. Scott, Mr. Zigarlik, Mr. Sheardown, nor other Red Dog management acknowledged any serious concern about the behaviors that should have concerned them that is, the rampant sexual liaisons, conflicts, work disturbances, and other sex-related behaviors that existed at the Red Dog Mine under their leadership.

In short, Teck Cominco did virtually nothing to demonstrate any appropriate and necessary commitment to non-discrimination and equal opportunity at its Red Dog Mine. It maintained none of the usual anti-discrimination policies or efforts that have been standard in other workplaces for decades. Its leadership was ill-informed and unknowledgeable concerning even the most basic equal opportunity concepts and practices.  As such, it could hardly be said to have invested the resources necessary in terms of time or attention to demonstrate anything like a commitment to equal employment opportunity and non-discrimination in its work place.  In this regard, Teck Cominco's actions were egregiously out of keeping with usual, fair, or reasonable management practice of similar employers.

2. Establishment and Maintenance of a Culture Supportive of Equal Employment Opportunity.

Organizational culture, that is the artifacts, values and beliefs, and behaviors that comprise the organization's identity, is also a critical component in workplace equity programs.  An organizational culture supportive of workplace equity will guide the organization safely through most challenges posed by day-to-day differences in perceptions, understanding, and competing claims and values, and ameliorate or even obviate inevitable lapses and mistakes.  An organizational culture that is not supportive of workplace equity will fatally undermine even the most carefully established and well-resourced program of non-discrimination policies and procedures.

Establishment and maintenance of a culture of compliance respecting equal opportunity and non-discrimination requires consistent leadership, substantial investment of time and attention, and continuous efforts to communicate and educate employees and managers as

to the organization's expectations. Again, Teck Cominco has demonstrated no evidence of fundamentally any efforts in that regard.   There is, for example, no proof of unambiguous, regular communication from the organization to employees on the subject of non-discrimination or diversity; there is no evidence of mandatory and comprehensive anti-harassment and discrimination education for managers, let alone employees, or the respect or diversity programs that similarly situated employers maintain in order to create a compliance culture with respect to equal employment opportunity.

Worse, according to numerous sources, including not only the above managers, but also managers such as Mike Schierman and Brian Beduz, Teck Cominco's Red Dog Mine culture was positively imbued with sex and sexuality and even racist and ethnic joking and other conduct that was highly unusual in other American workplaces by 2005.  For example, Red Dog's commissary sold condoms and Red Dog provided sexually explicit cable TV networks in the workers' dormitory rooms. It also appears to have had to increase the size of a waste conduit or pump to reduce the habitual problem of used condoms clogging the system. (Schierman Depo. at 32-33) At one time, a NANA employee reputedly showed X rated videos on Red Dog's in-house TV channel. (Schierman Depo. at 32-33) (Rawlins Depo at 31-32) A former general manager, John Key, who signed the Red Dog Mine's sexual harassment policy, was reportedly reprimanded for extensive internet surfing of porn sites. (Rawlins Depo. at 36-37) Even supervisors such as Mike Schierman, for example, admitted to sending and receiving significant amounts of sexually explicit emails including jokes and pictures. (Schierman Depo. at 12-13)  Others such as Materials Planner Dan Rawlins reported that Mr. Schierman was always joking about race, gender, and ethnicity, as was the former Mine General Manager's secretary, Connie Shafer, who was "terrible" in respect of inappropriate emails. (Rawlins Depo. at 21)  Former Superintendent Keith Malone apparently also was not above circulating such material.   However, none of the individuals in question were ever disciplined for isolating policies to Mr. Rawlins' knowledge.  (Rawlins Depo. at 21, 23, 30)  (Beduz Depo. at 25)

Although numerous others including Red Dog General Manager Scott testified that they were aware of many of the sexual behaviors, including multiple affairs between supervisors and employees, that occurred at the Red Dog workplace, the deposition testimony of the refreshingly candid Dan Rawlins, who has been at Red Dog almost since it opened in 1988, was particularly telling.  He described multiple incidents of sexual behaviors in the workplace over the years.  He described, for example, astonishing misconduct of Red Dog's former second in command, M. B. Abney, who slept around "extensively" with the women at Red Dog.  (Rawlins Depo. at 39.) What struck Mr. Rawlins, who saw Mr. Abney explicitly and crudely proposition a woman in front of other employees, was how exceptionally indiscrete Mr. Abney was, bragging about his sexual exploits with employees and other misconduct including ethics violations, and not seeming to care who heard him. (Rawlins Depo. at  41 – 43)

According to Mr. Rawlins, sexual affairs also led to promotions in Red Dog culture.  He described in particular an episode involving a general foreman, Kie Curtis, who was having an affair with a subordinate Kim Dobb, who was suddenly promoted and given special opportunities not given to others.  Even Human Resources employees apparently participated in the sexual affairs.  One HR employee, Sofie Branigan, who was Kim Dobb's mother, herself had an affair with then Superintendent Keith Malone. Mr. Malone

had previously had an affair with another subordinate employee Betty Sheldon. Ms. Branigan and Ms. Sheldon apparently even got into an altercation and filed for a protective order against Ms. Sheldon, presumably over the sexual liaisons they had each maintained with Superintendent Malone. (Rawlins Depo. at 33)

Additional testimony concerned racist aspects of the culture that Teck Cominco allowed to develop at Red Dog.  Not only were there extremely few black employees at Red Dog, approximately 4 of 400, but, as previously noted, neither Teck Cominco's policies nor the testimony of its leadership seemed to indicate awareness that race discrimination and harassment is also a violation of law and reasonable policy and requires active preventative and corrective measures.    Plaintiff Maurice Mitchell, who is black, apparently contemporaneously raised his concerns about racism, particularly from his supervisor Jeff Sheardown, with several of his peers and supervisors. (Beduz Depo. at 23 24) (Rawlins Depo. at  ) (Zigarlik Depo. at 50)  None of these managers raised the matter with Human Resources or escalated it in the organization as reasonable managers are trained in other organizations to do. Although a couple of these Red Dog managers, at least now, seem to attribute Mr. Mitchell's admitted problems with Superintendent Sheardown to mere personality conflicts between the two, their analysis is suspect given their evident lack of knowledge about and attention to anti-discrimination concerns. (Schierman Depo. at 9) (Zigarlik Depo. at 51)

