Kenneth Covell
LAW OFFICE OF KENNETH COVELL
712 Eighth Avenue
Fairbanks, AK  99701
Phone: (907) 452-4377
Fax:     (907) 451-7802
E-mail:  kcovell@gci.net

Attorney for Plaintiff

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA AT FAIRBANKS

| | |
|---|---|
| GREGG CONITZ,<br><br>    Plaintiffs,<br><br>  vs.<br><br>TECK ALASKA INCORPORATED,<br><br>    Defendant. | <br><br><br><br><br><br><br><br>Case No. 4:09-cv-20 RRB |

## DECLARATION OF GREGG CONITZ I

I, Gregg Conitz, Plaintiff in the above captioned matter, make my sworn declaration as follows:

1)   I am an adult resident of the State of Alaska and am competent to make the statements below.

2)   The first portion of this Declaration generally tracks the facts in the complaint.

3)   I work for Teck Alaska Inc. at the Teck mine in Northwest Alaska (Teck mine).

4)   I went to work for the mine on or about April 9, 1990. At that time, it was called Cominco Alaska Incorporated.

5) In 2001, Cominco merged with Teck. There have been several name changes throughout the years; but the staff and management have always been from the Teck companies, all of which have had the same home office in Vancouver, BC.

6) It is my understanding that the current corporate format of Teck is as a successor in interest to the prior corporate forms I have worked for; and that each of the corporate forms have had the same duties and obligations between Teck and/or Cominco and NANA Corporation; and between Teck and/or Cominco and its employees.

The Teck mine is wholly owned and operated by Teck Alaska, Inc. I have never heard or seen any reference to any legal ownership of twenty-five per centum or greater of equity of Teck by NANA in any corporate form, be it a joint venture or partnership. At some point after commencing my first lawsuit, Teck began to bald-facedly assert that it was variously a legal joint-venture or legal partnership with NANA. There is no such legal entity to my knowledge. NANA does not own twenty-five per centum or more of my employer Teck.

During discovery in Conitz I, we asked for documentation regarding the legal relationship of Teck and NANA. The defendants objected and the Court only allowed me a limited portion of the 1982 operating agreement. This agreement appears to be a mining lease. It in no way reflects a legal partnership or a legal joint venture.

7) According to the 1982 agreement between NANA and Teck (formally known as Cominco and Teck Cominco), §1.17, Natives of the NANA Region who are entitled to preference "means the stockholders of NANA whose stock carries voting rights, and the descendants and spouses of such stockholders."

8) Teck exercises a NANA Shareholder hire preference in the workplace. I have been aware of the Teck/NANA agreement and shareholder preference for many years. In 1993, when I was trying to get a transfer into the Mine Department, Ron McLean, Human Resources Superintendant, showed me a copy of the agreement and the some or all of the sections I discuss here. I did not see this agreement again until it was received in discovery, pursuant to a Court order on a Motion to Compel in Conitz I.

9) This agreement had always been used as a justification to me to give others workplace opportunities that I had wanted.

10) In situations where there is not a qualified Alaska Native/NANA Shareholder, the 1982 agreement, §10.1.1, states that "such employment shall be offered first to available Natives of the NANA Region who are qualified for the job, or if none are qualified…who meet job-related standards of fitness and ability which indicate that with a reasonable amount of on-the-job training…could satisfactorily perform the job."

11) This Alaska Native/NANA Shareholder preference is continued to this day.

12) Teck Incorporated has a policy of granting an employment preference to Alaska Native/NANA Shareholders. Teck has admitted that this preference exists, at a minimum, to the extent that when two applicants are equally qualified for a job and one is an Alaska Native/NANA Shareholder, then the Alaska Native/NANA Shareholder shall get preference. Teck has also said that this policy, written or not, is "well known around the property".

13) I, Gregg Conitz, am white and of European national origin. Conitz or Konitz is a town which is located in Northeastern Europe in either Germany or Poland. I also have Norwegian and Dutch ancestry.

14) I began mining in 1979 at the age of eighteen and currently have about twenty-eight years of experience in the business. I worked in a small base metal mill and underground mine in Idaho and a fairly large scale surface gold dredging operation in Nome, Alaska before my current employment at the Teck mine. I have worked in various positions with the defendant.

