SEAN HALLORAN
Hartig Rhodes Hoge & Lekisch P.C.
717 K Street
Anchorage, AK 99501
Phone: 907-276-1592
Fax:    907-277-4352
mail@hartig.com

Counsel for Teck Alaska Incorporated

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

GREGG CONITZ,                          )
              Plaintiff,               )
                                       )
vs.                                    )
                                       )
TECK ALASKA INCORPORATED,              )
              Defendant, and           )
                                       )
NANA REGIONAL CORPORATION,             )
              Intervenor Defendant.    )
_____)   Case No. 4:09-cv-00020-RRB

TECK'S OPPOSITION TO CONITZ'S MOTION
FOR INJUNCTION & JURY INSTRUCTION
and
CROSS MOTION FOR SUMMARY JUDGMENT

Conitz has filed a summary judgment motion in which he asks the court to permanently "enjoin Teck from giving any preference whatsoever to shareholders in the workplace" at Red Dog Mine, and to instruct the jury "that any shareholder preference" constitutes "illegal race and/or national origin discrimination". Teck opposes that motion and herein cross moves for summary judgment as to all claims remaining in this litigation.

## Background Facts

A.    **Teck's Hiring Preference For NANA Shareholders.**

As a condition for participating with NANA in the Red Dog Project and operating a mine on NANA land to extract NANA-owned minerals, NANA has required that Teck establish a hiring preference in favor of NANA's shareholders. [Scott Affidavit[1]; Zigarlick Declaration[2]; Somers Declaration; Greene Affidavit.] Consequently, when hiring employees at Red Dog, there are times when Teck gives a preference to NANA shareholders over other qualified candidates. [Id.] This hiring preference is applied when a NANA shareholder is otherwise rated equally with one or more top candidates that are not NANA shareholders. [Id.] In such

---

[1]    Mr. Scott's Affidavit was originally filed in <u>Conitz v. Teck</u>, 4:06-cv-00015 RRB at Docket 100. A true and correct copy is attached as Exhibit 5.

[2]    Mr. Zigarlick's Declaration was originally filed in <u>Conitz v. Teck</u>, 4:06-cv-00015 RRB at Docket 101. A copy is on file in this case at Docket 41-3.

situations, the preference given to NANA shareholders will tip the balance in favor of the shareholder and allow the shareholder to obtain the position. [Id.] In situations where a non-shareholder is rated superior to any other candidate, and in situations where a shareholder is determined to be superior to any other candidate, no preference is warranted or applied. [Id.] Whenever one candidate is deemed superior to other candidates, the top candidate is simply offered the job and hired into the position based entirely on merit. [Id.]

Contrary to the assertion of Conitz, Teck does not discriminate between different classes or groups of NANA shareholders in its preference for NANA shareholders, but applies its preference equally to all shareholders. [Somers Declaration.] Teck does not know or care what class of stock the shareholder may hold, and does not differentiate between those shareholders that may have voting rights and those who don't, or between those who are Alaska Natives and those who aren't. [Id.; e.g. Conitz Declaration at Docket 49-10 (asserting Jim McCutcheon "who is obviously non-native" benefitted from shareholder hiring preference).]

## B.    Teck Has No Hiring Preference Beyond NANA Shareholders.

Conitz continually misrepresents to the court and others that Teck has a hiring preference for Alaska Natives. His assertion is false.

The Red Dog Project has been an ongoing venture since 1982. Defendant

Teck Alaska Incorporated began participating in the Red Dog Project in 1988. [Docket 41-3.] Upon joining the Red Dog Project, Teck accepted NANA's requirement that it adopt a hiring preference for NANA shareholders. Since that time, NANA has had the right to enforce Teck's commitment to shareholder hire, and, if it should choose to do so, has a right to require that Teck adopt hiring preferences for successively larger groups of Alaskans in accordance with the terms of an earlier Agreement that NANA entered into with Cominco American Incorporated.[3] [Somers Declaration.] Even Mr. Conitz admits, however, that Teck has never adopted any hiring preference beyond that afforded to NANA shareholders. [Conitz depo. at 39.[4]] When considering the motions at bar, this court should recognize that it is undisputed in this litigation that no hiring preference beyond that favoring NANA shareholders is in existence at the Red Dog Project. [Scott Affidavit; Docket 41-3; Somers Declaration.]

C.    **Conitz Is Unaffected By Teck's Hiring Preference.**

Unlike applicants for entry level positions, who often are found to uniformly

---

[3]    NANA is charged by law with promoting the welfare of not only its shareholders, but also those who are dependents of its shareholders and Natives living within the region is serves. [E.g. 43 USC § 1606(r).]

[4]    Relevant excerpts of the Conitz deposition transcript are attached hereto as Exhibit 4.

meet relevant qualification standards,[5] the qualifications of candidates for

management and supervisory positions tend to very considerably, such that there

is typically one candidate who is found better qualified than others. [Somers

Declaration.] As a result, it is rare that the shareholder hire preference is invoked

to "break a tie" and tip the balance in favor of one managerial or supervisory

candidate over another. [Id.] This case is not the exception.

Barger is only one of four individuals who were hired or promoted into

exempt positions working within the department in which Conitz works since the

time that Conitz last filed suit in federal court. [Hanna Declaration.] The other

individuals are Martin Parillon, Jim Baldwin, and James Matosich. [Id.] Mr.

Baldwin is a NANA shareholder, but neither Parillon nor Matosich are NANA

shareholders. [Id.] Mr. Larry Hanna was given responsibility to make the hiring

decision with respect to three of these four positions, and a committee comprised of

Mr. Hanna and two others made the decision in the fourth instance. [Id.] No hiring

preference was applied for the benefit of any of the candidates for any of the four

positions that were filled. [Id.] The individuals who received the promotions were

in each instance found to be better qualified than any other applicant. [Id.]