Again, Mr. Rawlins's candid testimony is striking.  Not only did he discuss with Mr. Mitchell in detail Mr. Mitchell's concerns about his perceptions of racism and racist conduct by Jeff Sheardown, but he was aware of and described incidents of, unfair, and also possibly racist, conduct by Mr. Sheardown.   These included Mr. Sheardown becoming enraged and seeking to blame Mr. Mitchell for events that were not his fault and his repeatedly ignoring Mr. Mitchell while greeting Mr. Rawlins when he passed the two of them standing together. Mr. Rawlins also reported that a Native woman named Kathleen Wellman reported to him that she had heard Jeff Sheardown make racist remarks and also that she had heard and believed that Mr. Sheardown had something against Mr. Mitchell, although she wasn't sure what it was. (Rawlins Depo. at 17 – 19) A letter written by another employee, Sean Capelle, on or about September 28, 2006, confirms that he overheard Mr. Sheardown, who was not only Mr. Mitchell's supervisor but also an important advisor and participant in the investigation and decision-making concerning Mr. Mitchell's termination, make a derogatory and racist reference to Mr. Mitchell.    Speaking to Brian Beduz, Mr. Mitchell's direct supervisor, on the speakerphone, Mr. Sheardown reputedly derisively asked "So how did our Black Toast do for this last barge?"  Not only is such a comment highly inappropriate, but it reveals an animus against Mr. Mitchell that Mr. Sheardown was unashamed to share with Mr. Beduz. (Plaintiff's Motion

Mr. Rawlins also testified that he had heard numerous racial jokes, including black jokes in the Red Dog workplace. (Rawlins Depo. at 22-3)    In addition, he testified that there were supervisors who heard such jokes, and failed to do anything about it.  This included Mr. Schierman, who albeit being known as a "character" and for not really "meaning anything" bad, often even told such jokes and made "racial-sounding slurs" himself. (Rawlins Depo. at 23) Mr. Rawlins also testified as to knowing about the brief display in the Red Dog workplace of a poster showing a black stallion with Mr. Mitchell's head superimposed on the stallion in which Mr. Mitchell was clearly the butt of the "joke." Mr.

Rawlins also recalled a "joke" that, at least in his view was all in good fun, of giving Mr. Mitchell a watermelon with candles in place of a cake to celebrate his birthday. (Rawlins Depo. at 62.)

Finally, Mr. Rawlins also described use at Red Dog of that most appalling and hateful racial epithet "nigger" and "lazy nigger" against Mr. Mitchell. (Rawlins Depo. at 16, 21-22)  Not only did he hear Mr. Schierman and another supervisor Bob Garby use the term, but he was also aware of the fact that Rick Austin, Mr. Mitchell's previous boss, regularly used such derogatory language.  In addition, he said, Mr. Austin appeared to be "hell-bent" on getting Mr. Mitchell fired, although he did not know whether or not the reason was because Mr. Mitchell was black.  (Rawlins Depo at 16)

Some of the episodes described evidently happened within a reasonably short time of Mr. Mitchell's termination, others much earlier in his tenure.   No matter how long ago some of these episodes may have occurred, however, entrenched organization culture does not turn around easily. It takes a concerted effort on the part of management, significant investment, education and, ultimately, grassroots acceptance of change.  Teck Cominco has apparently not made any efforts in this regard even since the filing of this lawsuit. Instead of repudiating and altering this culture, Red Dog's leadership, even current leadership, has tolerated it, allowed it to flourish, and, in some cases, even encouraged it. Accordingly, it is reasonable to conclude that Teck Cominco's culture at the time of Mr. Mitchell's termination was still permeated with the sexual and racial behavior described by witnesses.   In fact, although I have been extensively involved with employers like Teck Cominco in such relatively rugged industries as mining, manufacturing, petroleum exploration and production, transportation, and law enforcement as a legal advisor, consultant, educator, investigator, and expert witness, I have never seen a workplace culture as extremely and unabashedly out of step in discrimination matters with those of similarly situated American employers as was, and is, Teck Cominco's Red Dog Mine.

3. Communication of comprehensive, understandable written antidiscrimination, harassment, and retaliation policies and procedures:

Another crucial element of an effective discrimination, harassment, and retaliation prevention and correction program is the employer's clearly stated prohibition of discrimination, harassment, and retaliation in its workplace; an understandable explanation of what it considers discrimination, harassment, and retaliation to consist of; a statement of managers' and supervisors' responsibilities regarding the organization's policies and procedures; a description of an accessible and workable complaint procedure for raising complaints of violation; assurance of reasonable confidentiality, promptness, and fairness in handling such complaints; a clear warning of serious disciplinary consequences that will flow from violation of the prohibition; and a credible promise of non-retaliation for making a complaint or participating in the anti-discrimination process. In addition, of course, such policies and procedures must be thoroughly communicated to all employees, managers, and supervisors. Finally, an employer must establish and maintain the additional policies, processes, practices, personnel, systems and efforts necessary actually to enforce its asserted policies and procedures on non-discrimination.

Ordinarily, discrimination, harassment, and retaliation prohibitions are incorporated in a written policy or policies that are effectively and comprehensively communicated to all

employees. First, employers insure that their anti-discrimination policies and procedures are prominently displayed in employee handbooks, codes of conduct and any other company documents or internet resources that set forth the company's expectations concerning employee conduct. They also post legally required notices concerning non-discrimination in prominent positions in every facility of the workplace and ensure that they remain effectively displayed. They often take additional steps such as regularly distributing them to each and every employee; ensuring that supervisors participate in the distribution effort and are knowledgeable about and willing to help support the policies. They also make other efforts such as placing EEO notices in employee's pay envelopes, sending them to employees' homes, or obtaining meaningful signed acknowledgements in orientation, training, or management train-the-trainer sessions and all-staff educational meetings.