15) I contacted Cominco Alaska Inc. about employment at the Teck mine prior to its start up in 1989. By 1990, due to the NANA shareholder hiring preference at the mine, I had been unsuccessful in obtaining a job in the Mine Operations Department, despite my mining and equipment operating experience. I then sought other openings and was finally offered a job in the Mill Maintenance department as a Level IV Millwright in the Mill Oiler position starting April 9, 1990. On or about July 2, 1990, I was promoted to Level VI Millwright in the position of Preventative Maintenance Technician.

16) On or about September 1, 1991, I applied for a transfer to the Mine Operations Department through Ron McLean, who was the Human Resources Superintendent at the time. Over the next four years I sought a transfer through Ron McLean and Ted Zigarlick, the Mine Operations Foreman, and was turned down numerous times for Mine Operator positions, which were filled by Alaska Native/NANA Shareholders with no mining experience and little or no equipment operating experience.

17) On or about June 6, 1995, I was offered a position in Mine Operations as a Level III Operator by the Mine Superintendent, Mr. Jim Greenhall. Mr. Greenhall assured me that I would be allowed to progress within the Mine Operations Department on a fair and equal basis without a hiring preference given to Alaska Native/ NANA Shareholders. (Mr. Greenhall is now deceased).

18) In May 1999, I submitted a written application for the Acting Supervisor position. On or about August 10, 1999, the Mine Operations Department Coordinator, Bill Haney, informed me that I was the best qualified applicant for the Acting Supervisor position and would begin receiving supervisory training.

19) On or about September 22, 1999, I was assigned to Level V Operator position in the Mine Operations Department with Cominco Alaska, Inc.

20) The week of December 9, 1999 was the first week I served as the Acting Supervisor, and on or about December 20, 2000, I was assigned to the Level VI Operator position.

21) In January of 2003, there was an opening for a permanent Mine Operations Supervisor. Leo Thomas, an Alaska Native/NANA Shareholder, was appointed as a "temporary" Supervisor in January 2003, and given the full-time appointment in July of that year. Leo had not previously served as Acting Supervisor; and after he started supervising, I was excluded from the position and was never told by management or given any reason why (this is despite the fact that I had been an Acting Supervisor for about three years; and Mr. Thomas had never been an Acting Supervisor). I did not complain or contest the decision at the time as I thought I would have a better chance for the next opening if I kept quiet.

22) In June 2004, Leo Thomas died in a boating accident. From July to November 2004, John Kells, the Mine Operations Foreman, evaluated the applicants for the Mine Operations Supervisor position.

23) Mr. Larry Hanna, who is an Alaska Native/NANA Shareholder, Mr. Martin Parillon, who is not an Alaska Native/NANA Shareholder, and I, Gregg Conitz, am not an Alaska Native/NANA Shareholder, applied for the Mine Operations Supervisor position.

24) On or about November 20, 2004, Mr. Larry Hanna, an Alaska Native/NANA Shareholder, was appointed as Mine Operations Supervisor for Teck Cominco Alaska, Inc., even though I was the most qualified for the position.

25) The evening before the announcement of Mr. Hanna's selection, John Kells, the Mine Operations Foreman, informed me that he had selected me as the best qualified candidate for Mine Operations Supervisor. However, Mr. Kells' decision was overruled by Mr. Rob Scott and/or Mr. Ted Zigarlic (both members of Teck Cominco Alaska, Inc. senior management). Mr. Kells stated that he was told by Mr. Scott and Mr. Zigarlick that he was required to give a hiring preference to an Alaska Native/NANA Shareholder.

26) Because I am not an Alaska Native/NANA Shareholder, I was not selected for the Mine Operations Supervisor position. A less qualified Alaska Native/NANA Shareholder was selected for the position.

27) On or about November 26, 2004, I filed a complaint about the supervisor selection process through the dispute resolution process of Teck Cominco Alaska, Inc. My complaint was reviewed by John Kells, Ted Zigarlick and Rob Scott. No satisfactory resolution of my complaint was had through this process.

28) On or about February 15, 2005, I submitted an application for the Mine trainer position with Teck Cominco Alaska, Inc, after Larry Hanna vacated the position.