Because the successful candidates were each determined to be better qualified than

---

[5]    It is common that applicants for entry level positions are rated equally.
Consequently, the shareholder preference is frequently applied when hiring entry
level employees. [Somers Declaration.]

any of the shareholders and/or non-shareholders with whom they competed, there was never an instance where it would have been appropriate to apply the preference for NANA shareholders. [Id.] The fact that half of the individuals who were hired or promoted happen to be NANA shareholders is merely fortuitous.

Mr. Conitz has never yet been affected by any hiring decision that involved Teck's preference for NANA shareholders. [Somers Declaration.] Given that Conitz is typically found to be unqualified for the positions he seeks, it is highly unlikely that Teck's hiring preference will affect him in the future. [Id.]

D.    **Procedural History.**

This is the second time that Mr. Conitz has brought his dissatisfaction with Teck's relationship with NANA before this court. (Since 2006, Conitz has also filed three complaints with the EEOC and two with the Alaska State Commission for Human Rights, as well as one appeal to the Ninth Circuit Court and one to the Alaska Superior Court.) In Conitz v. Teck, 4:06-cv-00015 RRB, Conitz asked this court -- just as he does here -- to declare that any hiring preference in favor of NANA shareholders at the NANA-owned Red Dog Mine constitutes unlawful discrimination on the basis of race in violation of Title VII, AS 18.80, and 42 USC § 1981.[6] Like here, his previous lawsuit sought an injunction to preclude Teck from

---

[6]    The Complaint from Conitz v. Teck, 4:06 cv-015 RRB is on file in this case at Docket 10-2.

preferring NANA shareholders when hiring Mine employees.  [Docket 10-2.]

This court has already granted summary judgment to Teck and NANA on the basis of res judicata with respect to all claims in the current complaint except those in Counts IV, VI, and VIII of the Complaint.  [Docket 48.]  Accordingly, and unless directed otherwise by the court, Teck will disregard Conitz's motion with respect to those issues as to which the court has already granted summary judgment.


## LEGAL STANDARDS

### A.    Standards For Issuance Of An Injunction.

Preliminary injunctions are granted without a full adjudication on the merits while permanent injunctions only take effect as part of a final judgment. Charles Alan Wright & Arthur R. Miller, *11 Federal Practice & Procedure* § 2947 (2d ed. 1995).

The United States Supreme Court's decision in <u>Winter v. Natural Resources Defense Council</u>, 129 S.Ct. 365, 374, (2008) has clarified the standard for issuing preliminary injunctions in federal court.  The Court reiterated that a plaintiff seeking a preliminary injunction "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  <u>Id</u>.  In this regard, the standard for a preliminary injunction is

essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success. Id. at 381. The <u>Winter</u> Court rejected as "too lenient" the Ninth Circuit Court's prior formulation of the standard, under which a plaintiff could show just a possibility of irreparable harm yet still obtain preliminary relief if he showed a strong likelihood of success on the merits. Id. at 367. When articulating the applicable standard, the Court reaffirmed that "A preliminary injunction is an extraordinary remedy never awarded as of right" but "may only be awarded upon a clear showing that the plaintiff is entitled to such relief". Id. at 367, 376.

## B.    Summary Judgment Standards.

Under Fed.R.Civ.P. 56(c), summary judgment is appropriate where there is "no genuine issue as to material fact," and the moving party is "entitled to judgment as a matter of law." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250-51 (1986); <u>In re: Apple Computer Securities Litigation</u>, 866 F.2d 1109, 1112 (9th Cir. 1989). Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Lujan v. National Wildlife Federation</u>, 110 S.Ct. 3177, 3186 (1990).

A party seeking summary judgment need not disprove claims for which his

opponent bears the burden of proof.  Celotex Corp. v. Catrett, 477 U.S. 317, 323

(1986).  The moving party "need provide nothing more than a reference to those

materials on file in the case which support the movant's belief that there is an

absence of any genuine issue of material fact." Musick v. Burke, 913 F.2d 1390,

1394 (9th Cir. 1990).  There is no issue for trial unless there is sufficient evidence

favoring the non-moving party for a jury to return a verdict for that party.

Anderson, 477 U.S. at 249; Bukoskey v. Walter W. Shuman, 666 F. Supp. 181, 185

(D. Alaska 1982).


## ARGUMENT

### A.    It Is Unclear Whether Conitz Seeks A Permanent Or Preliminary Injunction.

Conitz does not anywhere address the standards that he must meet to obtain

injunctive relief, and does not anywhere suggest what standards he is obligated to

meet in order to obtain summary judgment.  He variously describes the relief he

requests as "an order holding that any preference based on Alaska Native/NANA

Shareholder status is a violation of the laws of the United States and the State of

Alaska" and as requests that the court:

> 1) Forever enjoin Teck from giving any preference whatsoever to
> shareholders in the workplace at its mine in Northwest Alaska;
> and
> 2) Issue a jury instruction stating that any shareholder
> preference in the Teck workplace is illegal race and/or national

origin discrimination.

[Docket 49 at 77, 84.]

Where Conitz asks that the court now "forever enjoin" Teck, it appears to be a request for a permanent injunction. However, where Conitz simultaneously seeks a jury instruction, he suggests that he is not yet seeking a final judgment. Since preliminary injunctions are granted without a full adjudication on the merits and since permanent injunctions only take effect as part of a final judgment,[7] Teck assumes that Conitz has no clear understanding of injunctions generally. Teck does recognize that Conitz's motion is a request for summary judgment masquerading under a different name, and asserts herein that Conitz is not entitled to summary judgment but that summary judgment should be entered against him, and that Conitz is not entitled to either a preliminary injunction or a permanent injunction.