Clearly, Teck Cominco once again failed to engage in virtually any of these standard practices in its Red Dog Mine workplace. Although Discovery in the previously mentioned <u>Conick</u> case, turned up an otherwise unidentified policy entitled "Equal Employment Opportunity" the policy is defective in that it merely mentions that Teck Cominco Alaska will not discriminate because of race, color, creed etc. buried amid a host of other unrelated matters. These include such issues as it being Teck Cominco's belief that "every employee's contribution can only be maximized" if the Company "insists on achieving a high standard of performance" and, in classic union avoidance language, the Company can "deal directly" with each employee and each employee is able to "deal directly" with it. In any case, this "EEO policy" was not even included in the most important employee-related document, the Red Dog Operations Policy Manual, so could not have served as the requisite and comprehensive EEO policy that should have formed the cornerstone of Teck Cominco's anti-discrimination efforts.

As to the one anti-discrimination policy in the Red Dog Operations Policy Manual, Section 8.4.1, "Harassment", even that policy was highly deficient. First, it dates from October 1995. Many changes in both law and practice have occurred in the fast changing world of discrimination law and practice since that distant date; all of them appear to have been missed by Teck Cominco. Moreover, the policy relates only to sexual harassment and not to all forms of illegal or discriminatory harassment as has been the norm with most employers since the late 1990's. The policy offers no comprehensible definition of even sexual harassment, which makes it difficult if not impossible for employees to understand their rights and responsibilities under the policy. This permits and even encourages both over and under-complaining about sexual harassment matters by employees or others who fail to understand what sexual harassment is and what it is not. The policy also describes no complete or cogent complaint procedures or anti-retaliation promises for guiding employee and managers' behavior.

More important for accused individuals such as the Plaintiff Mr. Mitchell, the ambiguity of, and manifestly inadequate explanations in, Teck Cominco's harassment policy, including that as to what harassment is and what managers and supervisors are supposed to do about it, fostered the ignorance and confusion that was clearly expressed by Red Dog's management in their depositions. Worse, this inadequate and incomprehensible policy may also have been responsible for the allegedly unfair and unreasonable decision-making that led to Mr. Mitchell's termination and this discrimination lawsuit. Managers who don't understand their own policies can hardly be capable of applying and

implementing them fairly or appropriately.

That Teck Cominco also failed to undertake any of the other usual and reasonable actions described above in establishing and communicating comprehensive, written anti-discrimination, harassment, and retaliation policies and procedures seems evident. Again, Teck Cominco's lack of even these minimal efforts to prevent and correct discrimination and harassment in its Red Dog workplace, falls seriously short of the standard management practice of similarly situated employers.

4.  Effective education:

Meaningful, comprehensive EEO education for all members of an organization, but in particular for its managers and supervisors, is one of the most important weapons in an employer's arsenal for combating discrimination, retaliation and harassment. "Meaningful and comprehensive education" is not merely "training" on the employer's policy. Rather, it is accessible, understandable, and cogent explanation, and inculcation of real learning both of the information and the skills necessary to recognize discrimination, harassment and retaliation; to participate effectively in the prevention and correction process; and to comply with the employer's policies, the laws and societal expectations of an equitable workplace.

The facts and circumstances of this case indicate that Teck Cominco made no meaningful efforts whatsoever to educate its employees, including even managers and supervisors, as to their rights and responsibilities concerning the establishment and maintenance of a discrimination-free workplace.    Again, Teck Cominco appears to be operating well beyond the pale of the usual and reasonable management practice of responsible American employers.

5.  Relevant, effective accountability systems for managers and employees:

Employers committed to discrimination, harassment, and retaliation-free workplaces also explicitly communicate to managers and supervisors that both law and the organization's policies prohibit these forms of misconduct and that the organization firmly intends to hold all managers accountable for following and enforcing the employer's anti-discrimination and harassment policies. They inform managers and supervisors that they must themselves refrain from discrimination, harassment, retaliation, and even the appearance of discrimination, harassment, and retaliation.  They educate managers and supervisors as to the ways in which this conduct manifests itself in the workplace, and they explicitly direct managers and supervisors as to their responsibilities for preventing and correcting it. Importantly, employers also ordinarily establish programs, such as penalty and/or reward systems, to ensure that managers adhere to their responsibilities concerning such policies. Certainly, these include application even to managers of fair but firm disciplinary action programs for violation of the policies. They also include tying bonuses, compensation, or other perks to adherence to the policy as well as to notable successes or achievements. Many employers also let employees know of managers' responsibilities and their accountability for acting in accordance with the organization's expectations as a way of bolstering employee confidence that the organization is aware of and intent upon meeting its obligations to provide a discrimination, harassment and retaliation-free workplace.

Once again, the facts and circumstances of this case reveal no significant efforts on Teck Cominco's part to engage in the above-described usual and reasonable efforts. Teck Cominco's one effort, that is, warning managers and employees that "all management personnel are expected to work actively to maintain an environment which is free from direct or suggestive activity that is conducive to sexual harassment" in its Red Dog Operations Policy Manual "Harassment" policy is manifestly inadequate. First, it applies only to sexual harassment and not to race or other equally prohibited forms of discrimination and harassment. Failing to mention other important forms of discrimination, such as race or ethnicity discrimination, focuses any anti-discrimination attention that exists on sexual harassment. It may even suggest that management is really only concerned with and will hold managers accountable only for sexual harassment. At the least, it telegraphs the lack of importance the organization attaches to preventing and correcting such other forms of discrimination. That undermines the all-important demonstration of unambiguous commitment to a discrimination-free workplace that is the foundation of all successful anti-discrimination and harassment efforts.

Even more important, however, this asserted expectation of managerial accountability was routinely disregarded for years at Teck Cominco's Red Dog Mine workplace. As described above, in the deposition testimony of many Red Dog managers, and in the moving papers of Plaintiff Mitchell, Teck Cominco's 20 year history of operating the Red Dog Mine is rife with examples of egregious sexual, racial, and other misconduct, including that engaged in not just by employees, but also by numerous leaders and managers. Under the circumstances, to pretend that Teck Cominco's lone policy effort, the statement that "all management personnel are expected to work actively to maintain an environment which is free from direct or suggestive activity that is conducive to sexual harassment" could possibly be effective is wishful thinking at best.

Asserting, but not enforcing, policies such as this accountability provision manifestly fails to advance an employer's anti-discrimination efforts. In fact, however, asserting a compliance policy, but failing to take the steps necessary to actually enforce it, is worse than failing to establish it at all. This is because such organizational hypocrisy fosters disrespect and inattention to compliance measures in general. It also breeds cynicism in managers and employees and emboldens those who would ignore or violate necessary compliance policies. It is also because such gaps between policy and practice weaken employees' faith in the organization's asserted policies and procedures, including compliance efforts, and discourage or even intimidate employees from raising potentially critical complaints and concerns so that they may be addressed and resolved. That Teck Cominco paid so little attention to managers' accountability for anti-discrimination polices and procedures may well have encouraged failures in, or abuse of, the process that have led to the current lawsuit.