29) Mike Baker, an Alaska Native by ancestry and a NANA Shareholder, was given the position in May 2005. Mr. Baker had previously worked at the Teck mine as a Surface Crew Operator and Surface Crew Trainer; but had quit his position several years earlier to pursue other interests. He had no experience in Mine Operations at the Teck mine or any other mine; and had no experience operating most of the equipment used in the mine, at least in a mining type application; and was completely unfamiliar with Mine Operations Department policies, procedures, etc. Mr. Baker was supposed to train people on the day to day operating practices in the pit, but knew nothing of them himself. Mr. Baker quit his position again in 2007.

30) I, Gregg Conitz was more qualified for the position. Because I am not an Alaska Native/NANA Shareholder, I was not selected for the Mine Trainer position.

31) On or about February 8, 2006, I filed a Complaint of Racial and National Origin Discrimination with the U.S. Equal Employment Opportunity Commission (EEOC), regarding the unlawful Native American hiring preference used in favor of Larry Hanna in selecting him for the Mine Supervisor position and Mike Baker in selecting him for the Mine Trainer position. On or about February 23, 2006, the same charge was filed with the Alaska State Commission for Human Rights.

32) During this time, I was working at the Teck mine as an Acting Supervisor.

33) I was initially assigned to duties as Acting Supervisor in December 1999. After filing complaints with the EEOC and the Alaska State Commission for Human Rights, I was

deliberately excluded from my former duties as Acting Supervisor from March 2006 to January 2008. At the time, Mr. Barger had approximately five years of mining work experience and no previous supervisory experience.

34) On or about March 2, 2006, I went for one week of vacation and my regular R&R. When I returned to work on or about March 23, 2006, I found that I had been replaced as an Acting Supervisor by Charles "Chuck" Barger, an Alaska Native/NANA Shareholder. At the time, Mr. Barger had approximately five years of mining work experience and no previous supervisory experience. I was never told by anyone in management why I had been excluded from Acting Supervising; nor did anyone give me a reason why Mr. Barger had replaced me as Acting Supervisor. (*See* para. 37 and 38).

35) Teck Cominco Alaska, Inc. also opened my private letter mail. On or about April 6, 2006, I was at the mine worksite near Kotzebue and received my personal U.S. Postal Mail which had been previously opened and stapled shut. The envelope from my attorney, Mr. Kenneth Covell, was addressed to my home address and had been forwarded to the worksite via the Teck Cominco Alaska, Inc. Anchorage office. The mail person at the worksite stated the envelope had arrived from the Teck Cominco Alaska, Inc. Anchorage office opened and stapled shut.

36) Teck Cominco Alaska, Inc. opened my private letter mail a second time. Between April 6 and April 19, I received another letter from my attorney, Ken Covell, addressed to me and forwarded to me at the mine site. The flap on the back of the envelope appeared to have been glued shut when it was mailed, but had been carefully opened by separating

the glue, and then left open. No note was made on the letter by anyone prior to my receiving it.

37) Mr. Robert Shields, a Mine Department Supervisor at Teck Cominco Alaska, Inc., was my permanent supervisor. On or about May 10, 2006, Mr. Shields agreed with me that I was deliberately excluded from the duties of the Acting Supervising position. Mr. Shields informed me that it had not been his, Mr. Shield's, decision; and that I should discuss it with Warren Draper, the Mine Operation's Foreman. (Mr. Shields is now deceased.)

38) On or about May 17, 2006, Mr. Warren (Butch) Draper, Mine Operations Foreman at Teck Cominco Alaska, Inc., informed me that Mr. Draper was working on getting several Alaska Native/NANA Shareholders, specifically Mr. Baldwin and Mr. Barger, into supervisory positions. Mr. Draper stated that before coming to the Teck mine, he had been mandated or directed to promote Alaska Native/NANA Shareholders into trainer, supervisor, and other management positions inferring that these positions would be without regard to any person of any other race who might be qualified for the same positions. Mr. Draper then stated, in reference to my EEOC complaint that he would have to question the moral character of "someone who would do something like that".

39) The statements of Mr. Draper confirm that I am being retaliated against for asserting my civil rights; and being subjected to hostile environmental harassment. I am being excluded from promotion and development within the company due to the fact that I am white and of European origin and not an Alaska Native/NANA Shareholder. I am being ridiculed for questioning Teck's right to practice a preferential policy with regards to

Alaska Native/NANA Shareholders and for filing the Complaint of Racial and National Origin Discrimination, and the Charge of Discrimination.