**B.    Not Only Is Conitz Not Likely To Prevail On The Merits, Teck Is Entitled To Summary Judgment.**

Since 2006, Conitz has brought three EEOC complaints, two district court lawsuits, one 9th Circuit appeal, two complaints before the Alaska State Commission for Human Rights, and one Superior Court appeal against Teck, each seeking a declaration that Teck's hiring preference for NANA shareholders is

---

[7]    Charles Alan Wright & Arthur R. Miller, *11 Federal Practice & Procedure* § 2947 (2d ed. 1995).

Teck Opposition to Injunction / Cross Motion for Summary Judgment
*Conitz v. Teck & NANA*, 4:09-cv-00020-RRB

unlawful on its face.  No court or agency has agreed with him yet.

The remaining claims in the case at bar are that Conitz was discriminated against when Mr. Barger was promoted and Conitz was not.  The Alaska State Commission for Human Rights has already examined this claim and found that there are no facts to support the allegations of discrimination.  [Docket 22-2.]  Where Conitz's claims here duplicate those he presented to the Human Rights Commission, the Commission's determination alone is sufficient to show that Conitz is not likely to prevail on the merits, and to the extent his motion is intended to be a request for a preliminary injunction, his request must be denied.

Not only is Conitz not likely to succeed on the merits, but as to every issue presented in this litigation, and as explained below, Teck is entitled to judgment as a matter of law.  Conitz's motion for an injunction, whether permanent or peliminary, should be denied.

1.    **Conitz Cannot Establish A Prima Facie Case.**

a.    **Teck Is Entitled To Judgment On The Claims For Discrimination Relative To The Barger Promotion.**

To establish a prima facie case of discrimination, whether under federal or state law, Conitz "must show that (1) the complainant belongs to a protected class; (2) the complainant applied for and was qualified for a job for which the employer was seeking applications; (3) the complainant was rejected despite the

complainant's qualifications" and, "if an employer has not left the disputed position open, and has instead hired someone else, the fourth element of the prima facie case is the hiring of an individual not within the same protected class as the complainant." Raad v. Alaska State Comm'n for Human Rights, 86 P.3d 899, 904 (Alaska 2004). Conitz cannot meet the second or third prongs of his prima facie case.

Conitz has never been affected by Teck's preference for NANA shareholders. [Somers Declaration.] To the contrary, Conitz hasn't been promoted to any of the supervisiory positions that he has sought over the years because Conitz isn't qualified. [Id.; Hanna declaration, Docket 41-3.] He simply does not possess the skills and attributes that Teck desires. [Id.] Where Conitz is not qualified for the positions at issue, he cannot establish the second or third elements of his prima facie case, and Teck is entitled to judgment as a matter of law.

Mr. Barger was the successful candidate for a supervisor position because his leadership abilities "were superior to" those of Conitz and other candidates, because he was "most adept in making the best use of people and equipment", and because he "has demonstrated superior management skills". [Hanna Declaration; Exhibit 1.] In short, he was more than just qualified; he was better qualified than any other applicant. [Id.]

Conitz, on the other hand, while eligible to apply for supervisor positions in

exactly the same manner as every other person who may be eligible to work in the United States, was determined by Mr. Hanna to be entirely unqualified for the job. [Hanna Declaration.] In large measure, Hanna based his decision on Conitz's poor attitude, lack of leadership abilities, failure to be a team player, history of mediocre performance, and his failure to demonstrate that he has the skills that Teck was seeking. [Id.]

Race played no role in the decision to promote Barger. [Id.] Because Barger was found to be more qualified than any other candidate against whom he competed, Teck's preference for NANA shareholders was not a factor in that promotion. [Id.]

As a matter of law, there is no basis for a claim of unlawful discrimination with respect to a hiring decision when the most qualified candidate is selected over an unqualified candidate. When a hiring or firing decision is based upon a "lack of proper qualifications", the decision is legitimate and non-discriminatory. Coleman v. Quaker Oats Co., 232 F.3d 1271 (9th Cir. 2000); Sakellar v. Lockheed Missiles & Space Co., 765 F.2d 1453 (9th Cir. 1985). Teck is entitled to judgment as a matter of law, and summary judgment should be granted accordingly.

**b.    Conitz Makes No Attempt To Establish A Prima Facie Case Relative To Disparate Treatment Claims.**

According to Conitz, he is white and of European national origin, and comes

from a town that "is located in Northeastern Europe in either Germany or Poland".[8] [Docket 49-8.] He asserts as a consequence that he is therefore entitled to a ruling "stating that any shareholder preference in the Teck workplace is illegal race and/or national origin discrimination". [Docket 49 at 84.]

The fact of the matter is that Conitz offers absolutely no factual basis for asserting that Teck discriminated against Europeans and/or whites with respect to the Barger promotion. [See Docket 49.] To the contrary, he offers only the conclusory assertion that Barger was less qualified than himself, which he draws from the allegation that Barger had less tenure as an acting supervisor than he did. [Doket 49-8 at ¶ 44.] As Exhibit 1 shows, however, the amount of time that someone may have served in any position is entirely irrelevant where Teck is looking for specific talents that Conitz does not possess. [Exhibit 1, Hanna Declaration.] Otherwise, Conitz offers only the unsupported arguments of his counsel. His motion is entirely without merit. As set forth herein, the facts and the law dictate that summary judgment should be entered in favor of the defendants.