Erratic or inconsistent enforcement of such ordinarily unenforced policies that is, holding one or a few managers to the policy but failing to apply it to others, is also seriously problematic. Certainly it leads to actual or perceived unfairness. It may even create a tool for discrimination, as Mr. Mitchell alleges in this case. Given Teck Cominco's history of disregarding its harassment policy provision when it comes to applying it to many other managers and supervisors, none of whom appear to have been black, Teck Cominco's

discrimination prevention and correction program cannot be described as fair or reasonable in respect of holding managers and supervisors accountable either.

6.    Adequate documentation and record-keeping:

Among the crucial elements of an effective anti-discrimination, harassment, and retaliation program is a set of the necessary policies, procedures, practices, and systems to require and to enable accurate, complete record-keeping, archiving, and retrieval of relevant information and data.  Such programs are necessary for a variety of reasons. Clearly, accurate, fair, and non-discriminatory decision-making depends upon accurate, relevant, and reliable information, as does appropriate remediation of complaints and policy violations. Assurance that decision-makers are in fact provided with such necessary information, particularly as the result of a fact-finding investigation, is difficult or impossible without adequate documentation. Subsequent review and comparison, for fairness, and for non-discrimination or other employer compliance obligations is also impossible without appropriate documentation and retention of information. Deterrence of future wrong-doing also depends upon accurate and complete record-keeping and retrieval, as does the ability to monitor, and where necessary, alter or improve defective policies, practices, systems, or programs.

Here, proper documentation and record-keeping, particularly related to Teck Cominco's investigation interviews and decision-making related to Mr. Mitchell's termination, was absolutely critical.  Tech Cominco fired Mr. Mitchell, a 16 year employee, and one of only 4 black employees at Red Dog Mine, in part, because he allegedly "made an offer of employment to a woman as part of a concerted effort to entice her to enter into a personal relationship" with him.  He was also terminated, in part, for "lying" in his single and brief investigation interview.  As Teck Cominco stated in its May 25, 2009 termination letter, the lies that Mr. Mitchell allegedly told are:
1. "You initially denied any knowledge of the VECO employee whose supervisor initiated the complaint (although you later admitted to being familiar with her)," and
2. "you denied that you had ever asked Ms. Webb to make advances on your behalf."

Accurately recording what Mr. Mitchell was asked, what he said, and the context in which he said it was clearly vital under any circumstances, but particularly in this case. As the current litigation indicates, Mr. Mitchell maintains that he never offered a job in exchange for sex. Rather, he states, he sought out a friend, Carla Webb, to help him meet the VECO employee in question, Laurie Brekke.  Whether or not Mr. Mitchell hoped ultimately to involve Ms. Brekke in a voluntary sexual encounter with himself or with himself and his girlfriend, as he expressed to Ms. Webb, is not an issue that is or should be relevant to the Company.  Not only is truly consensual sex between adults, even those who meet in the workplace, not actionable as sexual harassment, it is not any of the Company's business. (This is of course, distinguishable from supposedly consensual relationships between superiors and their subordinates, which easily may have non-consensual overtones or may present a hostile work environment to uninvolved employees.)  Mr. Mitchell also states that as an entirely separate matter, he and Carla discussed that there might be summer jobs in the warehouse that Ms. Brekke could get if she wanted a job.

In short, Mr. Mitchell is adamant that he never linked the job discussion with sex; he never intended to do so and he never intended for his friend Carla to do so either. Mr. Mitchell's

version of the story is supported by the messenger of his approach to Ms. Brekke, Carla Webb. Close attention to the words used by Mr. Mitchell, Ms. Webb, and even Ms. Brekke and the capability to carefully weigh, accurately understand, and carefully compare and contrast them were thus of utmost importance in fairly determining whether Mr. Mitchell was guilty or innocent of offering a job for sex.

Mr. Mitchell also maintains that his answers in the interview were in fact truthful. He states as to the first alleged "lie" that he did truthfully deny "knowledge" of the "VECO employee whose supervisor initiated the complaint" because he did not, in fact, "know" her, having never met her. He says as to the second alleged "lie" that, in fact, he never asked Ms. Webb to "make advances on his behalf" and that what he asked Ms. Webb to do was to find out if Ms. Brekke was interested in "hooking up," with him, that is, meeting him. Writing a note was not his idea, he maintains.  In fact, he states that he did not even know that Ms. Webb would write or had written a note.  Rather, he claims, and Ms. Webb supports, Ms. Webb chose on her own accord to write a note to close off her attempts to "hook up" Mr. Mitchell and Ms. Brekke because she was herself leaving Red Dog.  Mr. Mitchell maintains that he was being truthful in his interview that he was not aware of and did not ask Ms. Webb to "make advances on his behalf."

The difference between Mr. Mitchell's account and Teck Cominco's, and therefore the truth of the matter, is slight and subtle.  It is more a matter of what was reasonably meant by each of the parties and what was reasonably understood by each of the parties to the interviews. This is far different that the usual, "it did happen or it didn't" question that employers ordinarily deal with sexual harassment matters.  The evidence is accordingly different: rather than physical, documentary, or percipient witness testimony, the truth as to what Mr. Mitchell did or didn't do and therefore whether he was fairly terminated or not, lies in the precise words and meaning and the actual context of what was asked, what was answered, and the reasonable understanding that should be gained from the exchanges.

Unfortunately, neither Teck Cominco's Human Resources chief, Jim Somers, who conducted the interview, nor Mr. Mitchell's long-time manager Jeff Sheardown, who also participated in the interview, took a single note, recorded any preparatory outline or list of questions to be asked, or more or less contemporaneously recorded any summary of the interview.  Because the context has been lost due to Teck Cominco's failures to record what, exactly, was being said and what it was actually learning from its fact-finding effort, the truth of what anyone asked and answered at the interviews, or even an approximation of the truth, is now unknowable.  This notion is reinforced by the fact that Mr. Somers' and Mr. Sheardown's memories of what they did, much less what they asked and what they heard from witnesses, were poor, and even in conflict with each other by the time they gave their depositions in this case in 2006.