40) On or about August 26, 2007, Larry Hanna was promoted to Mine Operations Foreman. This happened less than three (3) years after he was promoted to Mine Operations Supervisor. Mr. Hanna had begun filling in as Mine Operations Foreman while Mr. Draper was off site. This began less than one (1) year after Mr. Hanna received his Supervisor promotion. Mr. Hanna was promoted to Foreman over two other supervisors, Robert Shields and Steve Lozano, both who were not Alaska Native/NANA shareholders; and who both have far more experience than Mr. Hanna.

41) To my knowledge, the position of Mine Operations Foreman was never posted for application.

42) On or about September 1, 2007, I applied for the opening for Mine Operations Supervisor, which had been vacated by Larry Hanna. Jim Baldwin, an Alaska Native/NANA Shareholder, was given the position on or about November 23, 2007. Jim Baldwin was less qualified for the position than me. Larry Hanna, who made the decision of Jim Baldwin for his replacement as Supervisor, had only been in the Mine Operations Foreman position since on or about August 26, 2007. I was excluded from Acting Supervising during this entire time period.

43) On or about January 28, 2008, Mr. Hanna reinstated me to the Acting Supervising position. By this time, Mr. Baldwin had been promoted to Supervisor and Mr. Barger was firmly established as a full-time Acting Supervisor and was regularly assigned to these duties. After I was reinstated to Acting Supervisor, Mr. Barger was always given

preference for the position when he and I were on the same shift. During the period of my exclusion from Acting Supervisor, Marvin Jackson and Darold Sun, both Alaska Native/NANA Shareholders, where used as Acting Supervisors. They also were always given preference for the role of Acting Supervisor when either of them and I were on the same shift, after I was reinstated to Acting Supervisor.

44) In 2008, Mr. Shields was terminated. He had health problems that ultimately proved to be fatal. This created another opening for the Mine Operations Supervisor position. I applied for the position on or about May 24, 2008. On or about July, 25, 2008, Mr. Hanna informed me that the position had been given to Mr. Barger. When I inquired about the reason for Mr. Barger's selection, Mr. Hanna's response was, "Chuck was doing a good job." I then inquired whether there was anything about my performance that rendered me less qualified for the job. Mr. Hanna answered that there was not. I then inquired whether there was anything about Mr. Barger's performance that made Mr. Barger more qualified for the position. Mr. Hanna did not have an answer. Lastly, I inquired whether it was the company's policy to select the most qualified person for the job. Mr. Hanna denied any knowledge of such a policy. Mr. Barger was far less qualified for the position than I. Had Mr. Barger not been assigned to Acting Supervising duty instead of me, Mr. Barger would not have had any supervisory experience. *See* also Conitz Declaration filed in response to sur-reply concerning July 25, 2008 conversation with Hanna.

45) On or about July 27, 2008, I wrote a letter of complaint about the Chuck Barger selection as Mine Operations Supervisor over myself, to the General Manager, John Knapp. I received a response on or about July 31, 2008 that stated "whenever you compete against

others for a supervisor position with Teck Cominco, it is the best qualified applicant that will win the job."

46) Mr. Knapp also stated in his letter, "the mine's NANA shareholder hire policy is not about race and is completely legal."

47) As a proximate result of Defendant Teck's unlawful employment actions and inactions, I have been injured and have suffered past and future economic loss and lost earning capacity, opportunity for further advancement, humiliation, and emotional distress. I am aggrieved by the actions of Teck in discriminating against me on the basis of my race and national origin. Not only have I suffered economic damages; but I am demeaned on a daily basis in my workplace; because my position in the workplace is being judged based upon my race and national origin and not my self-worth.

48) On or about August 30, 2008, I filed a Complaint of Racial and National Origin Discrimination with the U.S. Equal Employment Opportunity Commission (EEOC), regarding the unlawful Native American hiring preference used in favor of Jim Baldwin and Charles Barger in selecting them for the Mine Operations Supervisor positions.

49) I received a right to sue letter on the Baldwin/Barger promotions complaint from the U.S. Equal Employment Opportunity Commission on or about January 30, 2009.