---

[8]      Contrary to the assertion in his declaration, Mr. Conitz is not from any European country. [Conitz depo. at 11-13.] To the contrary, Mr. Conitz's national origin is the United States. [Id.] Where an afidavit is implausible, sounds hollow or stands contrary to the evidence, the court has an obligation to ignore it. Radobenko v. Automated Equipment Corp. 520 F.2d 540, 543 (9th Cir. 1975); Babrocky v. Jewel Food Co., 773 F.2d 857, 861 (7th Cir. 1985).

c.    **Conitz Makes No Attempt To Establish A Prima Facie Case Relative To A Disparate Impact Claim, And Has No Standing To Assert Such A Claim.**

Conitz asserts that <u>Bonilla v. Oakland Scavenger</u> controlls the resolution of the claims that he asserts. <u>Bonilla</u> was a disparate impact case.[9] <u>Bonilla</u>, 697 F.2d 1297 (9th Cir. 1982). Disparate impact is a theory applicable to Title VII claims, but not § 1981 claims. <u>Gen. Bldg. Contractors Assn. v. Pennsylvania</u>, 458 U.S. 375, 398 (1982).

Conitz makes absolutely no effort to even suggest that there are any facts that would support a disparate impact claim.[10] Nor can he, for disparate impact is a theory that is unavailable to white males such as himself. <u>Livingston v. Roadway Express</u>, 802 F.2d 1250 (10th Cir. 1986). As the Supreme Court has explained, the objective of Title VII is

> to achieve equality of employment opportunities and remove barriers that have operated in the past to favor an identifiable group of white employees over other employees.

<u>Griggs v. Duke Power Co.</u>, 401 U.S. 424, 430 (1971). Consequently, disparate

---

[9]    In <u>Bonilla</u>, the court determined that offering stock to white employees (having Italian ancestry) but not black or Mexican employees, and then treating those who received stock differently from those who didn't, was unlawful discrimination under Title VII due to its disparate impact on Mexicans and blacks.

[10]    To establish a prima facie case for disparate impact, a plaintiff must (1) show a significant disparate impact on his protected class, (2) identify the employment practice at issue, and (3) show a causal connection between the disparate impact and the challenged practice. <u>Hemmings v. Tidymans Inc.</u>, 285 F.3d 1174, 1190 (9th Cir. 2002). Conitz offers no evidence and makes no effort to establish elements 1 or 3 of his prima facie case.

impact is a theory that is available only when practices that are neutral on their face serve to "freeze the status quo of prior discriminatory employment practices". Id.

Where Conitz does not assert that Teck's hiring preference for NANA shareholders serves to freeze the status quo and effectively favor white employees over others, he is without standing to assert a disparate impact claim. Livingston at 1252.

3.   **Even If Conitz Could Overcome the Hurdle of Establishing a Prima Facie Case, Shareholder Hire Is Neither Discriminatory Nor Illegal.**

In prior litigation between Conitz and Teck, this court determined that Teck's hiring preference for NANA shareholders is lawful and cannot be equated with racial discrimination. [Docket 10-3.] Conitz does not and cannot show that the court was wrong when it previously decided this issue, and he must lose once again.

a.   **NANA Shareholders Are Not A Race-Based Group As A Matter Of Law. The Preference For NANA Shareholders Is Not a Racial Preference.**

In 1971, Congress settled the aboriginal claims of Alaska's Indians, Aleuts and Eskimos. [Pub. L. No. 92-203, 85 Stat. 688 (1971) (The Alaska Native Claims Settlement Act ("ANCSA") is codified as amended at 43 U.S.C. §§ 1601 et seq.).] ANCSA provided for the creation and operation of numerous village and regional

corporations, and NANA is one of the ANCSA Regional Corporations. [43 U.S.C. § 1606(a)(3).] The Ninth Circuit Court has recognized that the statutory organization of certain individuals into ANCSA corporations as shareholders, "though they utilize blood quantum criteria, are clearly political classifications based on the unique non-reservation and non-tribal situation of the Alaska Natives". <u>Alaska Chapter, Associated General Contractors, Inc. v. Pierce</u>, 694 F.2d 1162, 1169 n10 (9th Cir. 1982). Any preference for NANA shareholders is therefore a preference for the political grouping of persons enrolled as shareholders in NANA by ANCSA and not the much larger group of Alaska Natives now living who may or may not have been assigned shares. <u>Morton v. Mancari</u>, 417 U.S. 535 (1974)[11]; <u>Doe v. Kamehameha Schools/Bernice Pauahi</u>, 470 F.3d 827, 849-856 (9th Cir. 2006) (En banc; W. Fletcher, Pregerson, Reinhardt, Paez, and Rawlinson, concurring)[12]. Even if a preference in favor of NANA shareholders was applied to Conitz's detriment (it was not), where such a preference does not amount to race based discrimination as

---

[11]    In <u>Mancari</u>, the Supreme Court determined that the BIA's employment preference for "Indians" was not an unconstitutional racial preference because it was not directed toward the racial group consisting of Indians, but rather was applicable only to the political group consisting of members of federally-recognized tribes, thus excluding some persons who were racially classified as Indians. <u>Mancari</u> at 554 n24. Here, the political group consisting of NANA shareholders similarly excludes most members of the much larger racial groups of Aleuts, Indians and Eskimos who qualify as Alaska Natives.

[12]    In <u>Kamehameha Schools</u>, the concurring opinion pointed out that a preference for any group that is political rather than racial in composition does not violate § 1981 as a matter of law.

a matter of law, an injunction must be denied to Conitz, and summary judgment must be entered in favor of the defendants.