Much more important, it was unknowable at the time Teck Cominco made its decision to fire Mr. Mitchell. The whole purpose of an investigation is to gather sufficient relevant accurate facts to provide to the decision maker so that the decision maker can make an appropriate decision. What Mr. Somers and Mr. Sheardown communicated about the "facts" to the actual decision-maker, General Manager Robert Scott, is unknown. What is certain, given Mr. Somers and Mr. Sheardown's failures to follow even minimally acceptable procedures for documenting investigations and interviews, is that the information they provided to the ultimate decision-maker on Mr. Mitchell's termination

was incomplete and inaccurate. It is accordingly highly unlikely that Mr. Scott had the necessary information to make a fair and reasonable decision concerning Mr. Mitchell's employment termination.

7.   Effective Action to Investigate and Evaluate the Facts

Both the law and appropriate management practice require employers to maintain effective, consistently applied enforcement mechanisms for correction of workplace discrimination, harassment, and retaliation. This includes adequate organizational capabilities, personnel, and procedures to ensure prompt but not hasty, competent, well-organized, fair, thorough and accurate investigations of workplace complaints of, or circumstances that might suggest potential, discrimination, harassment, or retaliation. This is because reasonable decision-making on such matters is impossible without sufficient, accurate, and relevant factual information. Moreover, employers must engage in meaningful assessment and evaluation of the results of such fact-finding, and make decisions based upon the results of it, rather than extraneous issues.   Effective investigations are accordingly of great importance in an employer's anti-discrimination efforts.

Because Teck Cominco's investigation in this case is also relevant to other issues, the nature and quality of its investigation in Mr. Mitchell's case is examined in detail below, as Opinion 2.  As Opinion 2 concludes that Teck Cominco's investigation was neither fair nor reasonable from any perspective, Teck Cominco's failed investigation represents but another example of Teck Cominco's failure to engage in the necessary efforts to achieve a fair and non-discriminatory workplace.

**<u>Opinion 2</u>: Teck Cominco also failed to engage in fair and reasonable fact-finding or investigation prior to deciding to terminate Plaintiff Maurice Mitchell's employment.  The Company's investigation was not conducted by competent and impartial investigators or appropriately well planned and organized.  It was unduly hasty. It was not thorough and accurate. It was not fair, either in the sense of being impartial and objective or being conducted according to fair process. It was not adequately documented so as to permit fair and appropriate decision-making. Teck Cominco's resultant decision-making concerning Mr. Mitchell's employment was consequently seriously flawed.  As such, Teck Cominco's decision to terminate Mr. Mitchell was neither fair nor reasonable and was well out of keeping with its own asserted policies and procedures as well as usual and reasonable management practice of similarly situated American employers.**

Although each workplace compliance investigation is based upon unique facts, the process of achieving a fair and effective investigation is relatively unvarying. All workplace investigations must be: staffed by competent, impartial and objective investigators or fact-finders; fair, both in the sense of being open-minded and conducted according to fair process; well-planned and organized; prompt, but not hasty; thorough and accurate; and adequately documented. Teck Cominco's investigation of the concerns raised by VECO contractor employee Laurie Brekke or her supervisors, that resulted in the decision to terminate Mr. Mitchell, was inadequate in virtually each of these respects.

First, Teck Cominco's investigation was not staffed by competent, impartial and objective investigators or fact-finders. Human Resources chief Jim Somers nominally headed the investigation. He was assisted in the interviews of Maurice Mitchell and Carla Webb by Mr. Mitchell's supervisor, Jeff Sheardown. He does not remember who assisted him in his interview of Laurie Brekke but thinks it may have been her direct supervisor or his boss. Review of Ms. Webb's and Mr. Mitchell's emails was conducted by Mr. Somers' subordinate, Peggy Spindler, and Mr. Sheardown because Mr. Somers was occupied by "other business." Both Mr. Somers and Mr. Sheardown, and possibly Ms. Spindler, communicated information directly to the ultimate decision-maker, General Manager Robert Scott. (Scott Depo at 12-13.)

Dividing the information-gathering tasks in this manner would in and of itself prevent a competent investigation. Without a single individual with knowledge of all the key parts of the investigation to identify and rectify knowledge gaps and to contrast and compare all information obtained, the analysis and communication of complete, accurate, and relevant information to the decision-maker could not occur. Mr. Scott indicated that he did not interview any witnesses himself but conferred with both Mr. Sheardown and Mr. Somers as to the facts they learned from witness interviews. He also claims to have read "some" of the emails that Mr. Sheardown and Ms. Spindler collected.

Given that the memories of Mr. Somers and Mr. Sheardown as to what they reviewed and what they learned are different; given that neither of them took or preserved notes; and given that neither of the fact finders possessed the "whole picture" when they provided fact-finding results to the decision-maker Robert Scott, it is highly unlikely that Mr. Scott could have made his termination decision based on sufficient, accurate, and reliable information. The fact that he conferred with an attorney, Sean Halloran, does not change that, since Mr. Halloran would also have been forced to rely on inadequate factual information for whatever conclusions he reached and thus, the advice he offered to Mr. Scott.

In addition, neither of the individuals involved in the fact-finding and decision recommendations appear to have had any significant experience or training in conducting effective workplace investigations. Such investigations are complicated and subtle, however. They require considerable skills, both analytical reasoning and softer "emotional intelligence" skills. They require a considerable amount of knowledge about the subject matter being investigated, in this case, sexual harassment. They also require personal qualities such as persistence, good organization, and careful attention to detail.

From their deposition testimony, it appears unlikely that the Teck Cominco personnel involved in this investigation possessed all or even most of the necessary qualities. It is evident that neither Mr. Scott, Mr. Sheardown nor Mr. Somers had any significant knowledge, much less a thorough understanding, of what sexual harassment actually is and what it is not. None of them appears to be aware of Teck Cominco's relevant policy guidance such as it is. None of them was able to provide a cogent or logical explanation of the purport of the emails between Mr. Mitchell and Ms. Webb and their impact on proper analysis of the situation. In short, Teck Cominco's investigation in Mr. Mitchell's case was ineffective and inadequate and could not form the basis for appropriate decision-making because it was not conducted by competent or experienced fact-finders.