50) I have been married to Karen Conitz since 1992.

## STANDING

51) I am an aggrieved person because my employer Teck Alaska, Inc. at the Teck mine treats me differently because of my race and national origin.

52) At the Teck mine there is a policy of preferential treatment of Alaska Native/NANA Shareholders.

53) This policy at the Teck mine has denied me the benefits of a racially diverse workplace in that I cannot receive fair and impartial treatment due to the fact that I am not an Alaska Native/NANA Shareholder.

54) Some of the limitations of the preferential treatment at the Teck mine are as follows:

   a) Preferential promotion and advancement that is not impartial to me as a non- Alaska Native/NANA Shareholder;

   b) Preferential treatment to Alaska Native/NANA Shareholders for entry level positions. – If I wished to change departments or job type at the Teck mine I would not be considered for any entry level positions. For example I would not be considered for an entry level Electrician position;

   c) Preferential treatment to Alaska Native/NANA Shareholders for inclusion in the Apprentice program. For example as a non- Alaska Native/NANA Shareholder I would not be considered for an entry level Electrician position that would include the Apprentice training to Journeyman. I could only be hired as a Journeyman Electrician;

   d) Preferential treatment to Alaska Native/NANA Shareholders for inclusion in the collage funding program. As a non- Alaska Native/NANA Shareholder I am not eligible for collage funding including a living stipend during my student status. This would also include summer or vacation employment as a student or Intern during my

      years as a student and a permanent position with the company upon achieving my degree;

    e) Preferential treatment to Alaska Native/NANA Shareholders for inclusion in the Drivers Training Program. As a non-Alaska Native/NANA Shareholder I would not have been hired without a valid driver's license. Alaska Native/NANA Shareholders can be hired without a valid driver's license, even when the position is directly related to driving such as a heavy equipment operator; and

    f) Preferential treatment to Alaska Native/NANA Shareholders for sub-standard work performance. For example re-hiring of employees multiple times, who have a history of poor work performance and inability to adhere to basic employment requirements like attendance, and the drug and alcohol policy. Offenders who are Alaska Native/NANA Shareholders that have been terminated for these infractions are allowed multiple opportunities at re-employment. This preference is not allowed to non- Alaska Native/NANA Shareholders if terminated for these infractions.

55) The environment of racial hostility at Teck Alaska Inc. The Teck mine has directly affected me for over 20 years.

56) From the beginning of operation at the Teck mine in 1989, when I first applied for the position as a Heavy Equipment Operator Level 2 or 3, I was unable to obtain this position due to the preference to Alaska Native/NANA Shareholders in the Mine Operations Department.

57) I accepted a position in the Mill Maintenance Department as a Millwright in light of the policy that an inter-department transfer is allowed after one year of employment.

58) For the next 5 years I applied for open positions in the Mine Operations Department and was repeatedly denied the position in preference of Alaska Native/NANA Shareholders.

59) Once I finally obtained a position with the Mine Operations Department I had, and continue to have, difficulty in obtaining advancement due to the preference of Alaska Native/NANA Shareholders regardless of level of experience.

60) I am the only non-Alaska Native and/or NANA Shareholder in my immediate work group of more than 30 employees.

61) The goal of Teck Alaska Inc. is to have 100% Alaska Native/NANA Shareholder hire at the Teck mine.

62) I go to work every day knowing that if, for whatever reason, they can get rid of me, they will have obtained their goal of having at least 100% Alaska Native/NANA Shareholder hire in my immediate department.

63) There is no statement of the preference to Alaska Native/NANA Shareholders in the employee handbook or posted policies. If this preferential treatment of a racial group in the workplace were legal, Teck should post and state these policy's for all employees.

64) I am an aggrieved employee because I have no benefit of the employment preference policy at the Teck mine because I am white and of European national origin.

## **DECLARATION**

I declare under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct to the best of my information, knowledge and belief.

Executed on November 11, 2009.

s/ Gregg Conitz

**CERTIFICATE OF SERVICE**
This is to certify that a copy of the foregoing has been served electronically through ECF to the following attorney(s) and/or parties of the record:

**Sean Halloran**

**Thomas Daniels**

Dated: November 11, 2009
By: s/    Kenneth L. Covell