**b.    To The Extent That Teck Contributes Employees To The Red Dog Project, Federal Law Permits It To Favor NANA Shareholders.**

**1.    Teck And NANA Participate In A Joint Venture.**

A joint venture exists under Alaska law when you have "an association of two or more persons to carry out a single business enterprise for profit, for which purpose they combine their property, money, effects, skill, and knowledge." Northern Lights Motel v. Sweaney, 561 P.2d 1176, 1187 (Alaska 1987). "The joint venture may be established without any formal agreement between the parties; it may be implied from the facts or circumstances of the case." Id. "Although each venturer need not exercise actual physical control of the instrumentalities used in the enterprise, each must have a legal right to some voice in the direction and control of the enterprise." Id. Here, the relationship between NANA and Teck is a joint venture. Reich v. Cominco Alaska, 56 P.3d 18, 23 (2002);[13] Somers Declaration; Docket 41-3. Specifically, Red Dog Mine is a Project in which Teck has participated with NANA since March 1988. [Id.] NANA contributes the land and

---

[13]    Cominco Alaska Incorporated and Teck Cominco Alaska Incorporated are each former names of defendant Teck Alaska Incorporated. [Somers Declaration.]

the mineral rights, while Teck contributes capital, operational expertise and operational abilities. [Docket 41-3.] Each contributes additional efforts and knowledge through participation in the Project's management committee. [Id.; Pankowski v. Cominco Alaska, ASCHR C-91-093 (1993).] For its contributions to the Project, NANA receives royalties and is paid 25-50% of the net proceeds in accordance with a regularly increasing schedule. [Id.; Reich at 24.] NANA's equity in the joint venture is currently 25% and will increase to 30% in 2011. [Somers Declaration.]

2.    **Teck Is Exempt From Federal Anti-discrimination Laws To The Extent It Participates With NANA In The Red Dog Project.**

Because NANA's equity in its joint venture with Teck meets or exceeds the threshold established by statute, federal law exempts Teck and other participants in the Red Dog Project from the discrimination prohibitions of federal law when hiring personnel to work at the mine. [43 U.S.C. §1626(g).]

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer to discriminate in hiring practices because of a person's race, color, religion, sex, or national origin. [42 U.S.C. §2000e-2(a).] However, the Act expressly exempted Indian tribes from the definition of employers, so as to permit them to favor Native Americans when hiring. [42 U.S.C. §2000e(b).] In addition, the statute provides that certain non-Indian business entities are also exempt, so as to encourage them

to provide preferential treatment to Natives under certain circumstances.  [See 42

U.S.C. §2000e-2(i).]  Congress extended the privilege for preferential treatment to

Alaska Natives when amending the Alaska Native Claims Settlement Act in 1991

and again in 1992 under the Alaska Land Status Technical Corrections Act.  These

Acts resulted in the following statutory provision:

> a Native Corporation and corporations, partnerships, joint
> ventures, trusts, or affiliates in which the Native Corporation
> owns not less than 25 percentum of the equity shall be within
> the class of entities excluded from the definition of "employer"
> by section 701(b) (1) of Public Law 88-352 (78 Stat. 253), as
> amended, or successor statutes.

[43 U.S.C. §1626(g).]

In developing the legislation contained in ANCSA, Congress was sensitive to

the impoverished condition of Natives and the lack of opportunities for Natives to

improve their conditions.  Hakala v. Atxam Corp., 753 P.2d 1144, 1147 (Alaska

1988).  Section 1626(g) was intended to facilitate Alaska Native shareholder

employment programs by resolving any uncertainty as to the applicability of the

Civil Rights Act to certain business enterprises in which Native Corporations

participate.  [S. Rep. 201, 100th Cong., 1st Sess. at 26 (1987), reprinted in 1987

U.S.C.C.A.N. 3269, 3290.]  According to (then) Senator Frank Murkowski, the

intent of Congress in adopting the ANCSA amendment was to ensure that Alaska

Native corporations and their affiliates were exempted along with Indian tribes

from the anti-discrimination laws of § 2000e(b).  [100th Cong. Rec. S3196 (March

28, 1988).]  Accordingly, federal law serves to promote economic participation by

Native corporations and the employment of Natives in enterprises in which those

corporations participate.  As one court noted, legislative history reveals that the

exemption from Title VII was created for the affected Native peoples

> in an effort to decrease unemployment and in order to integrate
> their people into the affairs of the national community, operate
> many economic enterprises, which are more or less supervised
> by the Indian tribes, the employees serving as apprentices in
> many instances, and as supervisors and regularly employed and
> paid employees in others.

Dille v. Council of Energy Resource Tribes, 801 F.2d 373, 375 (10th Cir. 1986),

quoting 110 Cong. Rec. 13702.  The exemption further allows affected Natives to

control their own economic enterprises and develop their natural resources.  Id.

The Red Dog Project is precisely the type of activity that Congress sought to

encourage when it exempted Alaska Native corporations from the discrimination

laws, because the Project allows NANA the ability to effectively control certain

employment aspects of the economic enterprise in which it participates and thereby

allow its shareholders to obtain employment opportunities that otherwise might not

be available.

NANA is charged by law with providing benefits to and promoting the

health, education and welfare of both its shareholders and the family members of

its shareholders who are not themselves shareholders.  [43 U.S.C. § 1606(r).]

Where Congress provided NANA and other Native corporations with the ability to

provide benefits to Natives and/or the corporations' shareholders and/or the families of their shareholders in the form of employment opportunities, Congress was merely enabling the Native corporations to fulfill their assigned role.