In addition, Mr. Sheardown, who played an active role in both the investigation and the decision-making in Mr. Mitchell's termination, does not seem to have been impartial or objective. His racist remarks and seeming antipathy to Mr. Mitchell had been observed and reported by a number of individuals on a number of occasions, including Mr. Mitchell. He was overheard by employee Sean Capelle making derisive, racist comments about Mr. Mitchell to Mr. Mitchell's direct supervisor. It is therefore most unlikely that he would have been able to discard such attitudes and behave as the requisite, impartial fact-finder he should have been while he was serving as an investigator and decision advisor in Mr. Mitchell's case. Accordingly, it is doubtful that Mr. Sheardown could have provided decision-maker Scott with accurate, objective, and fair evidence to inform Teck Cominco's ultimate decision-making concerning Mr. Mitchell.

Teck Cominco's investigation was also poorly planned and organized. Effective investigators ordinarily create a written investigation plan before they commence an investigation. This permits them to identify and remember the issues that they need to investigate, to determine what company documents and policies are involved or applicable, and to determine who and in what order to question witnesses. Creation of a plan also aids in making sure all witnesses are given the same admonitions and asked the same questions initially, and in checking back for missing details before witnesses are dismissed from the first interviews. Both of the latter are necessary to achieve requisite consistency, thoroughness and, possibly, important admissions. It also allows investigators to backtrack and to check carefully before reaching factual conclusions that all necessary issues have been addressed and fully pursued.

In this regard as well, Teck Cominco's investigators Somers and Sheardown were unsuccessful. They not only failed to make any semblance of an investigation plan, but they conducted the few interviews that they did conduct in a hasty and disorganized fashion. There is evidence to suggest that they did not even ask, or know to ask, many of the important questions in their brief and haphazard interviews. Among the obvious questions they seemed to have missed were whether Mr. Mitchell had asked or even knew that Ms. Webb had written the note that appeared to set Ms. Brekke off; whether Mr. Mitchell had asked Ms. Webb to produce the job application Ms. Brekke said she had received from her; and why, exactly, Ms. Brekke believed that the alleged job offer was linked to a request for sex from Mr. Mitchell, and whether that belief was logical and reasonable under the circumstances.

Importantly, Teck Cominco's investigators Sheardown and Somers abruptly summoned Mr. Mitchell for an exceedingly brief interview just before he left Red Dog on a plane. They have no cogent memories and made no record of the questions they asked him and the answers they received. Yet, they did not meet or speak with him again before Teck Cominco made its decision to terminate him. That meant not only that Mr. Mitchell was allowed no fair opportunity to add to, respond to, or to clarify the information that he is said to have initially, and hurriedly, provided. Moreover, Jim Somers appears to have interviewed the alleged complainant only once before she left the Red Dog Mine for good, as well. Such a hasty interview without a much more extensive re-interview once the scope and shape of the investigation became clear would also have been highly detrimental to good decision-making.

Importantly, virtually nothing that Teck Cominco did in its purported investigation of Ms. Brekke's complaint was sufficiently thorough and/or accurate. The mistakes Teck Cominco and its investigators and decision-makers made in this crucial regard are far too numerous to record. Among the most egregious, however, were the following:

1) Failure of Mr. Somers to understand and record the actual nature of Ms. Brekke's complaint. Good investigations always begin with a clear and thorough understanding of the complainant's concerns or complaints. When Ms. Brekke's written statement concerning what Mr. Mitchell had allegedly done to offend her is analyzed in a logical and natural fashion, she appears to be expressing more annoyance or irritation than the "terror" that Mr. Somers ascribed to her. She described the idea of an approach by Mr. Mitchell through the means of their mutual and female friend as "stupid" and griped that she didn't "feel that the first contact [I] have with the man needs to be for me to tell him to buzz off." Again, whatever the truth or lack of truth of the rumors about Ms. Brekke's sexual escapades, the indifference to the fact that she was one of few females in a male workplace that Ms. Brekke expressed in her deposition testimony as well as her casual descriptions of how she didn't like to, and thus didn't, engage in even friendly socialization with the employees at Red Dog, hardly paint a picture of a woman who was unable to take care of herself or who would be "just terrified" to go into the warehouse because Mr. Mitchell was there. As a measure of Mr. Somers' inaccuracy as a fact-finder, when challenged in his deposition as to whether a person like Laurie Brekke could possibly be easily "terrified," he countered with [well, she was], "afraid, uncomfortable or whatever." To a careful and analytical investigator, there is a world of difference between "terrified" and "uncomfortable", much less between "terrified and "whatever."

2) Failure of both the investigators Somers and Sheardown and the decision-maker Mr. Scott to read and understand the purport of the emails that Mr. Sheardown and Ms. Spindler collected. Mr. Somers acknowledged, for example, that he didn't see, didn't remember, or didn't understand, the lengthy email exchange between Mr. Mitchell and Ms. Webb about the rumors concerning Ms. Brekke's "threesome" sexual exploits. Whether the rumors were correct or incorrect is not the point; rather, Mr. Mitchell's belief about Ms. Brekke's alleged sexual adventurousness is clearly what sparked his interest in getting together with her. Rather than singling out a victim as prey to unwelcome attentions, as many harassers do, Mr. Mitchell, albeit perhaps mistakenly, had reason to believe that his attention in the form of an introduction would be welcome. Very likely, all that Ms. Brekke would have had to do to deflect his attention was to tell her friend Ms. Webb that she was not interested in meeting him. Teck Cominco's failure to understand the context of Mr. Mitchell's request for an introduction meant that Teck Cominco decision-makers could not appropriately understand or evaluate the nature and severity of his conduct.