Because the joint venture existing between NANA and Teck which is the Red Dog Project is exempt from federal discrimination laws, Teck's participation in that Project is exempt, including its contribution of personnel like Conitz to that Project. [43 U.S.C. § 1626(g).] This exemption is not limited to Title VII, but extends to § 1981 also. Courts recognize that "it would be wholly illogical to allow plaintiffs to circumvent the Title VII bar against race discrimination claims based on a tribe's Indian employment preference programs simply by allowing a plaintiff to style his claim as a § 1981 suit." Taylor v. Alabama Intertribal Council, 261 F.3d 1032, 1035 (11th Cir. 2001), cert. denied, 535 U.S. 1066 (2002). In this regard, "Given Congress's clear intent to exempt tribes from employment discrimination suits under the more specific later statute, Title VII, and the general rule that specific statutes prevail over general ones, courts have dismissed employment discrimination suits grounded in § 1981." Cohen, *Cohen's Handbook of Federal Indian Law* § 21.02; see e.g. Wardle v. Ute Indian Tribe, 623 F.2d 670, 673 (10th Cir. 1980); Yashenko v. Harrah's NC Casino Co., LLC, 352 F. Supp. 2d 653, 664 (W.D. N.C. 2005), aff'd, 446 F.3d 541 (4th Cir. 2006); see also Stroud v. Seminole Tribe of Florida, 606 F. Supp. 678, 680 (S.D. Fla. 1985).

Teck's hiring preference in favor of NANA shareholders is permissible as a matter of law and summary judgment must be granted to the defendants on Conitz's discrimination claims.

**3.    Alaska's Human Rights Commission Has Determined That Teck's Preference For NANA Shareholders Is Lawful.**

The Alaska State Commission for Human Rights is charged with enforcing Alaska's anti-discrimination laws.  [AS 18.80.060; 18.80.110 -.130.]  The Commission also acts on behalf of the EEOC to enforce Title VII.  [E.g. Pankowski v. Cominco Alaska, ASCHR C-91-093 (1993).]  The Human Rights Commission has determined that the hiring preference given by Teck to NANA shareholders at Red Dog does not constitute unlawful discrimination under AS 18.80 or federal Title VII. Pankowski v. Cominco Alaska, ASCHR C-91-093 (1993).  Beyond Red Dog, the Commission consistently recognizes that all ANCSA corporations and their affiliates are entitled to adopt hiring preferences favoring relevant Native corporation shareholders.  E.g. Mortenson v. Alutiiq Mgt. Svs., ASCHR C-04-095 (2005).[14]

The Commission's decision is entitled to deference by this court.  See Chevron

---

[14]    True and correct copies of the Pankowski and Mortenson decisions are filed herewith as Exhibits 2 and 3 for the convenience of the court.

U.S.A. v. Natural Res. Def. Council, 467 U.S. 837, 842-43 (1984).[15]   In this regard,

when an administrative agency's interpretation of a statute "involves agency

expertise or the determination of fundamental policies within the agency's statutory

function" courts should "determine whether the agency's decision is supported by

the facts and has a reasonable basis in law, even if we may not agree with the

agency's ultimate determination." State, Dept. of Admin. v. Bachner Co., Inc., 167

P.3d 58, 60-61 (Alaska 2007).

Where the Human Rights Commission has determined that a hiring

preference for NANA shareholders at Red Dog is permissible, the State

discrimination claims are without merit and judgment should be entered in favor of

Teck accordingly.

**4.    If State Law Did Not Allow The Shareholder Hire Preference, It Would Be
Preempted.**

In Malabed v. North Slope Borough, 335 F.3d 864 (9th Cir. 2003), the court

examined the Title VII exemption for non-Indian businesses that operate adjacent

to Indian rservations and concluded that the provision at issue, although intended

---

[15]      Chevron directs that courts should determine whether an agency's
interpretation of a statute is based on a permissible construction of that statute.  If
the agency's interpretation is within its authority and not otherwise arbitrary or
contrary to law, courts should defer to the agency.  See generally, I Kenneth Culp
Davis and Richard J. Pierce, Jr., *Administrative Law*, §§ 3.1-3.6 at 107-31 (3d ed.
1994).

to "assure our American Indians of the continued right to protect and promote their own interests and to benefit from Indian preference programs now in operation or later to be instituted",[16] "is not part of a comprehensive affirmative scheme like ANCSA" and therefore does not pe-empt the equal protection clause of Alaska's constitution.  Malabed at 873.  Conitz then cites Malabed and Dawavendewa v. Salt River Project, 154 F.3d 1117 (9th Cir. 1988) for the proposition that "Congress simply has not authorized" Native Corporations to prefer their shareholders.  He is wrong.

ANCSA expressly authorizes Native Corporations and the businesses in which they participate to serve the interests of their shareholders and other Natives:

> The authority of a Native Corporation to provide benefits to its shareholders who are Natives or descendants of Natives or to its shareholders' immediate family members who are Natives or descendants of Natives to promote the health, education, or welfare of such shareholders or family members is expressly authorized and confirmed.

[43 USC § 1606(r); see also 43 U.S.C. §1626(g) (excluding Native Corporations "and corporations, partnerships, joint ventures, trusts, or affiliates in which the Native Corporation owns not less than 25 percentum of the equity" from application of civil rights law).]

---

[16]     Malabed at 871-872, quoting 110 Cong. Rec. 13702 (Senate, June 13, 1964).

This case does not involve the Civil Rights Act's exemption for businesses operating adjacent to Indian reservations, but does involve the ANCSA's mandate that Alaska Native Corporations use their business enterprises to benefit their shareholders. ANCSA is precisely the type of comprehensive, affirmative, congressionally mandated scheme that serves to pre-empt state law. See Malabed. Even if Alaska law did not allow Red Dog Mine's preference for NANA shareholders (and Conitz is wrong when he asserts that Alaska law precludes it) any such prohibition would be pre-empted by ANCSA.