3) Mr. Somers also seemed to have had no idea of the significance of such important facts as that:

   - Carla Webb wrote the note to Ms. Brekke on her own initiative because she was leaving Red Dog and would not overlap with or see Ms. Brekke to communicate with her face-to-face;
   - Mr. Mitchell did not ask Ms. Webb to write the note and was not even aware that Ms. Webb would or had written the note to Ms. Brekke that Brekke said was the "final straw" in Webb's allegedly excessive campaign

to find out if Ms. Brekke was interested in meeting Mr. Mitchell;

- It was Ms. Webb who provided, and who decided without Mr. Mitchell's even knowing she was doing it, to provide the application papers that Ms. Brekke allegedly took for a linkage between the offer of a job and sex from Mr. Mitchell;

- Ms. Webb was a lesbian and may have had some sexual interest in Ms. Brekke herself and that this, rather than Mr. Mitchell's conduct, may have been the source of the alleged over-insistence or undue eagerness shown by Ms. Webb that put Ms. Brekke off in the first place;

- Mr. Somers never understood, although it was plain on the face of Ms. Brekke's written statement, that Brekke had never even met Mr. Mitchell and very possibly experienced nothing more objectively "terrifying" than the annoyance of thinking about having to brush him off if they were to meet;

- While sexual harassment is indeed viewed in terms of its impact on the victim rather than the intent of the perpetrator, the perspective as to impact must be both subjectively and objectively reasonable.

Mr. Sheardown's and Mr. Scott's mistaken and inaccurate "facts," misinterpretations, false assumptions, and lack of understanding were similar and equally numerous.  In short, this so-called investigation was so superficial and so riddled with error that it was an investigation in name only.  It could not have provided the basis for reasonable decision-making that requires reliable, accurate and sufficient factual information.

Finally, and perhaps most important, Teck Cominco's "investigation" of Ms. Brekke's complaint was simply unfair.  Aside from the lack of impartiality and objectivity that informed the investigation due to Mr. Sheardown's active participation, this investigation was not conducted according to fair process.  Among the most obvious lapses in fairness was the fact that Mr. Mitchell was never given an opportunity to understand the charges that were being made against him, either those of Ms. Brekke or the new ones stemming from his alleged "lying" in the hasty, disorganized, and overly brief interview that Mr. Somers and Mr. Sheardown conducted with him.  He was never given the opportunity to understand and respond to Ms. Brekke's perceptions or to Teck Cominco's assumptions about and understandings of what Ms. Webb did.  He was never shown the many emails that were interpreted or misinterpreted by Teck Cominco and that formed the possibly faulty context of Teck Cominco's understanding of his actions and even intentions concerning Ms. Brekke.  In short, Mr. Mitchell was given no opportunity to defend himself against the many potentially faulty beliefs and assumptions, mistaken facts, and ultimately, seriously adverse conclusions that Teck Cominco made about him and that resulted in the termination of his long term employment.

Although it is not a central issue in the current litigation, it should also be at least noted that Teck Cominco's incursions into the email boxes of Ms. Webb and Mr. Mitchell were not authorized; were unfair, and possibly even a legal violation of those individuals' privacy. While employers in the US do obtain access to the emails of employees, they are ordinarily aware, and careful of, the need to have an effective and comprehensive email policy in place well before doing so.  This is because unless the employer takes explicit steps to warn employees that they have no expectation of privacy in even company-provided email, as well as to enforce such policies rigorously and continuously, federal

courts take the view that such emails are private. An employer's incursions, in the absence of such prior and comprehensive precautions, are deemed an invasion of privacy. In some countries, including those such as Canada and European Union members, such inappropriate incursions may even be deemed to be a crime.

In this respect as well, Teck Cominco is out of step with usual and reasonable management practice. Its so-called "email policy" is inapposite and ineffective as far as reducing the expectation of privacy of Red Dog Mine employees. It never tells employees that they have no expectation of privacy in their email. It never tells employees that Teck Cominco may read their email. In fact, it actually implies or states, contrary to what Mr. Scott directed Mr. Sheardown and Ms. Spindler to do, that individual messages will not be monitored. It also says that inappropriate use of email might result in disciplinary action, but then provides examples of misconduct that have nothing to do with the behavior for which Mr. Mitchell and Ms. Webb were so severely punished.

Given the isolated and unusual physical setting of the Red Dog Mine and the fact that email is one of the only ways that those who have access to it have contact with the outside world, it is also impractical to expect that a mere policy, even a properly drafted policy, would be effective, without more, to prevent email abuse. In fact, the evidence appears to be overwhelming that Teck Cominco did not enforce its so called policy, much less some broader "general understanding" that email was to be used only for business purposes. The evidence is also substantial that many employees other than Mr. Mitchell and Ms. Webb, including managers and supervisors, were never disciplined for similar or even worse conduct then that they allegedly engaged in. Certainly, there is no suggestion that employees other than Mr. Mitchell suffered termination or being put on the third step of the discipline process because they violated the Company's email policy.

Teck Cominco's investigation was also manifestly unfair because Teck Cominco's investigators were egregiously casual, or careless, about remembering and documenting the "facts" that they were allegedly finding and the conclusions that they were drawing from those facts. As noted above, the whole reason for workplace investigating and fact-finding in the first place is to gather and to communicate to the decision-maker accurate, reliable, and sufficient information so that the decision-maker can make a fair and reasoned decision. As also noted above, Teck Cominco's investigators were inept, partial, or simply uninterested in and careless about adhering to careful and accurate fact finding methods and processes. As a result, they did not find, record, analyze, and thus could not communicate the requisite appropriate information to General Manager Scott so as to permit fair and treasonable decision-making. Without knowing from appropriate documentation what mistakes were being made, what faulty conclusions were being drawn and what the reasoning behind Teck Cominco's decision-making was, Mr. Mitchell was given no meaningful opportunity to challenge the fairness of Teck Cominco's decision to terminate him. This inability is directly contrary to the fair process and procedure that should always be followed in a proper workplace investigation.