## C.    Conitz Will Not Suffer Irreparable Harm In The Absence Of Injunctive Relief.

The shareholder hire preference has never yet been applied to any hiring decision that has affected Conitz. [Somers Declaration; e.g. Docket 10-3.] Altering the status quo with an injunction will not change that fact. Conitz is typically rated as the least qualified applicant for the jobs he seeks. [Somers Declaration; Hanna Declaration.] With or without an injunction, Conitz will be free to retain his employment at Red Dog, and with or without an injunction, Conitz will still be free to apply for positions that he is not qualified to obtain. [Hanna Declaration.] With or without an injunction, it is likely that Teck will continue to not select him for the positions he seeks on the basis that he is substantially less qualified than other candidates against whom he regularly competes. [Somers Declaration.]

Conitz has made absolutely no showing that any failure to issue an injunction in this case will cause him to suffer irreparable harm. His motion must be denied accordingly.

## 1.    Conitz Has An Adequate Remedy At Law.

Injunctive relief is not appropriate when money damages would compensate the plaintiff for his loss. Flynt Distributing Co., Inc. v. Harvey, 734 F.2d 1389, 1395 (9th Cir.1984). In only the very rarest of circumstances, therefore, does economic loss constitute an irreparable injury for purposes of obtaining injunctive relief. Colorado River Indian Tribes v. Town of Parker, 776 F.2d 846, 850 (9th Cir.1985). The Supreme Court, for example, has recognized that "loss of income" (the harm that Conitz claims where he asserts he was denied a promotion) "does not usually constitute irreparable injury". Sampson v. Murray, 415 U.S. 61, 90 (1974).

When considering the "irreparable harm" prong of the test for granting injunctive relief, the court must keep its focus on the term "irreparable". Id. "Mere injuries, however substantial", simply "are not enough" to constitute irreparable harm justifying an injunction. Id. When, as here, the possibility exists "that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation" the relevant factors weigh "heavily against a claim of irreparable harm". Id.

In his complaint, Conitz seeks "actual and\or compensatory damages, in an amount to be determined at trial". [Docket 1 at ¶ 116 .] Accordingly, if any facts or law supported Conitz's claims, money damages would be available to him. Consequently, there is no basis for issuance of an injunction even if his claims had merit, and his motion should be denied accordingly.

**D.    Conitz Cannot Show That The Equities Tip In His Favor.**

**1.    Conitz Won't Benefit From An Injunction.**

Conitz is a mediocre employee with a poor attitude and few skills of the type that Teck seeks in those it invites to join its management team. [Hanna Declaration; Somers Declaration.] He has never once failed to obtain a promotion at Red Dog as a result of the application of Teck's policy favoring NANA shareholders. [Somers Declaration.] The simple fact is that the policy favoring NANA shareholders is only applied when two or more top-ranking candidates are found to be equally qualified. [Id.] In that instance, and in that instance only, shareholder status would be the tie-breaker if one of the top ranked candidates was a shareholder. [Id.] Conitz, who has steadfastly been the bottom-ranked candidate for every position he has sought since he first began working in Mine Operations [Id.], will not benefit if the court preliminarily or permanently enjoined Teck from applying a preference to NANA shareholders. There are no facts to suggest that

Conitz would suddenly become qualified for the positions he seeks, and it is almost inconceivable that he could somehow rise above the competition to become the most qualified applicant for any supervisory or management level position that may come open when he has so often proven himself to be unqualified.

Where the requested injunction would not serve to enable the relief that Conitz claims to want, the equities do not favor Conitz, and the requested injunction should be denied.


## 2.    An Injunction Would Require Teck To Breach Its Obligations To NANA And Interfere With Teck's Employment Contracts.

It is undisputed that Teck accepted NANA and Cominco American's terms when it joined them in the Red Dog Project.  It is undisputed that those terms included a requirement that Teck apply a hiring preference in favor of NANA shareholders.  [Somers Declaration.]  Any injunction precluding Teck from applying a hiring preference in favor of NANA shareholders would necessarily place Teck in breach of its contractual obligations to both NANA and Cominco American. [Somers Declaration; Greene Affidavit.]

In addition to breaching its obligations to NANA, an injunction as requested by Conitz would interfere with the obligations that Teck owes to NANA's shareholders as a consequence of its agreement with NANA.  The fact of the matter is that qualified NANA shareholders are entitled as of right to obtain the jobs that

they receive through the application of Teck's preference for NANA shareholders. [Id.] Collectively, NANA shareholders are effectively a third party beneficiary of Teck's agreement with NANA. Teck anticipates that 60 or more individuals will be hired at Red Dog within the next year as a result of its preference for NANA shareholders.[17] [Somers Declaration.] Necessarily, if Teck is enjoined from applying a shareholder hire preference, some or all of the NANA shareholders who have a right to obtain employment at Red Dog may be denied that right. [Somers Declaration; Greene Affidavit.]

Unquestionably, the granting of any injunction requested by Mr. Conitz would create substantial fairness issues with respect to NANA, Teck, NANA's shareholders, and those job applicants who do not own NANA shares (especially where non-shareholders who may be hired only as a result of a wrongful injunction might have to have their employment terminated upon lifting of the injunction at the conclusion of this litigation).

Where Conitz would not himself benefit from any suspension of the shareholder hire preference, and where issuance of an injunction would cause Teck to be in breach of contractual obligations and may well wreak havoc with respect to

---

[17]    A typical entry level operator at Red Dog is paid $18.65 per hour and works 11.5 hours per day, seven days a week for two weeks on followed by one week off, earning total wages of $65,317.18 per year. Thus, the annual payroll for 60 entry level positions is $3,919,030.80 plus benefits. To the extent that persons are brought in to fill positions above entry level, the cost escalates.

the lives of as many as 60 or more NANA shareholders[18], this court should recognize

that the equities simply do not favor issuance of an injunction.