**Opinion 3: Teck Cominco's detailed progressive discipline policy for rank and file employees expressly assures fair and consistent treatment in disciplinary action matters. Whether or not the policy specifically applies to supervisory employees**

**such as Mr. Mitchell, any unfairness or inconsistency in such disciplinary decision-making clearly violates the spirit of Teck Cominco's policy, stated philosophy, and the image of fairness it attempts to project through its disciplinary action policy.**

**Teck Cominco's disciplinary action policy statement also allows for and encourages disciplinary decision-making that is both subjective and is based upon facts and judgments specific to each individual circumstance. While not wrong per se, such discretionary policies are easily subject to being abused by being applied unfairly and inconsistently by supervisors. They may even serve, through unfair application, as a tool for illegal discrimination.**

**The obvious fact that Teck Cominco appears to have at least applied this discretionary discipline policy inconsistently as between Mr. Mitchell, who is black, and numerous employees, including managers and supervisors, who are not black, raises the possibility of unfair or inappropriate application in Mr. Mitchell's case. Given Teck Cominco's failure to take necessary actions to assure fair application of its disciplinary action policy, its failure to engage in usual and reasonable actions to prevent discrimination in its workplace, and the concomitant impact of such failure on fair and reasonable decision-making, Teck Cominco's decision to terminate Mr. Mitchell is suspect as being neither fair nor reasonable. As such, Tech Cominco's decision to terminate Mr. Mitchell violated its own asserted policies and procedures and was well out of keeping with usual and reasonable management practice of similarly situated employers.**

Teck Cominco possesses an extremely detailed progressive discipline policy and program for rank and file employees. The policy is clearly designed to insure fairness in that it specifically states that "If disciplinary action is called for, each employee will be treated fairly." It is also designed to be applied consistently as it states that the "Red Dog Discipline Program will be used to provide a uniform means of handling infractions…" In addition, the policy carefully details a precise, multi-step, and gradually escalating set of penalties for different violations. It also offers precise listings of different types or levels of infractions to guide employees' conduct and to aid supervisors in applying discipline. It contains provisions for several levels of review of disciplinary decisions, and provisions for removing infractions from an employee's record after certain periods of time. Finally, it provides substantial guidance to assist supervisors as to how act fairly in applying discipline. This direction includes a specific checklist of questions supervisors are to ask before undertaking certain types of discipline. The policy tells supervisors, among other things, to:

- Listen to the employee's side of the story;
- Ask whether the employee should have known better;
- Ask whether the employee was unclear in terms of the company rule or policy, or whether the employment offense was extremely minor in relation to length of service and work record, etc.

In short, Teck Cominco clearly intends for its disciplinary action program and decisions, including those involving termination, to be fair. Although the Company may argue that the specifics of its policy do not apply to supervisory employees, the fairness in disciplinary action that Teck Cominco takes pains to promise to employees in general through its detailed disciplinary action program clearly should also govern or inform

25

disciplinary actions concerning employees such as Maurice Mitchell.  In the case of Mr. Mitchell, however, Teck Cominco's disciplinary procedures and decision-making appear to have been anything but fair.

In addition to Teck Cominco's multiple failures of fairness in the investigation described above, there is no evidence that Mr. Mitchell was given any of the opportunities, such as telling his side of the story, that Teck Cominco's disciplinary action policy and process appear to require.  Teck Cominco's investigators and decision-makers do not appear to have asked whether "the employee should have known better" or whether "the employee was unclear in terms of the company rule or policy" in Mr. Mitchell's case.  Certainly, given the clear failures of Teck Cominco to engage in effective efforts to establish, maintain, and communicate clear anti-harassment and discrimination policies, to educate employees about harassment and discrimination, to hold managers and supervisors accountable for following and enforcing Teck Cominco's policies, among other departures from reasonable practice described in Opinion 1 above, it is difficult to imagine that Mr. Mitchell "should have known better" or that he was clear in terms of the company rule or policy that Teck Cominco ultimately says it was trying to enforce. In short, Teck Cominco does not even appear to have followed its own disciplinary action policies, or at least its asserted philosophy, in imposing the ultimate penalty of termination upon Mr. Mitchell. In that sense alone, he was not treated fairly and reasonably by Teck Cominco.

In addition, Teck Cominco's disciplinary program permitted a high degree of discretion to supervisors in making disciplinary decisions.  This included allowing them to decide whether or not to impose discipline at all and to select the disciplinary penalty based upon their assessments of the circumstances rather than according to a rigid and pre-selected set of penalties.   Although a program that allows subjective decision-making by supervisors is not wrong per se, it easily can be abused for personal reasons or even used as a tool for illegal discrimination against an employee because of the employee's race, ethnicity, gender or other protected status.  Employers with such broadly subjective and discretionary disciplinary action systems must accordingly take special care to prevent such abuse or illegal and inappropriate behavior.

Unfortunately, however, there is no evidence in this case that Teck Cominco did take special care to prevent abuse or illegal and inappropriate behavior in connection with its discretionary disciplinary action policy.   In fact, as repeatedly noted above, Teck Cominco failed to engage in virtually any of the actions commonly engaged in by other employers to prevent discrimination and thus unfairness in its workplace.  It did not devote significant resources to the issue, and it did not establish, implement and widely communicate clear, comprehensive policies concerning the Company's anti-discrimination expectations.  It did not educate managers and supervisors or hold them accountable for capably enforcing its policies or addressing the issue of discrimination in the workplace.  It did not teach managers to conduct competent, objective fact-finding prior to decision-making concerning disciplinary action, or prepare existing personnel to meet the challenges of creating a non-discriminatory workplace.

Moreover, as also noted above, there is substantial evidence in this case that Mr. Mitchell and even Ms. Webb, both of whom were black, were treated differently in terms of disciplinary action than other employees, including managers and supervisors, who were

not black. As a number of Teck Cominco's employees testified in their depositions, the Red Dog Mine working environment was permeated with sexual conduct and very possibly sexual harassment.  It was rife with racial and other prohibited "joking", slurs, and derogatory attitudes toward minorities.  Teck Cominco's so-called email policy was not just routinely abused by virtually every employee who had access to the internet, but also routinely abused, at least, in terms of personal and non-business content, particularly sexual content, by managers and supervisors, up to and including the General Manager of the Mine and several second-in-command superintendents.  Yet no other employees ever appear to have received discipline commensurate with that imposed on Mr. Mitchell, and in fact, most employees who engaged in similar or worse conduct, received no discipline whatsoever.   At the least, such evident inconsistency indicates that Teck Cominco did not take appropriate actions to assure that its disciplinary action decisions provided the fairness that its policies and philosophy provided.  It also at least suggests that Teck Cominco did not act to prevent abuse of, or potential discrimination within its discretionary disciplinary action policies.

In such a context, the quality of Teck Cominco's discretionary decision-making concerning imposition of disciplinary action is suspect as being both unfair and unreasonable. In this respect as well, Teck Cominco is out of step with the reasonable and fair practice of similarly situated employers.

September 8, 2009

Respectfully submitted,

D. Jan Duffy