E.    **An Injunction Is Contrary To The Public Interest Where Shareholder Hire Comports With Congressionally Declared Public Policy.**

ANCSA "was drafted from the beginning with profitable business activities

and resource developments in mind". [Linxwiler, *The Alaska Native Claims*

*Settlement Act at 35: Delivering on the Promise*, 53 Rocky Mtn. Min. L. Inst. 12 at

4 (2007).] In this regard, "ANCSA was intended to be a development tool as much

as a claims settlement, a way for one of America's poorest minority groups to escape

from poverty on a self-determined path".[19] [Colt, *Alaska Natives and the "New*

*Harpoon": Economic Performance of the ANCSA Regional Corporations*, 25 J. Land

Resources & Envtl. Law 155, 157 (2005).] Accordingly, "The land grant under

ANCSA was a generous one, clearly intended to exceed the subsistence needs of

Natives and to give them a significant economic stake in the future development of

---

[18]    "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.". Winter v. Natural Resources Defense Council, No. 07-1239, Slip at 14 (129 S.Ct. 365, 374, 172 L.Ed.2d 249) (2008).

[19]    When settling the Native claims through ANCSA, Congress recognized that those who were enrolled as shareholders in the Native corporations were "among the most disadvantaged citizens of the United States in terms of income, employment, educational attainment, life expectancy, health, nutrition, housing, and every important indicator of social welfare". [Senate Rep. No. 92-405, at 72 (1971).]

Alaska." <u>Chugach Natives, Inc. v. Doyon, Ltd.</u>, 588 F.2d 723, 731 (9th Cir. 1978)

(citing H.R. Rep. No. 92-523 (92d Cong., 1st Sess. 5; reprinted in *U.S. Code Cong. &*

*Admin. News* pp. 2192, 2195 (1971)). As reported by the House Committee on

Interior and Insular Affairs, it was "very important" that Alaska's mineral deposits

be made available to Native Corporations for development through mining to

benefit their shareholders. [H.R. 92-523 (Sept. 28, 1971).]

ANCSA expressly authorizes Native Corporations and their joint ventures to

serve the interests of their shareholders and other Natives:

> The authority of a Native Corporation to provide benefits to its
> shareholders who are Natives or descendants of Natives or to its
> shareholders' immediate family members who are Natives or
> descendants of Natives to promote the health, education, or
> welfare of such shareholders or family members is expressly
> authorized and confirmed.

[43 USC § 1606(r); <u>see</u> <u>also</u> 43 U.S.C. §1626(g) (excluding Native Corporations "and

corporations, partnerships, joint ventures, trusts, or affiliates in which the Native

Corporation owns not less than 25 percentum of the equity" from application of civil

rights law).]

The mining of ANCSA lands, as occurs at Red Dog and elsewhere, counters

the economic challenges that rural villages face, by stimulating the job market and

providing greater financial self-sufficiency to a growing number of the Native

Corporation shareholders who comprise 82% of Alaska's rural population. [See

Alaska Native Policy Center, *Our Choices, Our Future: The Status of Alaska*

*Natives 2004* at 5; Berardi, *Natural Resource Policy, Unforgiving Geographies, and Persistent Poverty in Alaska Native Villages*, 38 Nat. Resources J. 86- 88 (1998); Huskey, *Alaska's Village Economies*, 24 J. Land Resources & Envt'l L. 435, 437, 440-43 (2004).]

Conitz makes no argument that ANCSA is unconstitutional. Where ANCSA "expressly authorized and confirmed" a public policy of allowing Native Corporations (including NANA) to use the economic enterprises in which they participate to benefit their shareholders, this court must recognize that the public interest is best served by denying an injunction.

## F.    If An Injunction Issues, Conitz Should Post At Least A $6,000,000 Bond.

"The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." [Fed.R.Civ.P. 65(c).]

Teck anticipates that there are likely to be 60 or more positions filled within the coming year in which in which its preference for NANA shareholders will be a decisive factor. [Somers Declaration.] (Because the shareholder preference is applied only when candidates are rated equally, it primarily comes into play when Teck is filling entry level positions. [Id.]) Payroll for those positions between the anticipated date(s) of hire and the end of 2010 is likely to exceed $1,877,000. [Id.]

For the year 2011, payroll for those positions is likely to be between $3,920,000 and $4,289,000. [Id.]   If Teck is wrongfully enjoined from applying its shareholder hire preference, individuals who have a right to obtain employment at Red Dog will be denied it, while others having no right to Red Dog employment may obtain it.  The only remedy that would exist for such a situation upon the lifting of the injunction would be to terminate the employment of persons who were hired in violation of the hiring preference and replace them with the appropriate NANA shareholders. [Somers Declaration.]  If, upon the lifting of a wrongful injunction, Teck is required to make the individuals who are wrongfully denied employment whole, the cost will likely be between $5,797,000 and $6,166,000, plus interest[20], assuming that the injunction is in place for not more than two years.  [Id.]  Accordingly, any injunction that the court might enter should be conditioned upon Conitz posting a bond in the amount of not less than $6,000,000, to cover damages in the event that the injunction turns out to have been wrongfully issued.

Dated this 13th day of November, 2009.

HARTIG RHODES HOGE & LEKISCH, P.C.
Attorneys for Teck Alaska Incorporated


By: _____
   Sean Halloran

---

[20]     At 3.5%, one year of interest on $6,166,000 amounts to $215,810.

CERTIFICATE OF SERVICE

I hereby certify that on the 13th day of November, 2009
a true and correct copy of the foregoing was served
on Kenneth Covell and Thomas Daniel by electronic
means through the ECF system as indicated on
the Notice of Electronic Filing.

*Becky Lewis*

Becky Lewis
Hartig Rhodes Hoge & Lekisch PC